STATE EX REL. OWEN, Attorney General, vs. DONALD, Secretary of State.

*May 28, 1914—February 12, 1915.*

SUPREME COURT.    (1, 2) *Original jurisdiction: Broadening issues: Bringing in parties.* (7, 18, 54, 65) *Judicial questions.* (68) *Judgments and orders: Reference.*

CONSTITUTIONAL LAW: AMENDMENTS: STATE DEBT: INTERNAL IMPROVEMENTS: FORESTRY LAWS: TRUST FUNDS: TAXATION: POLICE POWER: COUNTY GOVERNMENT.    (3–8) *Amending constitution: Power of legislature: Limitations: Procedure.* (9–17) *State indebtedness: Power to incur: Limitations: Evidences of state debt: Contracts to purchase land: Moneys borrowed from trust funds: Refund by U. S.*    (18–22, 60) *"Works of internal improvement:" What are.* (21, 53, 54, 65) *Forest reserves: Creation.* (66) *Reforestation and afforestation.* (12, 22–33, 61, 67, 68) *Trust funds and lands: Control and disposition: Commissioners of public lands: Powers: Conservation: Withdrawal of lands from sale: Dedication to educational purposes: School lands proper: Swamp lands: Drainage: Legislative control: Confusion with other funds and lands: Restoration: Lien on other funds: Procedure: Assessment for taxation.* (34, 35, 40) *Construction of constitution: Intent.* (36–53, 55, 66) *Taxation: Appropriations: Limitations on legislative power: State expenses: Annual estimates: Public purposes.* (53–66) *Police power: Scope and limitations.* (69, 70) *Special laws for assessment and collection of taxes: Validity: Assessment of trust lands: Local self-government: Tax-title lands: Limiting right of disposal: Uniformity in county government: Taking property without compensation: Equality.*

1. Given a subject of litigation within the original authority of the court, involving some question of great public importance and an appropriate application to afford jurisdiction of adversary parties, the court may entertain it and permit or order the scope thereof to be broadened as such importance may require, without regard to change of mere form of action or the nature of the appropriate redress.

2. In the circumstances stated, if the application exhibits a subject of controversy, however narrow, the court may, and, if great public interest demands it, will, upon application of a party to the record, or on its own motion, permit or order any broadening of issues or addition of parties advisable to bring into the litigation all questions so connected with the initial matter as to constitute an entirety.

3. To amend the fundamental law the prescribed procedure must be followed with substantial accuracy. *State ex rel. Postel v. Marcus, post,* p. 354.

4. In proposing an amendment to the constitution the legislature acts ministerially under a grant of power defining its limitations and manner of its exercise, so that it should observe the restraints and particulars of the grant. *State ex rel. Postel v. Marcus, supra.*

5. A legislative proposal to amend the constitution, in order to be submitted to the electors, must have been agreed to by each house of one legislature, be entered upon their journals in understandable connection with a recorded yea and nay vote, showing that a majority of all members of each house favored the same, and there must be a like recorded vote at the next legislature as to the precise question agreed to before, and though entry on the journals is not necessary, it is advisable.

6. Passage of the ordinary bill directing submission of a proposed amendment of the fundamental law to the people, reciting that it has been agreed to by the two houses at two sessions of the legislature, does not take the place of the constitutional procedure. *State ex rel. Postel v. Marcus, supra.*

7. Whether a purported amendment to the fundamental law is such in fact, is a judicial question which the court may determine when it appears, from any viewpoint, involved in a controversy submitted for decision, and must determine, in case of its being vital to the final result. *State ex rel. Postel v. Marcus, supra.*

8. A judicial determination that the prescribed constitutional steps are essential to efficiency in submitting to the people a proposal to amend the constitution, does not involve technical adherence to form,—only that the sovereign command must be obeyed.

9. An agreement between the state and another, in the form of an

ordinary land contract, the former promising, absolutely, to pay the purchase price of property at stated times in consideration of the promise to sell, creates state debt, within the meaning of sec. 4, art. VIII, of the constitution and is prohibited thereby.

10. Such an instrument, as in number 9, is evidence of state debt, within the meaning of sec. 9, art. VIII, of the constitution, and is prohibited thereby.

11. A legislative appropriation of money to buy land, purporting to confer authority to contract therefor and pay as money becomes available, does not include power to obligate the state upon fixed, time, interest-bearing, absolute obligations.

12. The commissioners of public lands, under the constitution, constitute an artificial person, intrusted with control of the trust fund lands and trust funds as therein mentioned, though the control, as to lands is restricted "to school lands proper" and university lands, except as otherwise provided by the legislature, and in case of the state obtaining money from such fund, in form, by borrowing, the relations of debtor and creditor are thereby created, within the prohibition of the constitution in respect to incurring state indebtedness.

13. The money obtained by the state from 1860 to 1870, in manner indicated in number 12, and used for state purposes, created state indebtedness within sec. 4, art. VIII, of the constitution, and the certificates issued therefor, constitute evidences of indebtedness within sec. 9 thereof, and such indebtedness and such evidences are within the prohibitions of such sections.

14. June 1, 1911, the state was under disability, in any event, to incur indebtedness, since it was then indebted in excess of $100,000.

15. Regardless of the state indebtedness existing June 1, 1911, on account of dues to the trust funds, it was under disability to incur ordinary land purchase indebtedness, since such is not within the emergency purposes mentioned in secs. 6 and 7 of art. VIII of the constitution.

16. Aside from state indebtedness to the trust fund, the land contracts of January 1, 1911, with other such obligations exceeded the constitutional limitation of the capacity of the state to incur indebtedness.

17. The refund by the United States to the state of money obtained from the trust funds which was carried into the general fund and used for general state purposes did not affect the status of the state indebtedness.

18. What constitutes "works of internal improvement" within the prohibition of sec. 10, art. VIII, of the constitution, is a judicial question.

19. The term "works of internal improvement" used in sec. 10, art.

VIII, of the constitution, refers to a broad principle as to state engagement in works of internal improvement, and not to any particular species thereof.

20. The constitutional prohibition as to "works of internal improvement" is not restricted to such as appertain to business enterprises and public purposes not mere avenues of trade and commerce. It extends to every kind of public improvement not necessary or convenient for use of the state in carrying out its essentially governmental function as fenced about by the constitution.

21. Creation of a forest reserve, permanent improvement thereof for the production of forest products, conservation and equalization of the flow of natural waters for effect on climatic conditions, development of water power on the reserve, and business operations to make such reserve a source of gain for increase thereof or replenishment of the public treasury are, taken as a whole, a "work of internal improvement."

22. Temporary reservation of trust fund lands from sale for conservation thereof, protection of such lands from fire hazard and the state generally from such hazard, purchase of lands by the commissioners of public lands by legislative authority to block up within existing trust lands for the purpose of increasing proceeds of the latter, the investment in the additional lands within a reasonable time to be returned into the general fund if furnished therefrom as legitimate state expense, and care of the land during the waiting time for sale so as to utilize the forest products of an annual character and to save dead and dying and mature timber is not a "work of internal improvement" though the incidental effect may be such an improvement.

23. Withdrawal from sale of "school lands proper" or university lands, except in the discretion of the constitutional commissioners and for the benefit of the trust is prohibited by secs. 7 and 8, art. X, of the constitution.

24. The school lands of the swamp land class and the drainage land may be withdrawn from sale, in the discretion of the legislature, so long as the purpose thereof is conservation of the lands for the benefit of the purpose of the grant from the United States and the dedication of moneys arising from the school land class as stated in the sections to follow.

25. Sec. 2, art. X, of the constitution dedicated to educational purposes "all moneys arising from any grant to the state where the purposes of the grant are not specified" so as to create an obligatory trust for some other purposes.

26. Under the federal grants to this state of wet and overflowed lands, commonly called the swamp land grants, for the purpose of draining such lands, so far as necessary, it was given to the state

State ex rel. Owen v. Donald, 160 Wis. 21.

to decide upon the necessity, leaving excess "lands where the purposes of such grant are not specified" within the meaning of the constitution.

27. The constitutional dedication impressed the land which the state derived from the swamp land grants with a trust for educational purposes, so far as such lands were not necessary for the particular purposes mentioned in the grant, to the extent that all moneys arising therefrom constitute a part of the school fund.

28. The purpose of the federal grant and the provision of the constitution together created a disability of the legislature to dispose of the land for any other purpose than that mentioned in such grant and dedication.

29. Upon the legislature definitely deciding between the two purposes for which the lands derived from the swamp land grants were held, those appropriated to the constitutional purpose, automatically became a part of the state school fund land under the same trusts, reservations and restrictions as are provided in the constitution, to the extent that all moneys arising therefrom belong to the school fund to the same extent as proceeds of lands granted to the state for educational purposes.

30. The partition of the swamp lands under ch. 537, Laws of 1865, one half for school purposes and one half for drainage purposes, relieved the former from any trust for the latter and gave the school land half the status of school lands as regards moneys arising therefrom subject to be added to by any future express or implied determination to further limit the amount of land to be devoted to drainage purposes.

31. The constitution acted upon all lands derived from the swamp land grants immediately upon title thereto being vested in the state, dedicating the same to the extent aforesaid, irrevocably, to educational purposes so far as not found necessary for the primary purposes of the grant.

32. Ch. 367, Laws of 1897, ch. 450, Laws of 1903, and ch. 264, Laws of 1905, and all other acts and parts of acts, so far as they would otherwise supersede sec. 250 and sec. 251 of the Statutes of 1898, embodying the provisions of the legislative enactment of 1865, the confirmatory enactment of 1869, and the recognition thereof for a long term of years, are invalid. Said secs. 250 and 251 are a part of the written law of the state, any act of the legislature to the contrary notwithstanding.

33. While the proceeds of lands granted to the state for educational purposes and the moneys arising from lands of the swamp land grant which were dedicated to such purposes by sec. 2, art. X, of the constitution form one "school fund" irrevocably pledged to school purposes, there are two classes of lands, the first being

"school lands proper" and under the jurisdiction of the commissioners of school and university lands to the extent mentioned in secs. 7 and 8 of such article, and the second the lands derived from the swamp land grant which are under the control of the legislature subject to duty on its part to administer the same for the purpose of producing moneys for such school fund.

34. The fundamental law means what its framers and the people approving of it intended to have it mean, that to be determined by reading it in the light of the circumstances in which they were placed, particularly, as to the objects they had in view.

35. When the intent of the framers of the constitution looking at it from the environment of its makers, is plain, and the language they used to express such intent is susceptible of a narrow and a broad construction, the one favorable to such intent should be adopted as the correct one and extended so far as necessary to fully vitalize such intent.

36. In making the fundamental law a government was created with limited functions, specified expressly or by necessary inference, and the power of taxation limited to carry out such functions.

37. The purpose for which the power of taxation may be used is covered in general terms by sec. 5, art. VIII, of the constitution and is denominated "expenses of the state."

38. The power to appropriate money out of the state treasury is limited by the power of taxation to create a fund to appropriate from.

39. The power to appropriate money out of the public treasury being coextensive with the power to tax, it is inherently and also impliedly and expressly limited by the constitutional functions of government.

40. In determining whether a particular purpose may be constitutionally served by state appropriations or taxation, the fundamental law must be examined from the plane the people occupied when they created the government.

41. The power to tax is not retained by the legislature for all purposes not mentioned in the constitution; but the mention, expressly and impliedly, of particulars as recognized governmental purposes, excludes all others.

42. The language of the constitution as to state taxation, though, in form, a grant of power, is, in fact, a limitation thereof. It must be read in the light of the rule peculiarly adaptable to the construction of such constitutional provisions, *Expressio unius exclusio alterius.*

43. The constitution contemplated a legislative estimate for each year of the amount of money required to defray the expenses of the state for such year in the carrying out of its governmental func-

State ex rel. Owen v. Donald, 160 Wis. 21.

tion, and addition thereto of any deficiency in the amount provided for in the previous year, a legislative estimate of the income for the ensuing year, other than from ordinary taxation, a 'balance struck between the two, and, if thereby found necessary a legislative levy of a state tax to cover the deficiency.

44. The purposes for which taxes may be levied are denominated public purposes, not in the broad general sense; but in the constitutional sense of such state-wide purposes as are contemplated by the functions of government under the system created by the fundamental law.

45. Where there is no public purpose, in the sense of carrying on the machinery of government, there is no power to tax.

46. The plan embodied in the constitution contemplates confining the subject of state appropriations and taxation as near to the people as practicable.

47. If there were no fundamental limitations on the power of taxation, the inherent nature of organized society would limit it to the legitimate purposes of government.

48. The maxim "the right to tax is the right to destroy" is appropriate to a system of government based on possession by the people of privileges by sovereign grace. It is applicable to a system based on possession by them of inherent rights, only upon the theory that the taxing activity is confined to execution of governmental functions within fundamental restraints.

49. There may be destruction by means of taxation for governmental purposes under a system based on possession by the people of mere privileges, which would be confiscation under a system based on inherent rights, and so unconstitutional both by the inherent nature of the government and by fundamental restraints as well.

50. Any purpose, whether public or not, not included in the plan of government created by the constitution, is outside the limitation upon the right to take private property for public use by the power of taxation, and outside the power to appropriate money.

51. Where there is no benefit to the property owner of any character which is, to some extent, common, there is no right to tax; the underlying principle of taxation being that in return for taxation there is a consideration either of a pecuniary or protective nature to person or property or both.

52. The demands of charity in a foreign jurisdiction, however urgent, do not afford a legitimate basis for taxation. There is no such basis except in the uses of the government levying the tax in execution of its legitimate functions.

53. The practice, however extensive, in foreign jurisdictions, of creating permanent forest reserves by using proceeds of public taxa-

tion regardless of the limitations of the police power and fundamental prohibitions as to state engagement in works of internal improvement,—is unimportant respecting the legitimacy of legislative imposition of such burdens here, except as it bears on the question of whether there is reasonable ground for belief that promotion of public welfare under the police power calls for such creations.

54. So far as creation of forest reserves is a subject within the scope of the police power, that being a judicial question, and the means adopted to that end are appropriate and not unduly oppressive,—that being a legislative question, within the boundaries of reason,—and neither the subject nor the means are prohibited, it is a constitutional exercise of the police power.

55. The cost of governmental activity within the limitations specified in number 44, is state expense within the meaning of sec. 5, art. VIII, of the constitution.

56. What is within the police power, in its broad sense, must be determined from the viewpoint of the American system of constitutional liberty based on inherent rights regulated by law, and not on ancient and foreign systems based on the theory that the individual possesses only privileges which are absolutely in sovereign power to take partly or wholly away.

57. The police power extends to everything promotive of public welfare, but exercise of it is limited by the spirit of the fundamental law and some express provisions therein besides.

58. When not within some express fundamental limitation any governmental activity within the police power which promotes the purpose for which governments are instituted among men deriving their just powers from the consent of the governed, is legitimate.

59. Governmental activity, not prohibited, and appropriate to the purposes mentioned in number 57, so far as it conserves and promotes efficiency of inherent rights, is legitimate: anything further, going to the extent of impairment or destruction of such rights is condemned by the spirit of the constitution.

60. Governmental activity within the scope of the police power, otherwise legitimate, which is within the field of the express prohibition of the state engaging in works of internal improvement, is condemned by the constitution.

61. The power of the federal government over the public lands and that of any state over lands which it owns in its proprietary capacity, has no relevancy to the situation in this state in regard to state handling of lands held in trust for particular purposes.

62. The police power is the broadest in scope of any field of governmental activity. It is inherent in the very nature of organic so-

State ex rel. Owen v. Donald, 160 Wis. 21.

ciety.   We do not look into the fundamental law to find it or de-
fine it but only for limitations upon it.

63. The police power has limitations, both inherent and fundamental;
it is the most powerful instrumentality for good when properly
used and likewise for oppression when not so used.

64. In view of the possible benefits as well as dangers with which the
police power was conceived to be pregnant, in the creation of our
system of government, a well understood standard of disability
as to its exercise and some express disabilities, were provided
and also authority created to defend such standard.

65. Whether within constitutional limitations as to express prohibi-
tions, creation of a permanent forest reserve at state expense is
within the scope of the police power as to means of promoting
the public welfare, is a matter within legislative discretion.   But
if, under the particular circumstances, the means adopted are
either not appropriate or are unduly oppressive, they are con-
demned by the constitution and it is the duty of the court to give
voice thereto.

66. Reforestation and afforestation within limits stated in the opinion,
and other activities within such limits provided for in the for-
estry legislation are legitimate, partly referable to the police
power and partly to the state function to care for and conserve
the lands· held by it in trust for granted and constitutionally
dedicated purposes and the cost of such administration would be
"state expense" within the meaning of sec. 5, art. VIII, of the
constitution.

67. Trust fund lands and trust funds having been confused with other
lands and funds, particularly the general state fund and forestry
funds, and moneys having been drawn from such funds and in-
vested in other lands, and operations occurred creating confusion
between the various funds and trust fund lands,—an equitable
lien may be held to result upon the general and forest funds in
favor of the trust funds and property to the extent necessary to
restore the latter funds and property, so far as practicable, both
as to amount of fund and property.

68. For the purpose of rendering a judgment as indicated in number
67 efficient, the court, in the exercise of its general jurisdiction
to carry out its judgments may make all necessary orders re-
quired to fully carry out such judgment and for that purpose
order a reference to a referee with a special master as assistant
and settle the controversy, finally, upon the coming in of the re-
port, judicially determining the amount of each of the different
kinds of property belonging to each fund.

69. Ch. 740, Laws of 1913, providing for assessing trust fund land in
particular taxing districts by a special method, also for special.

authority as to reviewing the assessment, obtaining a re-equalization of the relative assessment of property in different taxing districts of a county and taxing the lands for local purposes at the expense of the general fund of the state, is void, because

    a. It appropriates state money for local purposes.

    b. It violates the constitutional right of local self-government.

    c. It is a special law for the assessment and collection of taxes.

70. Secs. 1494—132 to 1494—134, Stats. 1913, specially limiting the capacity of particular counties to realize on their tax-title lands by compelling such counties to sell their tax-title lands to the state at cost, while other counties may sell similar lands when and at such price as their governing boards may see fit, and affording former owners of lands in the particular class less advantages for redressing wrongs in respect to tax deeds on their lands than is possessed in general are unconstitutional, because

    a. They violate the constitutional requirement for singleness and uniformity of town and county government so far as practicable.

    b. They are a special act for the collection of taxes.

    c. They take county property to which it is entitled the same as a private individual, without rendering therefor a constitutional equivalent.

    d. They violate the equality clauses of the fundamental law.

    [Syllabus by MARSHALL, J.]

MANDAMUS proceedings to compel the secretary of state to audit a claim in favor of the G. F. Sanborn Company for payment of an account claimed to be due such company on a land contract between it and the state of Wisconsin.

The petition for the writ, in addition to essential and appropriate matters, contained, in substance, this statement of facts: June 1, 1911, under sec. 1072—1 and sec. 1494—61, Stats., in a contract, in writing, between G. F. Sanborn Company and the state of Wisconsin, it was agreed that the former should sell the latter certain lands for $90,076.11, payable $30,076.11 down and $20,000 on the first day of each year for three years thereafter, with interest at six per cent. per annum, payable annually. All payments except the last have been made. The proposed purchase should be completed to enable the state forester to carry on systematic forestry work and fire protection. There is money for such completion in

the appropriate fund and payment without delay will be a saving to the state in interest. The secretary of state refuses to audit the claim for such payment and threatens not to audit any such claim because of doubt as to the validity of such contracts and of the statute purporting to authorize them, under sec. 10, art. VIII, Const., and that he will not be justified in considering them valid before such doubt shall have been judicially solved. Irreparable damage will occur to the state and general prejudice to the executive officers of the forestry board, unless such contract shall be carried out.

On such petition an alternative writ of *mandamus* was duly issued to bring up for adjudication the controversy indicated.

In due course, respondent and defendant, secretary of state, demurred to the petition for insufficiency.

In considering the issue thus raised it seemed that several serious questions were involved in whether money should be paid out of the state treasury upon contracts made under the statutes aforesaid; that such questions reached the whole state forestry scheme of appropriating state lands for forestry purposes, purchasing other lands for such purposes, paying therefor out of the proceeds of existing state lands and money raised by taxation, and using the lands in the manner contemplated by such scheme. The whole subject having been put within reach of the court by the *mandamus* action, it was determined that the great public interests involved should not be prejudiced and the state officers embarrassed in performing their duties by any delay within its power to reasonably prevent, and, accordingly, it declined to decide the mere narrow issue raised by the petition and demurrer thereto, and determined to permit the demurrer to be withdrawn and an answer to be interposed, presenting every existing matter of defense in order that all questions in relation to defendant's duty might be so solved as to protect him, the state, and its officers in respect to use of money for forestry purposes.

In aid of consummating the result suggested, the court

mentioned the following for consideration by eminent counsel representing the secretary of state:

1. Has the forestry board correctly construed the statute in presuming to have authority to bind the state by long-time interest-bearing obligations?

2. Is the basis, itself, of the forestry scheme,—the legislative diversion of the land and proceeds thereof granted to the state for particular purposes to a different one, legitimate?·

3. Is using revenue raised by present taxation to promote the production or improvement of forests for the benefit of future generations, a public purpose within the meaning of the constitution?

4. Are interest-bearing obligations of the state in excess of $100,000 valid in any event?

5. Is the creation of interest-bearing obligations of the state of a less amount than $100,000 proper in view of existing indebtedness of the state to the trust funds, or otherwise?

The court, prefacing the order entered, said:

"All, such matters, and perhaps still others, upon due consideration, aided by eminent counsel, may be deemed worthy of judicial interference and of being brought to the attention of the court in this litigation in an appropriate way. The case is of great importance. The best service which eminent counsel can afford would be appropriate to the situation and, in the public interest, should be called to the work by the parties and thus the court given all the legitimate aid practicable in arriving at a proper conclusion."

The way being thus opened for bringing the great subject respecting the forestry scheme in its entirety to the bar of the court and submitting it for decision with the best professional services obtainable to illuminate the same, eminent counsel appeared upon both sides,—resulting in the permission to withdraw the demurrer being acted upon and an answer being interposed tendering issue as to all the questions

suggested by the court and others. These, in substance, are the facts pleaded:

1. The contract in question is one of several of the same nature. Each is in the ordinary form of a land contract. There is mutuality of obligations therein,—on the one side a positive promise to pay the stipulated price for the land specified, and on the other, a like promise to convey the land upon payment being made. The particular contract and several of the others, provided for payment of interest and for deferred payments of principal,—in some cases until 1921. The contracts were made at different dates—the first April 21, 1908, and the last September 7, 1912. The aggregate amount of land covered by all the contracts is 57,016.33 acres, the purchase price $220,893.46, and the price per acre from $2.50 to $4.60. The total amount of deferred payments is $190,817.35. None of the contracts have been fully paid. The Sanborn contract was for 25,736.23 acres of land at $90,076.11, $30,076.11 of which was paid down when the contract was finally consummated August 22, 1911, leaving $60,000 to be paid in three instalments of $20,000 each, one payable each year and the last June 1, 1914, all to draw interest at the rate of six per cent. per annum. The last payment with the accrued interest is unpaid and is what the secretary of state refused to audit, precipitating this litigation. The total amount due on all the contracts is now $130,817.35, exclusive of interest. The Sanborn contract bears date June 1, 1911. Negotiations in respect to it preceded said date by a considerable period. They had proceeded so far, by March 28, 1911, that deeds, in due form, for conveying the land to the state were made which were thereafter deposited with the Central Wisconsin Trust Company for delivery on payment of the purchase price. The contract was assigned to such company July 18, 1911; but final consummation and making of the down payment waited upon approval of the abstracts of title which occurred August 21,

1911. The officers of the state in making the purchase in its behalf depended upon ch. 264, Laws of 1905, and ch. 639, Laws of 1911 (sec. 1072—1, Stats. 1913), for authority. At the date of the Sanborn contract there was in the forestry fund accumulated under the act of 1905, $31,161.33, which was derived from the sale of swamp lands, and in the tax-title fund referable to secs. 1494—131 to 1494—135, inclusive, Stats. 1911, $53.87, and when the down payment was made $10,053.87 in the latter fund and $41,741.23 in the former. Such payment was taken out of the general fund depending upon sub. 1, sec. 1072—1, Stats.

In some of the towns where said lands and other forest lands are situated, the local authorities claim the right to include them in property for general taxation under sec. 1092m, Stats. 1913. Proceedings have been taken to tax the state trust lands against the state and pay the taxes to the several taxing districts out of its general fund.

2. North of township line 33 the state owns trust fund lands as follows:

School fund lands, 24,840 acres, obtained under par. 1, sec. 7, Enabling Act, and sec. 2, art. X, State Constitution.

University lands 560 acres, obtained under the federal act of June 12, 1838.

Agricultural college lands, forty acres, obtained by the federal act of January 2, 1862.

Normal school lands, 1,800 acres, referable to the federal grant of September 28, 1850, as amended.

Swamp lands 240,000 acres, through the federal grant of September 28, 1850, and the act of Congress of March 2, 1855.

19,138 acres derived through the federal grant of June 27, 1906, this being specifically for forestry purposes.

A large number of small unsurveyed and unattached islands in inland lakes granted to the state for forestry purposes by the federal act of August 22, 1912.

4,321.07 acres conveyed to the state September 6, 1912, for forestry purposes only, by the Nebagamon Lumber Company.

Pursuant to sec. 1494—43, Stats., the state forestry board assumed control of all the swamp lands and withdrew them from sale as held for forestry purposes only.  The rest of the trust fund lands have not been so appropriated but are liable to be at any time.  Such other trust fund lands, specially granted to the state for specific purposes, have been withdrawn from sale by the land commissioners because the present selling price is too low.  Claiming to act under the forestry statute, a considerable amount of trust fund lands have been exchanged for other lands which are asserted to be a part of the forestry reserve.

The primary title to all the lands in the forestry reserve is referable to the Virginia cession deed of March 1, 1784, conveying the same as follows:

"Unto the United States in Congress assembled, for the benefit of the said states, all right, title, and claim, as well of soil as jurisdiction, which this commonwealth hath to the territory or tract of country within the limits of the Virginia charter, situate, lying, and being, to the northwest of the river Ohio, . . . upon condition that the territory so ceded shall be laid out and formed into states, . . . having the same rights of sovereignty, freedom, and independence, as the other states. . . .

"That all the lands within the territory so ceded to the United States, . . . shall be considered as a common fund for the use and benefit of such of the United States as have become, or shall become, members of the Confederation or federal alliance of the said states, Virginia inclusive, according to their usual respective proportions in the general charge and expenditure, and shall be faithfully and *bona fide* disposed of for that purpose and for no other use or purpose whatsoever."

3. In 1862 and 1863 the state incurred $100,000 of bonded indebtedness for the construction, in part, of the state capitol and in part of a hospital for insane.  Such indebtedness still

exists in the form of obligations to the state trust funds, evidenced by seven per cent. certificates of indebtedness.

During the Civil War the state for war and other purposes, incurred bonded indebtedness to an amount exceeding $2,000,000. In the course of time it was all funded into seven per cent. certificates of indebtedness to the state trust fund, which are now outstanding. Prior to 1866, the state accumulated $528,000 by general taxation for the purpose of paying, in part, the public debt, but by ch. 80 of the laws of that year it was diverted to other purposes.

The Congress of the United States duly provided for making good to the state the money advanced to it for war purposes, which was done from time to time, in the aggregate, principal and interest, to about $2,257,291.74, as follows:

|  |  |  |
|---|---:|---:|
| September 2, 1861 | $205,000 | 00 |
| July 18 and September 30, 1862 | 257,163 | 83 |
| May 19, 1865 | 300,238 | 26 |
| March 2, 1870 | 219,742 | 06 |
| March 31, 1873 | 54,279 | 12 |
| December 31, 1875 | 10,347 | 53 |
| April 11, 1888 | 24,102 | 86 |
| 1903 | 458,677 | 90 |
| 1905 | 727,740 | 18 |
|  | $2,257,291 | 74 |

Of the indebtedness incurred by the state during the Civil War, part of the money being taken directly from the trust funds on the pretense of borrowing it, and the balance obtained by bonds, the United States refused to make good to the amount of $766,200, upon the ground of its having been used for state purposes only.

The money refunded, as stated, instead of being covered into the trust fund, thus making good so far its depletion and canceling the certificates of indebtedness then held, to the amount of some $2,250,000, was put into the general fund and used for general state purposes, leaving the state indebtedness as before, which has ever since existed.

4. The state indebtedness aforesaid on the $100,000 of

bonds was not authorized by sec. 6, art. VIII, of the constitution, limiting the power of the state to contract debts exceeding $100,000 and conditioning exercise of the power to necessity for defraying extraordinary expenditures, to a vote of all the members elected to each house of the legislature in favor of the same, taken by yeas and nays, and the law providing for the levying of an annual tax sufficient to pay the annual interest on the debt and the principal within five years from the passage of the law and the appropriation of the proceeds of the taxes to payment of such principal and interest,— the law in that regard not to be repealed nor the taxes postponed or diminished in advance of the principal and interest being wholly paid. Nor was it authorized by sec. 7 of such article, which empowers the state to borrow money to repel an invasion, suppress insurrection, or defend the state in time of war, the money to be used exclusively for the object for which the loan was authorized or to the repayment of the debt thereby created. Nor was it otherwise authorized, but, on the contrary, was prohibited by the constitution. The existence of the $100,000 of bonds in 1862 and 1863 for building purposes, which have never been paid, precluded legitimately contracting other indebtedness such as that on the lands in question.

The limitations in sec. 6 aforesaid require loans under such section to be made in compliance therewith. So, in any event, the right of the state to incur indebtedness was exhausted before the land contracts were made.

5. The attempted appropriation of the state trust fund lands by sec. 1494—43, Stats. 1913, and other statutes, to state forestry purposes, and to authorize the sale of said lands, or exchange of them with private parties for other lands, is within the prohibitions of secs. 2 and 6, art. X, of the state constitution setting aside, among other things, the proceeds of all lands granted to the state for educational purposes, except university lands, and all moneys arising from any grant where

the purposes of such grant are not specified, as a separate fund to be called the school fund, the interest on which and all other revenues derived from the school lands to be exclusively applied, so far as needed, to the support and maintenance of common schools and the purchase of suitable libraries therefor, and the residue to the support and maintenance of academies and normal schools, and suitable libraries therefor.

6. The legislation, particularly secs. 1072—1, 1494—43, 1494—61, and 1494—62, providing for use of money raised by taxation for the growth of forests, operations and improvement thereof, for future use, is not a public purpose within sec. 5, art. VIII, of the constitution, limiting exercise of the power of taxation to levies from year to year sufficient to meet state expenses.

7. Neither sec. 1072—1, nor any other law of the state, contains, in letter or otherwise, any grant of power to buy land for forestry purposes on credit, giving long-time interest-bearing obligations therefor.

8. The land contracts in question are evidences of indebtedness and so prohibited by sec. 9, art. VIII, of the constitution, providing that: "No scrip, certificate, or other evidence of state indebtedness whatsoever, shall be issued except for such debts as are authorized by the sixth and seventh sections of this article."

9. If the land contracts in question and the forestry system, in general, can be considered as within the field of public use warranting state taxation to support the same, in any event, they are within the prohibition of sec. 8, art. X, of the state constitution providing that: "The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works," except in case of lands or other property granted to the state "especially dedicated by the grant to particular works of internal improvement."

10. Sec. 1092m, Stats., attempting to burden the trust

fund lands of the state with taxation and thus invade the right of the school fund to the proceeds of such lands, violates the constitution in respect to such matters and violates the requirement that the "rule of taxation shall be uniform." Sec. 1, art. VIII, Const.

11. All the appropriations for forest reserve purposes depend for validity upon the constitutionality of the statutes mentioned and, in the course of the administration of the duties of the office of secretary of state, he will be called upon to audit claims for money under such statutes, dependable for their validity upon questions material to the validity of the claim which gave rise to this litigation, and, therefore, he was and is justified in refusing to obey the command of the alternative writ.

The plaintiff demurred to the answer for insufficiency and the issues thus raised were submitted for decision on all questions suggested by the return.

After the cause was thus submitted, the court, deeming considerable time necessary for study thereof, and that pending the decision, to the end that the final judgment might have the fullest judicial efficiency, the activities of the state forestry administration should be restrained in the meantime to the necessary work of taking care of the lands of the state, whether held in trust or otherwise, of its own motion entered an order enjoining, until otherwise ordered, the creation of any obligation, in form or in fact, of the state, for the purchase of land under the forest reserve act, or paying out money upon any contract for such lands theretofore made, or selling, or contracting to sell, any lands derived under any grant from the United States which are claimed to have been turned over for forest reserve purposes, or any lands purchased for such purposes, or incurring any expense in respect to land claimed to belong to the state for a forest reserve other than such as should be found necessary to protect the same against danger from fires or from being injured by trespassers.

For the plaintiff there were briefs by the *Attorney General* and *Winfield W. Gilman,* assistant attorney general, and oral argument by *Mr. Gilman.* They argued, among other things, that the contract in question here does not create a "debt" of the state within the meaning of sec. 6, art. VIII, Const. In determining whether or not such a contract creates indebtedness, the funds in the treasury, and those in process of collection, available for the purpose of meeting the payments called for by the contract, may be offset against the amount of such payments, and if the amounts so available equal the total amount to be paid under the contract no indebtedness is created. *Earles v. Wells,* 94 Wis. 285, 68 N. W. 964; *State ex rel. Marinette, T. & W. R. Co. v. Tomahawk Common Council,* 96 Wis. 73, 91, 71 N. W. 86; *Rice v. Milwaukee,* 100 Wis. 516, 76 N. W. 341; *In re State Warrants,* 6 S. Dak. 518, 62 N. W. 101, 55 Am. St. Rep. 852; *Bryan v. Menefee,* 21 Okla. 1, 95 Pac. 471; *State ex rel. Ash v. Parkinson,* 5 Nev. 15; *Rowley v. Clarke* (Iowa) 144 N. W. 908, 912. The payments on such a contract are payable only out of the funds provided for that purpose, and are in no sense a claim against the general revenues of the state. *Regents v. Hart,* 7 Minn. 61; *Brown v. Ringdal,* 109 Minn. 6, 122 N. W. 469. Contracts which do not create a general liability of a municipality or a state, but which bind merely particular property or special funds, do not create "debts" within the meaning of that term as used in our constitution. *Burnham v. Milwaukee,* 98 Wis. 128, 73 N. W. 1018; *Connor v. Marshfield,* 128 Wis. 280, 292, 107 N. W. 639; *Regents v. Hart,* 7 Minn. 61; *Brown v. Ringdal,* 109 Minn. 6, 122 N. W. 469; *State ex rel. Armington v. Wright,* 17 Mont. 565, 44 Pac. 89; *Allen v. Grimes,* 9 Wash. 424, 37 Pac. 662; *Fleckten v. Lamberton,* 69 Minn. 187, 72 N. W. 65. And the mere fact that such contracts provide for payment of interest does not change their nature in that respect. *Rhea v. Newman,* 153 Ky. 604, 156 S. W. 154; *In re State Warrants,* 6 S. Dak. 518, 525, 62

N. W. 101, 104, 55 Am. St. Rep. 852, 857; *State ex rel. Ash v. Parkinson,* 5 Nev. 15.   The state board of forestry had authority to enter into contracts like the one involved here. *Regents v. Hart,* 7 Minn. 61; *Jewell N. Co. v. State,* 4 S. Dak. 213, 56 N. W. 113; *State v. Mills,* 55 Wis. 229, 245, 12 N. W. 359.   The revenues to be derived from a grant to the state for works of internal improvement may be anticipated.   *Sloan v. State,* 51 Wis. 623, 8 N. W. 393.   The state had the power to place the remaining swamp lands in the state forest reserve.   The state has the absolute power of disposition of the swamp lands and of the funds derived from the sale thereof.   *La Pointe v. Ashland,* 47 Wis. 251, 2 N. W. 306; *American E. Co. v. Adams Co.* 100 U. S. 61; *Mills Co. v. B. & M. R. Co.* 107 U. S. 557, 2 Sup. Ct. 654; *Hagar v. Reclamation Dist.* 111 U. S. 701, 4 Sup. Ct. 663; *U. S. v. Louisiana,* 127 U. S. 182, 8 Sup. Ct. 1047; *Cook Co. v. Calumet & C. C. & D. Co.* 138 U. S. 635, 11 Sup. Ct. 435; *Dunklin Co. v. District Court,* 23 Mo. 449; *Barrett v. Brooks,* 21 Iowa, 144; *Whiteside Co. v. Burchell,* 31 Ill. 68, 78; *McRae v. Comm'r S. L. Office,* 89 Mich. 463, 50 N. W. 1091; 26 Am. & Eng. Ency. of Law (2d ed.) 351; 32 Cyc. 912, 928. Even if it should be held that there is a trust attached to these lands, yet the grantor, the United States, alone can raise the question of a breach of that trust.   *La Pointe v. Ashland,* 47 Wis. 251, 2 N. W. 306; *Schulenberg v. Harriman,* 21 Wall. 44; *American E. Co. v. Adams Co.* 100 U. S. 61; *Mills Co. v. B. & M. R. Co.* 107 U. S. 557, 2 Sup. Ct. 654; *Hagar v. Reclamation Dist.* 111 U. S. 701, 4 Sup. Ct. 663; *U. S. v. Louisiana,* 127 U. S. 182, 8 Sup. Ct. 1047; *Barrett v. Brooks,* 21 Iowa, 144; *Whiteside Co. v. Burchell,* 31 Ill. 68, 78; *McRae v. Comm'r S. L. Office,* 87 Mich. 463, 50 N. W. 1091; 32 Cyc. 928; 26 Am. & Eng. Ency. of Law (2d ed.) 351. The normal school fund is not a fund created by the constitution, but is purely a creature of statute.   It is one of the funds belonging to the state and over which the legislature

has plenary power. 36 Cyc. 882, 889. The legislature had the power to transfer the swamp lands from this fund to any other fund it desired. *Board of L. Comm'rs v. Hemingway,* 66 Miss. 289, 6 South. 235; *Richmond Co. v. Lawrence Co.* 12 Ill. 1. Secs. 250 and 251, Stats., being merely statutory enactments, the legislature had and has plenary power to amend or repeal them or any part of them. 36 Cyc. 1054, 1069; *State v. Coyle,* 7 Okla. Cr. 50, 122 Pac. 243; *S. C.* 8 Okla. Cr. 686, 130 Pac. 316; Cooley, Const. Lim. (7th ed.) 174. In so far as the law placing these swamp lands in the state forest reserve is inconsistent with secs. 250 and 251, Stats., it repeals those sections. The legislature has full power to dispose of the proceeds of the sales of these swamp lands. *La Pointe v. Ashland,* 47 Wis. 251, 2 N. W. 306. The purchase of these lands, and the carrying on of forestry work thereon, is a public purpose. "Forestry in the U. S." (Pinchot) 8 Americana; 3 Johnson, Univ. Cyc. "Forestry," 475; *Loan Asso. v. Topeka,* 20 Wall. 655; Report of State Forester (1911–1912) 13, 58, 59; *People v. Adirondack R. Co.* 160 N. Y. 225, 54 N. E. 689, affirmed in *Adirondack R. Co. v. New York,* 176 U. S. 335, 20 Sup. Ct. 460; *People v. Brooklyn C. Co.* 187 N. Y. 142, 79 N. E. 866, affirming 100 N. Y. Supp. 19. Land taken for public parks is taken for a public use. *Gilman v. Milwaukee,* 55 Wis. 328, 13 N. W. 266; *Shoemaker v. U. S.* 147 U. S. 282, 13 Sup. Ct. 361; *Brooklyn Park Comm'rs v. Armstrong,* 45 N. Y. 234; *In re Central Park Comm'rs,* 63 Barb. 282; *Owners of Ground v. Albany,* 15 Wend. 374; *State Park Comm'rs v. Henry,* 38 Minn. 267, 36 N. W. 874; *Kansas City v. Bacon,* 147 Mo. 259, 48 S. W. 860; *Memphis v. Hastings,* 113 Tenn. 142, 86 S. W. 609; *Laird v. Pittsburg,* 205 Pa. St. 1, 54 Atl. 324; *Att'y Gen. v. Burrell,* 31 Mich. 25; *Salisbury L. & I. Co. v. Comm.* 215 Mass. 371, 102 N. E. 619; *Kansas City v. Ward,* 134 Mo. 172, 35 S. W. 600; *U. S. v. Cooper,* 9 Mackey (20 D. C.) 104; *Londoner v. Denver,* 52 Colo. 15, 119 Pac. 156;

*Southern R. Co. v. Memphis,* 126 Tenn. 267, 148 S. W. 662;
Mills, Em. Dom. (2d ed.) § 18; Nichols, Power of Em. Dom.
§ 233; 10 Am. & Eng. Ency. of Law (2d ed.) 1084; *Holt v.
Somerville,* 127 Mass. 408; *County Court v. Griswold,* 58
Mo. 175, 194; *Higginson v. Treasurer & S. H. Comm'rs,* 212
Mass. 583, 99 N. E. 523; *Hartford v. Maslen,* 76 Conn. 599,
57 Atl. 740; "Relations of Forests to Stream Control," Amer-
ican Waterways, 221; 3 Johnson, Univ. Cyc. "Floods," 422;
2 Johnson, Univ. Cyc. "Climate," 338; 5 Americana, "Cli-
mate;" *People v. Salem,* 20 Mich. 452, 4 Am. Rep. 400, 406;
*Att'y Gen. v. Williams,* 174 Mass. 476, 478, 55 N. E. 77, 78;
*Brodhead v. Milwaukee,* 19 Wis. 624, 652; *Shenandoah L.
Co. v. Governor,* 115 Va. 865, 80 S. E. 753. An incidental
private interest does not render the law invalid. *Soens v.
Racine,* 10 Wis. 271, 280; *Att'y Gen. v. Eau Claire,* 37 Wis.
400, 435; *State v. Eau Claire,* 40 Wis. 533. The purchase
of forest reserve lands is not "works of internal improve-
ment." At the time of the adoption of the constitution the
term "improvement" as applied to lands meant, among other
things, clearing the trees from the land and fitting it for cul-
tivation. Webster, New Internat. Dict.; *Mathews v. Davis,*
6 Humph. 324; *Byers v. Fowler,* 12 Ark. 218, 293; *McIvor
v. Williams,* 24 Ark. 33; *Simpson v. Robinson,* 37 Ark. 132;
*Johnson v. Gresham,* 5 Dana (Ky.) 542; *Voight v. Meyer,*
42 App. Div. 350, 59 N. Y. Supp. 70; *Clark v. Phelps,* 4
Cow. (N. Y.) 190; *Bixler v. Baker,* 4 Bin. 213; *Chase v.
Sioux City,* 86 Iowa, 603, 53 N. W. 333. Such a thing as
forestry was farthest from the minds of those who used the
term "works of internal improvement." Clearing the land
would be an improvement, while allowing the forest to grow
would be leaving the land in a state of nature—unimproved—
as those terms were then understood. The expression "in-
ternal improvement" has likewise a special meaning, and
nearly always implies facilitation of transportation. *Daw-
son Co. v. McNamar,* 10 Neb. 276, 4 N. W. 991; *Yesler v.*

*Seattle,* 1 Wash. 308, 311, 25 Pac. 1014; *Cooke v. Iverson,* 108 Minn. 388, 122 N. W. 251; *Wetumpka v. Winter,* 29 Ala. 651, 660; *Wetumpka v. Wetumpka W. Co.* 63 Ala. 611, 629; *Bonsal v. Yellott,* 100 Md. 481, 60 Atl. 593, 69 L. R. A. 914. That this was the thought uppermost in the minds of the members of the constitutional convention clearly appears from the journal of the convention. See pp. 207–211, 236, 237, 345–347, 350, 351. See 11 Americana, "Internal Improvements;" Funk & Wagnalls, New Stand. Dict. (1913) 1282, "Internal improvements;" 5 Cent. Dict. 3021, "Improvement." Thus, the following have been said to be works of internal improvement: Improving the channel of a river (*Wilcox v. Paddock,* 65 Mich. 23, 31 N. W. 609; *Gibson v. Comm'r S. L. Office,* 121 Mich. 49, 79 N. W. 919; *Ryerson v. Utley,* 16 Mich. 269); street railways (*Att'y Gen. v. Pingree,* 120 Mich. 550, 79 N. W. 814, 46 L. R. A. 407; *Att'y Gen. ex rel. Brotherton v. Detroit,* 148 Mich. 71, 111 N. W. 860); railroads (*Savannah v. Kelly,* 108 U. S. 184, 2 Sup. Ct. 468; *State ex rel. Burlington & M. R. R. Co. v. Wapello Co.* 13 Iowa, 388); railroads, highways, bridges, and wharves (*Cass v. Dillon,* 2 Ohio St. 607; *Pattison v. Yuba,* 13 Cal. 175); bridges (*Union Pac. R. Co. v. Colfax Co.* 4 Neb. 450; *Fremont B. Asso. v. Sherwin,* 6 Neb. 48; *South Platte L. Co. v. Buffalo Co.* 7 Neb. 253; *State ex rel. Peterson v. Keith Co.* 16 Neb. 508, 20 N. W. 865; *State ex rel. Columbus v. Babcock,* 23 Neb. 179, 36 N. W. 474; *Dodge Co. Comm'rs v. Chandler,* 96 U. S. 205; *U. S. v. Dodge Co.* 110 U. S. 156, 3 Sup. Ct. 590); roads, highways, bridges, ferries, streets, sidewalks, pavements and wharves, and the like (*Leavenworth Co. v. Miller,* 7 Kan. 479, 12 Am. Rep. 425); pipe lines for transportation of petroleum (*West Va. T. Co. v. Volcanic O. & C. Co.* 5 W. Va. 382); macadamized roads (*People ex rel. Hubbard v. Springwells,* 25 Mich. 153); telephone or telegraph lines (*Northwestern T. E. Co. v. C., M. & St. P. R. Co.* 76 Minn. 334, 79 N. W. 315). The better rule is that

the term "works of internal improvement" includes "those things which ordinarily might, in human experience, be expected to be undertaken for profit or benefit to the property interests of private promoters, as distinguished from those other things which primarily and preponderantly merely facilitate the essential functions of government." *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 91 N. W. 115. See, also, *Atkinson v. Ada Co.* 18 Idaho, 282, 108 Pac. 1046, 1048. Other illustrations of this rule are: Grain elevators (*Rippe v. Becker,* 56 Minn. 100, 57 N. W. 331); levees (*Alcorn v. Hamer,* 38 Miss. 652); levees and drains (*State ex rel. Douglas v. Hastings,* 11 Wis. 448); improvement of Fox river (*Sloan v. State,* 51 Wis. 623, 8 N. W. 393); irrigation reservoirs and canals (*In re Senate Resolution,* 12 Colo. 285, 21 Pac. 484; *Cummings v. Hyatt,* 54 Neb. 35, 74 N. W. 411; *Perkins Co. v. Graff,* 114 Fed. 441; *Kearney v. Woodruff,* 115 Fed. 90; *Keith Co. v. Citizens' S. & L. Asso.* 116 Fed. 13); lighting plants, waterworks, gasworks, and the like (*Cass v. Dillon,* 2 Ohio St. 607; *Pattison v. Yuba,* 13 Cal. 175; *Leavenworth Co. v. Miller,* 7 Kan. 479, 12 Am. Rep. 425); ditches (*Wallace v. Skagit Co.* 8 Wash. 457, 36 Pac. 252); oil refineries (*State ex rel. Coleman v. Kelly,* 71 Kan. 811, 81 Pac. 450, 70 L. R. A. 450); grist mills (*Blair v. Cuming Co.* 111 U. S. 363, 372, 4 Sup. Ct. 449; *Guernsey v. Burlington,* 4 Dill. 372; *Burlington v. Beasley,* 94 U. S. 310; *Traveler v. Merrick Co.* 14 Neb. 327, 15 N. W. 690, 45 Am. Rep. 111; *State ex rel. Perry v. Clay Co.* 20 Neb. 452, 30 N. W. 528). The term "internal improvements" indicates something of a fixed and permanent nature. *In re Internal Improvements,* 18 Colo. 317, 32 Pac. 611. Forestry, on the other hand, implies a constant changing—removal of the mature timber and allowing the young trees to grow. It is universally held, we believe, that this prohibition does not prevent the purchase by the state of such lands and the erection of such buildings as are reasonably necessary for the exercise

of its governmental functions.    Asylums, state capitols, state universities, penitentiaries, reformatories, quarantine buildings, courthouses, and the like are not "works of internal improvement" within the meaning of the prohibition.    *In re Internal Improvement Fund,* 24 Colo. 247, 48 Pac. 807; *Lewis v. Sherman Co.* 5 Fed. 269; *Dawson Co. v. McNamar,* 10 Neb. 276, 4 N. W. 991; *Union Pac. R. Co. v. Lincoln Co.* 3 Dill. 300, 301; *Lewis v. Comanche Co.* 35 Fed. 343, 348; *Leavenworth Co. v. Miller,* 7 Kan. 479, 12 Am. Rep. 425.

On behalf of the G. F. Sanborn Company there was a brief by *Olin, Butler & Curkeet,* and oral argument by *H. L. Butler.*    They contended, *inter alia,* that continuing appropriations such as those embraced in sec. 1072—1, Stats., may lawfully be made.    *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 633, 108 N. W. 557; *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 88 N. W. 596; *Guilford v. Chenango,* 13 N. Y. 143, 149; 36 Cyc. 893, 894; *Ristine v. State,* 20 Ind. 328, 338; *People ex rel. McCauley v. Brooks,* 16 Cal. 11, 29; *Stein v. Morrison,* 9 Idaho, 426, 75 Pac. 246, 263; *In re Continuing Appropriations,* 18 Colo. 192, 32 Pac. 272; *Chicago & N. W. R. Co. v. Faulk Co.* 15 S. Dak. 501, 90 N. W. 149; *Fleckten v. Lamberton,* 69 Minn. 187, 72 N. W. 65.    Contracts payable from appropriations or funds are not public debts, but operate to apply and charge moneys raised pursuant to such appropriations to the discharge of such contracts.    *People ex rel. McCauley v. Brooks,* 16 Cal. 11; *State v. McCauley,* 15 Cal. 429, 456; *Koppikus v. State Capitol Comm'rs,* 16 Cal. 248, 253; *People ex rel. Att'y Gen. v. Pacheco,* 27 Cal. 175; *Brown v. Ringdal,* 109 Minn. 6, 122 N. W. 469; *Fleckten v. Lamberton,* 69 Minn. 187, 72 N. W. 65; *Regents v. Hart,* 7 Minn. 61; *In re State Warrants,* 6 S. Dak. 518, 62 N. W. 101; *Bryan v. Menefee,* 21 Okla. 1, 95 Pac. 471; *State ex rel. Ash v. Parkinson,* 5 Nev. 15, 25; *Rhea v. Newman,* 153 Ky. 604, 156 S. W. 154; *Stein v. Morrison,* 9 Idaho, 426, 75 Pac. 246, 254; *In re Incurring of State Debts,*

19 R. I. 610, 37 Atl. 14, 15; *State v. Medbery,* 7 Ohio St. 522. If the principal provided for is not a debt within the meaning of the constitution, the interest payable from the same fund may not be so considered. *State ex rel. Resley v. Farwell,* 3 Pin. 393; *State ex rel. Ash v. Parkinson,* 5 Nev. 15, 28; *In re State Warrants,* 6 S. Dak. 518, 62 N. W. 101; *Bryan v. Menefee,* 21 Okla. 1, 95 Pac. 471; *Rhea v. Newman,* 153 Ky. 604, 156 S. W. 154. Concurrence by the Assembly in Bill No. 553, S. (ch. 514, Laws of 1909), was an agreement to the amendment within the meaning of the constitution. *Lovett v. Ferguson,* 10 S. Dak. 44, 71 N. W. 765, 766; *Prohibitory Amendment Cases,* 24 Kan. 700, 710; *State ex rel. Adams v. Herried,* 10 S. Dak. 109, 72 N. W. 93, 95; *State ex rel. Morris v. Mason,* 43 La. Ann. 590, 9 South. 776, 805. There are many respectable authorities which hold that the omission to comply with positive constitutional requirements involving ministerial or clerical duties, such as entry upon the journals, does not defeat a constitutional amendment, these being regarded as matters of form and not of the essence. *Prohibitory Amendment Cases,* 24 Kan. 700; *West v. State,* 50 Fla. 154, 39 South. 412; *Nesbit v. People,* 19 Colo. 441, 36 Pac. 221; *People ex rel. Elder v. Sours,* 31 Colo. 369, 74 Pac. 167; *Taylor v. Comm.* 101 Va. 829, 44 S. E. 754; *State ex rel. Thompson v. Winnett,* 78 Neb. 379, 110 N. W. 1113, 10 L. R. A. N. s. 149; *Green v. Weller,* 32 Miss. 650. The courts will indulge in the presumption that the legislature, a co-ordinate branch of government, has conformed to every constitutional requirement, including enactment by the requisite majority, which the journal of its proceedings does not clearly and affirmatively show was disregarded. *Weyand v. Stover,* 35 Kan. 545, 11 Pac. 355, 359, 360; *In re Taylor,* 60 Kan. 87, 55 Pac. 340; *Homrighausen v. Knoche,* 58 Kan. 546, 50 Pac. 879; *Missouri, K. & T. R. Co. v. Simons,* 75 Kan. 130, 88 Pac. 551; *State v. Peterson,* 38 Minn. 143, 36 N. W. 443, 444; *State ex rel.*

*Minnesota R. C. Co. v. Hastings,* 24 Minn. 78, 81, 82; *In re Ellis' Appeal,* 55 Minn. 401, 56 N. W. 1056, 23 L. R. A. 287, 292; *Miesen v. Canfield,* 64 Minn. 513, 67 N. W. 632, 633; *People ex rel. Hart v. McElroy,* 72 Mich. 446, 40 N. W. 750, 2 L. R. A. 609, 612, 613; *Hull v. Miller,* 4 Neb. 503; *State ex rel. Douglas Co. v. Frank,* 60 Neb. 327, 83 N. W. 74, 75; *State ex rel. Oldham v. Dean,* 84 Neb. 344, 121 N. W. 719; *School Dist. v. Chapman,* 152 Fed. 887; *Miller v. State,* 3 Ohio St. 475, 484; *Glidewell v. Martin,* 51 Ark. 559, 11 S. W. 882, 883, 884; *Keene v. Jefferson Co.* 135 Ala. 465, 33 South. 435, 438; *Uniontown v. Glass,* 145 Ala. 471, 474, 39 South. 814, 8 Ann. Cas. 320, 321; *West v. State,* 50 Fla. 154, 39 South. 412, 414; *State ex rel. Cheyney v. Sammons,* 62 Fla. 303, 57 South. 196, 200; *Speer v. Athens,* 85 Ga. 49, 11 S. E. 802, 803, 804; *State ex rel. Whitson v. Algood,* 87 Tenn. 163, 10 S. W. 310; *Williams v. State,* 74 Tenn. 549, 553; *Richardson v. Young,* 122 Tenn. 471, 125 S. W. 664, 687, 688; *Jackson v. Weis & L. M. Co.* 124 Tenn. 421, 137 S. W. 757; *McKennon v. Cotner,* 30 Oreg. 588, 49 Pac. 956; *State v. Rogers,* 22 Oreg. 348, 30 Pac. 74; *Andrews v. People,* 33 Colo. 193, 79 Pac. 1031, 1033, 1034; *State ex rel. Aull v. Field,* 119 Mo. 593, 24 S. W. 752, 755, 756; *State v. Wray,* 109 Mo. 594, 19 S. W. 86; Cooley, Const. Lim. (6th ed.) 163. The forestry legislation is directed to a legitimate public purpose. It is the legitimate exercise by the state of its sovereign power as regards the use and disposition of its own property. 26 Am. & Eng. Ency. of Law (2d ed.) 219, 225; 36 Cyc. 869; *Light v. U. S.* 220 U. S. 523, 31 Sup. Ct. 485; *Marshall D. Co. v. Iowa,* 226 U. S. 460, 33 Sup. Ct. 168; *Holmes v. U. S.* 118 Fed. 995, 1000; *Wisconsin v. Torinus,* 26 Minn. 1, 49 N. W. 259, 260. Apart from the consideration of proprietary right, the legislation is justified by legitimate public purposes. The primary authority and duty of determining this question were vested by the constitution

in the legislature. And when it declares a particular use to be public, the sole judicial question is whether the legislative "declaration is so manifestly wrong as not to admit of a reasonable doubt on the question." *Chicago & N. W. R. Co. v. Morehouse,* 112 Wis. 1, 9, 87 N. W. 849; *Wallman v. R. Connor Co.* 115 Wis. 617, 92 N. W. 374; *Allaby v. Mauston E. S. Co.* 135 Wis. 345, 116 N. W. 4; *Wis. River Imp. Co. v. Pier,* 137 Wis. 325, 118 N. W. 857; *In re Southern Wis. P. Co.* 140 Wis. 245, 122 N. W. 801; Cooley, Tax. (3d ed.) 182. Public use is not synonymous with public benefit and need not concern the whole population of the state. *Wis. River Imp. Co. v. Pier,* 137 Wis. 325, 338, 118 N. W. 857. Embraced within the police power of the state is the power to legislate to increase the industries of the state, develop its resources, and add to its wealth and prosperity. *Bittenhaus v. Johnston,* 92 Wis. 588, 597, 598, 66 N. W. 805; *Barbier v. Connolly,* 113 U. S. 27, 31, 5 Sup. Ct. 357; *Jones v. North Ga. E. Co.* 125 Ga. 618, 54 S. E. 85; *Nolan v. Central P. Co.* 134 Ga. 201, 67 S. E. 656, 660; *People ex rel. Detroit & H. R. Co. v. Salem,* 20 Mich. 452, 4 Am. Rep. 400, 406; *Hudson Co. W. Co. v. McCarter,* 209 U. S. 349, 355, 356, 28 Sup. Ct. 529; *Georgia v. Tenn. C. Co.* 206 U. S. 230, 238, 27 Sup. Ct. 618. As supporting the proposition that all the purposes here involved are public, see, also, *Light v. U. S.* 220 U. S. 523, 536, 537, 31 Sup. Ct. 485; *Kansas v. Colorado,* 206 U. S. 46, 99, 27 Sup. Ct. 655; *Marshall D. Co. v. Iowa,* 226 U. S. 460, 33 Sup. Ct. 168; *U. S. v. Grimaud,* 220 U. S. 506, 515, 31 Sup. Ct. 480; *Shannon v. U. S.* 151 Fed. 863, 867; *S. C.* 160 Fed. 870, 873; *U. S. v. Tygh Valley L. & L. Co.* 76 Fed. 693, 694; *Conley v. Daughters of Republic* (Tex.) 156 S. W. 197; *Op. of Justices,* 103 Me. 506, 69 Atl. 627; *People v. Brooklyn C. Co.* 187 N. Y. 142, 157, 79 N. E. 866; *Comm. v. LaBar,* 32 Pa. Super. Ct. 228, 231; *Stockman v. Leddy,* 55 Colo. 24, 129 Pac. 220; *People v. Fisher,* 190

N. Y. 468, 83 N. E. 482, 486. The acquisition and establishment of public parks furnish a further example of legislation looking far into the future and also of legislation resting upon some of the considerations applicable to forest reserves. Such legislation is uniformly sustained. 21 Am. & Eng. Ency. of Law (2d ed.) 1066; Mills, Em. Dom. (2d ed.) § 18; *Shoemaker v. U. S.* 147 U. S. 292, 297, 13 Sup. Ct. 361; *People v. Adirondack R. Co.* 160 N. Y. 225, 54 N. E. 689; *Adirondack R. Co. v. New York,* 176 U. S. 335, 349, 20 Sup. Ct. 460.

For the defendant there were briefs by *B. R. Goggins* and *Hugh Ryan,* special counsel, and separate briefs by *Mr. Ryan,* and the cause was argued orally by *Mr. Goggins.*

MARSHALL, J. The decision in this case has been delayed very much longer than is usual after submission. That circumstance signifies the court's conception of the importance of the particular matter. There has been no undue delay. The questions presented and requiring consideration and decision measure up with anything heretofore dealt with here. When the case was submitted we were confronted with these propositions among others:

1. Legislation has been placed on the statute books, causing large expenditures of public money and imminent peril of further such expenditures, in violation of the inhibition against the state contracting "any debt for works of internal improvement, or being a party in carrying on such works."

2. The modification of such inhibition purporting to have been adopted in November, 1910, and supposed to permit appropriations of money out of the state treasury "for the purpose of acquiring, preserving, and developing the water power and the forests of the state," under which large sums of public moneys have been expended and other such expenditures are imminent, is not a part of the constitution.

3. The legislature in proposing such amendment did not comply with the grant of power in respect to the matter.

4. The particular indebtedness questioned in this case was created pursuant to legislation,

    (a) in violation of the inhibition as to internal improvements;

    (b) in violation of the constitutional limitation of indebtedness to $100,000;

    (c) in violation of the prohibition as to issuance of evidences of indebtedness;

    (d) in violation of the constitutional prohibition as to creation of indebtedness except for emergency purposes;

    (e) in absence of legislative authority, even in form, to buy land on interest-bearing credit.

5. The particular indebtedness is a part of and dependable upon the general scheme contained in secs. 1494—43 to 1494—62, inclusive, Stats., setting aside the state trust fund lands and proceeds thereof to be used, with money derived from taxation, to purchase other lands for reforestation and exploitation for general benefit in violation

    (a) of the terms of the grant by which such trust lands were acquired from the United States and

    (b) in violation of the state constitution pledging fidelity to the terms of the grant from the United States and setting apart "all moneys arising from any grant to the state where the purposes of such grant are not specified" for common school and other school purposes.

6. The legislature, in constructing the forestry scheme, violated the constitutional jurisdiction of the commissioners of public lands over property set aside by the fundamental law for school purposes, wholly ignoring and superseding constitutional limitations in respect to such property.

7. All appropriations for forestry purposes violate the constitutional system limiting all tax burdens to such as are necessary to "defray the estimated expenses of the state."

8. It violates the constitutional system designed to limit all state expenditures to public purposes of a governmental character.

9. So far as within the police power, it violates the constitutional limitation upon the exercise thereof.

10. The legislative plan for burdening the lands in the forest reserve for local taxation purposes, violates the constitutional requirement for uniformity of "rule of taxation," the prohibition of "special legislation for the assessment or collection of taxes," and the right of local self-government.

Each of such propositions was so supported as to challenge the most serious attention thereto of representatives of the state and its officers, who, as indicated, were charged with being the legislative instrumentalities for burdening the state with illegal taxation, wrongful diversion and waste of its school funds and property, depletion of its treasury, and increase of its indebtedness. It was claimed, and not without reason, as will be seen later, that the trust funds and trust fund lands,—notwithstanding the protection of the state's obligation to the United States and the mandate of the state constitution,—have been inextricably confused with other funds and lands and diverted from their legitimate purpose to such as are entirely foreign thereto, causing loss to such trust funds of thousands of dollars, ignoring their sacred character and entirely imperiling their existence.

There was no other way under the circumstances by which the great interests of the state could be properly conserved, but for the court to exercise in a somewhat extraordinary, but proper way, its power to prevent and redress wrongs, particularly where vital interests of the whole people were imperiled. That was done, as indicated in the statement, by supervising the formation of issues so as to bring all the matters referred

to definitely before it upon the record, and by restraining further activity within the alleged scope of illegalities until such time as the real rights involved could be considered and as the result of exhaustive study, be determined. We should say, in passing, that the state officers who now are the commissioners of public lands, were not adversary to having such questions thus presented for solution, but rather were favorable thereto and co-operated in having the right of the matter vindicated.

It is believed that the situation sought, as stated, to be reached by the court, has been attained as nearly as can be under the circumstances. That some diversity of views should exist where so many important far-reaching questions are involved, having to do with a long practice, developed through legislative promotion from a small beginning to the state indicated, is unavoidable. Happily there is practical unanimity on the generality of questions which we must answer. They will be taken up in the order which seems best suited to the case, though quite out of that seen in the statement, which follows more closely the presentation by counsel.

## I.

Is the second proviso to sec. 10, art. VIII, of the constitution, purporting to modify the original general disability of the state as to internal improvements, so, as is supposed, to authorize state appropriations and expenditures for "acquiring, preserving, and developing the water power and forests of the state,"—a part of the fundamental law?

The principles applicable to the stated question are so fully set forth in *State ex rel. Postel v. Marcus, post,* p. 354, 152 N. W. 419 (as modified on rehearing), it is sufficient to refer thereto, restricting the treatment here, in the main, to a statement of the facts.

The joint resolution which resulted in the proviso above mentioned appearing in the official publications as part of the state constitution, was introduced in the Senate at the 1907

session.    The only notation on the Senate Journal at first is this:

"Jt. Res. No. 43 S.

"Providing for an amendment to section 10 of art. VIII of the constitution relating to internal improvements.

"Resolved by the Senate, the Assembly concurring, that section 10 of article VIII of the constitution be amended by adding at the end of said section the following: 'Provided that the state may appropriate money for the purpose of acquiring, preserving, and developing the water power and the forests of the state.' "    S. J. 674.

That is identical, so far as it goes, with the language finally written into the constitution; but, sometime during the proceedings in the legislature, this was added without being spread on the journal either by itself or as a part of an entire proposal: "But there shall not be appropriated under the authority of this section in any one year, an amount to exceed two-tenths of one mill of the taxable property of the state as determined by the last preceding assessment."

Thus the possible burden per year for the new activity was restrained to about $500,000, according to existing conditions, with progressive probabilities which, in time, might reach a much larger amount.

In due course, a substitute was proposed which was not entered on the Senate Journal.    S. J. 1049.

Later, a second substitute was proposed.    S. J. 1119.    It was not entered on the journal.

The second substitute was adopted.    S. J. 1134.    It was not, at any time, entered upon the journal of either house *in extenso* or by title.

After adoption of such substitute, substitute No. 1 was withdrawn and the resolution was passed without journal entry as to its final form.    S. J. 1134.

The action of the Senate was, in due course, reported to the Assembly and the resolution was entered on the journal by its

number and origin without any indication of its import. A. J. 1298.

Later, without reference to any committee, the Senate resolution was concurred in; no journal entry being made other than of the vote, except this: "Jt. Res. No. 43 S., providing for an amendment to Section 10 of Art. VIII of the Constitution relating to internal improvements."

At the legislative session of 1909, an attempt was made to submit the proposition of 1907 in the Senate by Joint Resolution 33 S., and in the Assembly by Joint Resolution 38 A.

The resolution as entered on the Senate Journal purports to embody the action of the previous session and includes sec. 10 of art. VIII as it would appear if amended as proposed. It omitted the earlier change relating to highways, making a very different proposal than that of the previous session.

In due course, Joint Resolution 33 S. came before the Senate for action upon a substitute which was adopted, and in its new form the resolution was passed. S. J. 731.

What the nature of the substitute was is not disclosed by the journal. The only reference to the matter after the resolution was introduced, is by number. The actual title, from first to last, is this: "A joint resolution purporting to amend the constitution, permitting the state to appropriate money in excess of $100,000 for the purpose of acquiring and developing water powers and forests of the state." Quite different, as will be seen, from the resolution as introduced at the 1907 session.

In due course, the Senate resolution was received by the Assembly, but no journal entry was made indicating its purport. A. J. 842. After the several steps had been taken without any more expressive journal entry, the resolution was ordered "held at the clerk's desk for reference to the special committee on waterways to be appointed." A. J. 1009. Such

committee was in contemplation, as what follows will indicate. The clerk's indorsements on the resolution agree with the journal entries. The last is this: "Referred to special committee to be appointed by the speaker for the special session."

May 1, 1909, a joint resolution was adopted providing for a committee to consider several matters and report at a special session which was in contemplation. In general scope, they included the subject of Joint Resolution 33 S. and Joint Resolution 38 A. Both were referred accordingly. The committee was not appointed. The contemplated session did not occur. Thus both the resolutions dropped out of sight.

In anticipation of the adoption of Joint Resolution 33 S., Bill 553 S. was introduced; providing, as usual, for submission of the proposed amendment to a vote of the electors. The bill erroneously recited that the proposal had already been agreed to by the Senate and Assembly. It was passed in the Senate May 25, 1909, and concurred in by the Assembly June 9, 1909. There was no yea and nay vote nor record showing by what vote the matter was passed in either house. In due course, it became ch. 514, Laws of 1909.

It is thought that no discussion is necessary for the purpose of demonstrating that the facts detailed come far short of satisfying the requirement of sec. 1, art. XII, of the constitution conferring upon the legislature the ministerial power to formulate proposed amendments to the constitution. The proposal, as agreed to, at the first session was not, in any sense, entered on the journals of the two houses. At the second session it was not entered on the Senate Journal nor on the Assembly Journal, nor was it agreed to by the Assembly. Such journal entries, at the second session, though advisable, were not vital, as held in *State ex rel. Postel v. Marcus, post,* p. 354, 152 N. W. 419.

The failure by the Assembly to concur in the Senate resolution was not, by any means, cured by its concurring in

Bill 553 S.   That did not purport to pass on the resolution. It proceeded regardless of the condition thereof.   The fact that it was not passed by a recorded yea and nay vote in either house, of itself, leaves no fair basis, from any viewpoint, for holding that it supplies the place of an express approval of the proposal to amend.

Testing the foregoing by *State ex rel. Hudd v. Timme,* 54 Wis. 318, 11 N. W. 785, "No amendments can be made under this section without a compliance with all its provisions both in the passage in the legislature and the submission to the people," fatal infirmity is easily seen.

If all else could be successfully passed by in this case, the fact that the proposal was not passed upon, at all, in the Assembly at the session of 1909 would be insurmountable.   Such an effort, as in the case heretofore decided, to be efficient must be characterized, among other things, by these circumstances:

The proposal must be acted upon favorably by a majority of the members elected to each house, evidenced by a recorded yea and nay vote.

If agreed to at the first session, it must be entered, substantially, upon the journals of each of the two houses, as indicated in the final decision in the *Marcus Case.*   At the next session of the legislature each of the two houses must agree to the precise proposal agreed to at the previous session, and that must be evidenced by a recorded yea and nay vote in each house.

We may well add that, Senate resolution 33 aforesaid, was not published as having been agreed to.   How it came about does not appear; but the fact is that Assembly resolution 38 was published, which never passed out of the Assembly and was referred, as before indicated.   The executive officers of the state have, in several ways, treated the proposed amendment as not adopted.   It was not published in the laws of 1909.   The legislature of 1911, inferentially, declared the previous proceedings void by commencing anew to change the

constitution substantially as before.   Laws of 1911, p. 1386. The legislature of 1913, likewise passed upon the matter by making a third attempt to so amend the constitution.   Laws of 1913, p. 1120.

Therefore it is considered that the second proviso to sec. 10 of art. VIII of the constitution, as printed in the official publication, is no part thereof and does not furnish any support for the proceedings called in question in this case.   So far as such proceedings and others concerning the administrative acts of acquiring and using lands for the development of forests and water powers and legislation in respect thereto are within the constitutional scope of "works of internal improvement," they must be declared void.

We think proper to remark as of public interest, that it is a mistake to suppose the judicial disapproval of a legislative effort to propose a constitutional amendment to the people, is based on what is commonly termed in legal matters "technicalities."   It is very far therefrom.   Those who assume to teach on this subject should be very careful not to inculcate false notions in respect to such an important matter.   To characterize the point that there has been a failure to do a thing which the people made a condition precedent to efficiency of the particular activity of amending the constitution, a technicality, shows want of appreciation of the very basic features of a constitutional system and, unwittingly, breeds disrespect for such a system, if not for law in general. The court does not accord any dignity to mere technical accuracy in respect to nonessentials, and none in any situation unless required by mandate of written law.   But the court is in duty bound to decide upon what is technical or directory, and what is substantial and mandatory.   What the people in creating our form of government made material, no one has a right to say is not, or is technical, in the common acceptation of that term as being mere matter of form.   The court can-

not so invade the sovereign command unless its trusted instrumentalities violate the solemn obligations to which they are pledged by their oaths of office.

## II.

Is the indebtedness created for purchase of land for reforestation and water-power purposes within the constitutional prohibition contained in sec. 4, art. VIII, of the constitution, providing that "The state shall never contract any public debt except in the cases and manner herein provided"?

Little time need be spent in answering that question. For the purpose thereof we will assume for now, without deciding, that the state forester has authority to sign the corporate name of the "State of Wisconsin," by himself, as its authorized officer.

The obligations to pay for the contract lands may be, at this point, considered, apart from the evidence of it. If any authority existed to purchase land, obviously, the agreement to pay in consideration of the agreement to sell, which characterized all the actions of the state forester in the purchase of land, created indebtedness.

There is nothing particularly technical about the meaning of the word "debt" as used in the constitution. It includes all absolute obligations to pay money, or its equivalent, from funds to be provided, as distinguished from money presently available or in process of collection and so treatable as in hand. *Earles v. Wells,* 94 Wis. 285, 68 N. W. 964; *Doon Tp. v. Cummins,* 142 U. S. 366, 376, 12 Sup. Ct. 320.

There was an unqualified promise to pay in all the land purchase transactions. The character of each was the same as that of any ordinary binding promise to pay in consideration of a promise to sell and convey the agreed equivalent. They were not grounded on money presently, or its equivalent, available for their discharge, but upon anticipated means to be derived from state appropriations running years into

the future, and proceeds derivable from state property. That the promise to pay, so far as any competency existed, created state indebtedness, does not seem to admit of a question.

### III.

Is the indebtedness, so called, incurred, within the exception of the prohibited competency mentioned in sec. 4?

The language of such exception is very precise and its meaning unmistakable. "The cases and manner herein provided" requires us to find express authority to create such as that in question and to create it in the particular manner attempted. The only purpose specified as within the exception is found in secs. 6 and 7 of art. VIII of the constitution, as follows:

"For the purpose of defraying extraordinary expenditures the state may contract public debts (but such debts shall never in the aggregate exceed one hundred thousand dollars). Every such debt shall be authorized by law, for some purpose or purposes to be distinctly specified therein; and the vote of the majority of all the members elected to each house, to be taken by yeas and nays, shall be necessary to the passage of such law; and every such law shall provide for levying an annual tax sufficient to pay the annual interest of such debt and the principal within five years from the passage of such law, and shall specially appropriate the proceeds of such taxes to the payment of such principal and interest; and such appropriation shall not be repealed, nor the taxes be postponed or diminished, until the principal and interest of such debt shall have been wholly paid.

"The legislature may also borrow money to repel invasion, suppress insurrection, or defend the state in time of war; but the money thus raised shall be applied exclusively to the object for which the loan was authorized, or to the repayment of the debt thereby created."

It would seem that little, if anything, need be said to demonstrate that the obligations, aggregating some $230,000 in all, and undischarged to the extent of some $130,817.35 when this action was commenced, answer to the constitutional mean-

ing of "public debt" and do not answer to its call for exceptional cases for incurring such debts or for manner in respect thereto. The particular infirmities are too clear to require being pointed out.

There was no option feature about the purchase agreements, as in *Burnham v. Milwaukee,* 98 Wis. 128, 73 N. W. 1018, and *Stedman v. Berlin,* 97 Wis. 505, 73 N. W. 57. The absolute liability was not contingent upon some future occurrence, as in *Herman v. Oconto,* 110 Wis. 660, 86 N. W. 681; *Vaughn v. Montreal,* 124 Wis. 302, 102 N. W. 561. Payment was not made dependable upon particular funds, as in *Brown v. Ringdal,* 109 Minn. 6, 122 N. W. 469, nor appropriations without incurring any indebtedness *in præsenti,* as in *Fleckten v. Lamberton,* 69 Minn. 187, 72 N. W. 65.

Much time might be spent in reviewing the numerous cases, brought, by the industry of counsel, to our attention. It may well be admitted that courts have been quite, and perhaps too, resourceful in discovering methods of so construing the term "debts" and "indebtedness" as to restrict the meaning thereof so as to meet the exigencies of particular cases. The safest way is to cut quite loose from case law and look to the fair meaning of the constitution itself. To study the many judicial sayings and endeavor to evolve a rule of unwritten law therefrom would be liable to impair the constitutional mandate and add to the confusion which I think already exists. This court, in the public utility and option cases, has given as broad a meaning to the constitution as can well be accorded thereto. These agreements come far short of satisfying the logic of those cases. They are absolute promises to pay sums of money, fixed as to amount, *in præsenti,* with payments deferred and without reference to money in hand or equivalent.

## IV.

Are the obligations, in form, within the prohibition of sec. 9, art. VIII, of the constitution providing that "No

scrip, certificate, or other evidence of state debt whatsoever, shall be issued except for such debts as are authorized by the sixth and seventh sections of this article"?

.What has been said under the previous head sufficiently answers this question. Obviously, the excepted indebtedness for which evidences may be issued does not include such as that in question, as we have seen. Given the premises, that the promise to pay created a state debt and that such debt was within the prohibition of sec. 4, aforesaid, of the constitution and it follows, logically, and conclusively, that the written contracts embodying promises, as is ordinarily the case, *inter partes,* where there is mutuality of absolute obligations, are "evidences of state debt" in the constitutional sense of the term.

· ' It will not do to restrict the meaning of "evidence of state debt" to municipal bonds or other similar obligations, because, impliedly, secs. 6 and 7 refer to debts, commonly and well nigh universally, evidenced by such obligations. The clause is in words of limitation respecting the manner in which the state may become indebted. The prohibition in the later section harmonizes with that in sec. 4 and the exceptions in secs. 6 and 7, and is so phrased as to leave no possible room for construction. No "evidence of state debt whatsoever" is permissible except for the particular purposes mentioned in secs. 6 and 7.

.V.

Were it not for infirmities in the land purchase agreements, assuming for now that ch. 639, Laws of 1911 (sec. 1072—1, .Stats.), is constitutional, is the particular agreement which gave rise to this litigation,—the Sanborn contract so called,— one authorized thereby? The enactment, in terms, appropriated $50,000 per year for a period of five years and the interest thereon as a forestry investment fund, authorized the state forester, under the supervision of the state board of forestry, to contract for the purchase of land as an addition to

the forest reserve, and to pay therefor out of the forest reserve fund as moneys became available. Under this and other sections very broad powers were attempted to be given to the officer, called state forester. A legislative creation removed from control of any of the constitutional departments of the state, by jurisdiction as to competency of the active officer being conferred upon a minor United States official and his selection, subject to such jurisdiction, being placed with a board, called the state board of forestry, made up of five members, three not officers of the state, one constitutional officer, and one appointee of the governor—was substantially given all powers formerly exercised by the commissioners of public lands named in the constitution—the secretary of state, the attorney general, and the state treasurer; and large additional powers were conferred upon such officer under the supervision of the practically nonofficial board, no one except the attorney general being responsible directly to the people. Such officer, so clothed with large powers was not required to be a citizen of the state or give bonds, as in ordinary cases to secure fidelity to his trust. This situation is not referred to in criticism of the public policy evinced thereby, but as throwing some light on the probability of whether the legislature purposed by the statute under consideration to confer upon the state forester the extraordinary authority to sign the corporate name of the state to contracts of the nature of those under consideration. They might have run up to a very large amount,—hundreds of thousands of dollars,—$250,000 referable to the particular piece of legislation. The contracts, though signed by the state of Wisconsin, do not contain any personal signature except that of the state forester and the president of the state university in his capacity as chairman of the board of forestry.

The extraordinary authority thus assumed would, of itself, suggest ambiguity in the legislation calling for construction, if it were plain in its letter. It is not altogether plain. One

would expect to see authority of the large nature suggested conferred, if at all, even upon constitutional officers of the state, clothed in plain unmistakable language. *A fortiori,* when conferred upon a legislative creation the selection of which was practically surrendered to an outside agency and a nonofficial class, not answerable to the people and not under bonds for fidelity to the trust.

We are unable to find authority, even in form, conferred to make such contracts as those in question,—long-time interest-bearing absolute obligations to pay. An investment fund was contemplated and payment out of that as available, which might be cut off at any session of the legislature. It is quite significant that the forester by the terms of the act was to contract for lands payable out of the investment fund as available, not payable in fixed sums and at stipulated times with interest. The fund was denominated an investment fund and language·was used, showing, unmistakably, that it was expected to be augmented by interest, in striking contrast with the idea of using the fund for payment of large sums of accrued interest on land purchase obligations.

The question of whether the Sanborn contract, dated June 1, 1911, in fact, antedated the act of 1911 which was approved July 11, 1911, was argued at considerable length. There are some reasons for holding in the affirmative and some for a contrary view. As we have already seen, and shall see further, if this point were important in any event, it is so overshadowed by other features of the case as to practically drop out of sight. We will dispose of the point on the assumption that the indebtedness on the Sanborn .contract of $90,076.11, originated after the act of 1911 became in force, notwithstanding the conflict as to dates. Most of the contracts in number and also in amount, if we consider the San-born contract as indicated, making up the entire amount around $200,000 of indebtedness contracted, were made after the act of 1911 took effect. Nothing in the foregoing should

State ex rel. Owen v. Donald, 160.Wis. 21.

be taken as casting any reflection upon the incumbent of the office of state forester. Nothing which we have perceived in this case casts the slightest discredit on him personally. On the contrary, there are many evidences of most distinguished devotion to the legitimate duties he was employed to perform.

## VI.

If by any possibility we were mistaken in our conclusions up to this point, we would then face this question: In making the land purchase contracts was sec. 6, art. VIII, of the constitution violated as to the feature limiting state indebtedness to $100,000?

We see no way of escape from the conclusion that such question must be answered in the affirmative. The statement of facts plainly shows this: The purchase contracts themselves far exceeded the constitutional limit. True, the limit, looking only to such contracts, was not reached by the Sanborn contract, but the state was indebted, in fact, at the time of making the first contract in a sum exceeding $2,000,000. As indicated in the statement, it was mostly incurred during the Civil War and to defray cost of constructing the state capitol and hospital for the insane; some being borrowed, so called, direct from the trust funds of the state, and some by issuing obligations in the shape of bonds and other evidences of indebtedness. None of this was, really, ever paid. The evidences of debt were taken out of circulation, so far as any reached that stage, by the commissioners of public lands as an investment for trust funds under legislative authorization, in form. All was used for legitimate state purposes and, doubtless, the state is morally and equitably liable to make the trust fund good, and it has done so up to date by paying interest on the indebtedness out of the proceeds of tax burdens, contrary to the constitutional plan. The state is liable to make good the misuse the same as any trustee is responsible for money intrusted to his care. Whether the state is remediably so liable, does not matter for the purposes of this

case. It has always recognized liability by maintaining outstanding interest-bearing evidences of debt, made in due form, as between borrower and lender, and, doubtless, will continue to do so without interference from any source, until some efficient plan shall have been adopted and executed for their retirement. Had the trustees asserted their constitutional power when they might have done so, they could have preserved their trust inviolate in spite of legislative direction. Had forces been seasonably put in motion to redress departure from the legal course it would have been somewhat troublesome to them and their sureties notwithstanding they were so. morally innocent.

It is very plain that the constitution made the three constitutional officers a board of commissioners for the administration of the university and school lands and the funds derived therefrom. Sec. 7, art. X, Const. That provided for the sale of all such lands. All, until within recent years, as regards sales and protection of lands, was administered under such provisions. The board was made an independent entity, substantially an artificial person like a corporation, referable for its authority solely to the fundamental law, except as to some particulars, and not to the legislature. The latter possessed power for the purpose of conservation of the trust, but no power to breach it, or afford authority to the constitutional board to do so. The only way the state, if it were not for disability as to restrictive use of the trust fund and as to incurring indebtedness, could properly obtain any part thereof for general governmental purposes, is by creating the relation of debtor and creditor.

The policy pursued by the state during the distressing conditions existing during the Civil War, it is not our business at this late day to criticise. The emergency was one of that overshadowing character which, sometimes is supposed to excuse, if not justify, a breach of some feature of the fundamen-

tal law for the purpose of saving the sovereignty which cre-
ated it. But that does not militate against the fact that some
over $2,000,000 of state certificates of indebtedness held by
the constitutional board of trustees of state trust funds, stand
for indebtedness in fact, the same as if the money had been
borrowed in the ordinary way.

The fact that the money so obtained has been returned to
the state, principal and interest, to the extent of $2,257,-
291.74, or thereabouts, does not change the situation. It has
never been returned to the trust fund. The history of this is
strange, " 'tis passing strange," but involves no moral turpi-
tude. It demonstrates, however, how prone the people are,
unless restrained by a strong arm, to leap over the very bar-
riers they have created for their own protection.

Of the original indebtedness to the trust funds, there stands
the $100,000 of the bonded indebtedness for the state capitol
and hospital for the insane, incurred in 1862 and 1863, taken
by the board of commissioners of the trust funds as an invest-
ment and so remaining. That, of itself, was enough to ex-
haust the capacity of the state to borrow money. Again, the
indebtedness to the trust fund includes several hundred thou-
sand dollars borrowed by the state and used for general state
purposes. As indicated, why the large sums paid to the state
to reimburse it for the trust fund depletion were not returned
thereto, is not our business. The fact, though, is important
here that, notwithstanding payment to the representatives of
the state of $2,257,291.74, none of it reached the trust funds.
It was used for general state purposes and to lighten the bur-
den of taxation. Whatever wrong is thus involved the con-
stitutional elective officers of the state, legislative and execu-
tive, except the justices of this court, have been to some ex-
tent participants therein with passive consent of the people
and without moral turpitude and without, in a technical sense,
any financial loss to the state, assuming that it obtained value

received for its expenditures. But the real test of what is wrong, in an ethical sense, does not rest in whether there is injury nor whether the transgression is remediable.

As before indicated, though we thought it proper to indulge in the observations above, we appreciate that the policy involved in the past of handling of the trust funds as regards the use thereof as a source from which to borrow by the state is a matter we have nothing to do with in this case, except as it incidentally throws light on the character of the certificates of indebtedness we have discussed.

If this case so brings to public attention such real character as to cause greater fidelity in the future to the great trust created by the constitution and stimulate, to effect, remedial measures for the past, it will have served a monumental purpose. For now, suffice it to say, that the certificates of indebtedness of the state held by the board of commissioners of school and university lands represent state debts, within the meaning of sec. 6, art. VIII, of the constitution, and no act of the legislature can properly change that situation. The school and university trust funds are high above the competency of the legislature to destructively assault them.

## VII.

This further question is presented as overshadowing all heretofore treated as regards the land purchase agreements, and, as counsel for defendant claim, strikes at the very foundation of the legislative scheme of which the law of 1911 is a part and is supposed, by the state agencies, to specially authorize such agreements if no authority existed before:

Does the forest reserve scheme provided for by sec. 1072—1, Stats. (ch. 639, Laws of 1911), and secs. 1494—41 to 1494—62, inclusive, contemplate state participation in works of internal improvement, within the meaning of sec. 10, art. VIII, of the state constitution?

To such extent as the stated question must be answered in the affirmative, such scheme must fall under the condemna-

tion of the fundamental law, since the legislative effort to amend it failed, as we have seen.

What are "works of internal improvement," in a constitutional sense, would admit of differences of opinion as an original proposition. If it be confined to the particular kind of improvements which moved the framers of the constitution to make the broad prohibition a part of the fundamental law, it means one and a somewhat narrow thing. If it was a principle the constitution makers had in view, and not particular activities within the scope of such principle, it means quite another and covers a very broad field.

It will be instructive to look at the matter under consideration from the various viewpoints. If the line of sight from each of the points of view leads to the same result, the conclusion which should be pronounced will stand upon pretty solid ground.

### The legislative view.

By attempts to amend the constitution so as to cover the subject, as we have seen, the legislature most considerately, consistently, and persistently treated reforestation as involving a work of internal improvement. Not only at one session but at three, it was so treated. By two joint resolutions in 1907, two more in 1909, and Bill 553 S., the subject was referred to as "relating to internal improvements." The "appropriation of money for acquiring and developing water powers and forests" was likewise made referable thereto. The final act, as before stated under another head, embodied in ch. 514, Laws of 1909, bears this title: "An act to submit to the people an amendment to section 10 of article 8 of the constitution, relating to internal improvements." There we have the legislative conception of the joint resolution which failed; entitled as a proposal to authorize appropriation "of more than $100,000, for acquiring and developing water powers and forests." Referring more particularly to the legislative construction, the legislature of 1911 by the new attempt

to accomplish that which failed before, labeled the resolution "To amend section 10 of article VIII of the constitution, relating to internal improvements." Laws of 1911, p. 1121. The repetition was by a still broader proposition bearing the same label in the legislature of 1913. Laws of 1913, p. 1386. Those efforts at four sessions to embody in the constitution authority to appropriate money for internal improvements of the character specified therein, viz.: "acquiring, preserving and developing the water powers and forests of the state" as phrased at first; "permitting the state to appropriate money in excess of $100,000 for the purpose of acquiring and developing water powers and forests of the state" later; then: "Providing that the state may appropriate moneys for the purpose of acquiring, preserving, and developing the water-power resources and forests of the state," and lastly: to "regulate or improve the navigable waters or streams in the state, and to acquire, preserve, regulate or develop the water supply, water powers, lands and forests in the state"—make about as strong a case respecting the legislative idea of whether the particular activities under consideration are "works of internal improvement" as circumstances could create.

It will be observed that the various phrasings of what was in the legislative mind check up with the language found in some parts of the reforestation scheme and with the spirit of the whole.

True, the legislative idea does not settle the matter at issue. While it shows the legislative intent, pretty conclusively, what meaning the framers of the constitution intended to convey by the term "internal improvements" might be more restrictive. We must recognize that it is the latter which is the subject for discovery. It may be that the forest reserve scheme, to some or much extent, is legitimate, yet that its promoters persuaded the lawmakers to go so far that the very magnitude of the undertaking as it developed aroused appre-

ciation of a probable constitutional peril, leading to the strenuous efforts indicated to guard against it by the fundamental law, in its letter, according to legislative interpretation covering the subject favorably to the enterprise.

### Former judicial view here.

We note that counsel for plaintiff recognize that the words of the constitution must be accorded the meaning its framers attributed thereto, though some other reasonable meaning might be gathered therefrom if we were not thus restricted. That is a cardinal rule of construction which we will refer to on another branch of the case.

A further concession of counsel we must accept as sound. That is, that if the words "internal improvements" are to have a broad general meaning they must be held to include the use of public money for the purchase of lands and the preservation and development of water powers and forests thereon and much of the activities contemplated by the forestry scheme. In that connection it is confidently suggested that "the broad and general meaning being an impossible one the restrictive meaning in which the words must, necessarily, have been used is the thing to be sought for."

If it were true that, "the broad and general meaning is an impossible one," the conclusion of counsel would appear very plausible. It seems that taking the whole of counsel's reasoning it is illogical and the conclusion a *non sequitur*. If the premise in the latter part were accepted as a verity, the conclusion would be quite clearly correct. But what right have we to assume that "the broad general meaning is impossible?" If that be correct, or if the words must "necessarily have been used in the restricted sense" of referring to some particular species of "internal improvements" instead of to declare a principle of general application, then this court must have made a serious mistake in the line of logic

adopted and the conclusion reached in *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 91 N. W. 115, and other courts have made a like mistake as we shall see.

The case to which we refer did not escape the attention of counsel. But it seems they did not get the right idea out of it. It did not deal with any such internal improvements as "channels of trade and commerce" which is thought to be the restrictive meaning of the term "internal improvements" now contended for. It applied the "broad general meaning" which is now said to be "impossible" to include the particular enterprise. It was conceded that the particular matters were what had challenged the attention of the members of the constitutional convention and that the question was whether their view was thus restricted in guarding against dangers to the prospective new state. We cannot do better now than to adopt the course of reasoning which then led to a unanimous conclusion. That conclusion must be followed now or be overruled. The fact, if it be a fact, that such result will or may lead to some embarrassment in respect to other enterprises which the state has entered upon at public expense, can make no difference. The constitution must be upheld at all hazards until the people who made it see fit to change it. It is not likely that they would sanction large general taxation which cannot, in the very nature of things, come home to them, individually, if they had an opportunity to pass on the matter directly. A constitution would be of little protection to the people against their representatives who might for a time lose sight of the wise limitations of the fundamental law, if the very result of the infraction could be successfully held up to intimidate those who are charged with the duty of rectifying the mischief.

The calamities which had befallen the people of neighboring and near-by states from the creation of debts and burdens of taxation for "works of internal improvement," had made a deep impression upon the people of the territory before the

selection of delegates to formulate a constitution for the prospective new state. How to avoid the mischiefs which had so befallen the people of other communities was regarded as one of the greatest problems to be solved. The difficulties to be overcome and the fears that they might not be successfully met, constituted a powerful deterrent to the formation of a new government and surrender of the advantages of the territorial organization. No halfway work would satisfy, as will be seen, so as to insure adoption of the work of the convention by the people. That was well understood. Imbued with that sentiment, the constitutional convention of 1846 approached consideration of the subject. A committee was appointed upon the particular matter. From the beginning to the end, there was no lessening of the determination to encompass the matter in hand effectually if possible. The committee's report was one of the first to come before the convention. It was as follows:

"Internal improvements shall forever be encouraged by the government of this state. But the legislature shall, in no case, create or incur a state debt for that object, without at the same time providing means for payment of interest thereof and final liquidation of the same."

That proved very unsatisfactory. Methods of strengthening the prohibition were suggested and on motion of Hon. E. G. Ryan the whole matter was referred to a special committee of seven. He was made its chairman. In due course, the committee reported this:

"Section 1. The state shall encourage internal improvements by individuals, associations and corporations, but shall not carry on, or be a party to carrying on, any work of internal improvement, except in cases authorized by the second section of this article."

"Section 2. When grants of land or other property shall have been made to the state, specially dedicated by the grant to particular works of internal improvement, the state may

carry on such particular works, and shall devote thereto the avails of such grants so dedicated thereto; but shall in no case pledge the faith or credit of the state or incur any debt or liability for such works of internal improvement."

"Section 3. All lands which come to the state by forfeiture or escheat, or by grant, where the grant does not specially dedicate the same to any other object, shall be held by the state as part of the state school fund, under the same trusts, reservations and restrictions as are provided in this constitution in regard to school lands proper."

We shall later recur to this last and very significant section on another branch of the case.

The unqualified, unmistakable character of the effort of the Ryan committee is about what one would naturally expect to come from the hands of its distinguished head. It left no room for construction, as was doubtless thought. The reference thereto in the second convention, is convincing evidence of that. What was aimed at was the declaration of a principle as broad as plain English words could make it. The recommendation without change became a part of the proposed constitution.

The only possible weakness in the proposal thus submitted to the people was the pledge of state encouragement of internal improvements. The fear was that through such avenue some way would be found to use state revenues and state property for other than ordinary state purposes. However, the proposal was, in general, approved though the constitution as a whole was disapproved and, of course, the particular proposal went with the rest; though it furnished the model for guidance in the second convention.

There was still a deep-seated fear that insecurity lurked in the move to form a new government and the people demanded to be convinced of the contrary and to that task the second convention bent all its energies, proceeding by the light of the former experience. The favor with which the particular clause was received before was referred to in the convention,

frequently, and was given much significance by this court in *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 91 N. W. 115, as indicating, pretty clearly, that the principle of exclusive individual and local communal instead of state enterprise was the thing the framers of the constitution had in mind and not any particular class of internal improvements.

Speaking of the history of the subject in the second convention this court before said:

"In the convention of 1847 . . . the clause from the former which directed encouragement of internal improvements by private enterprise was at first reported but afterwards dropped out, and that prohibiting the incurring of any indebtedness therefor was inserted. The debates make entirely clear, however, that the choice made was between the policy of permitting governmental construction of 'internal improvements,' and that of leaving them to come by private enterprise. The same choice was obvious in Michigan, when in 1850 the people reversed the policy commanded by the constitution of 1835, and adopted a prohibitory section substantially like our own. . . .

"There cannot be doubt that this quarter century of vehement discussion had produced a fairly definite conception of what had come to be designated 'internal improvements,' which either the government was to undertake, or was to leave to private enterprise, according as one policy or the other prevailed. We think it clear that such conception included those things which ordinarily might, in human experience, be expected to be undertaken for profit or benefit to the property interests of private promoters, as distinguished from those other things which primarily and preponderantly facilitate the essential functions of government. Of course, this line of classification does not exclude possibility that the dominant characteristics of one class may be present in illustrations of the other. A toll-earning canal which gathers spreading water within its banks may promote public health, as also may a drainage system undertaken for improvement of the lands of those who construct it. Improvement of the grounds of a state institution may improve access to, and enhance the value

of, private property. But in each case the dominant purpose is obvious, and therefore the classification along the line of distinction above stated." *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 38, 91 N. W. 115.

The idea that the constitutional conception of the term "works of internal improvement" was restrictive in character, and included only avenues of travel and commerce upon which the calamitous expenditure of public state money had been made elsewhere, and so had imperiled the welfare of the older states, was repudiated in the light of the times in which the constitution was framed, the proceedings in respect thereto, and authority elsewhere to which we will specially refer.

The following were pointed to as illustrating the broad character of the term under discussion: Dredging sand flats from a river; deepening and straightening a river; constructing a street railway; telephone and telegraph lines; irrigation reservoirs, roads, highways, bridges, ferries, streets, sidewalks, pavements, wharves, levees, drains, waterworks, improvement of Fox river have been held to be internal improvements. It was said that, whether a particular enterprise answers to the call for a public purpose, is not the test of whether it is outside the constitutional prohibition; that many matters so answer and on that account power in respect to them may be delegated to governmental subdivisions of the state; but such public enterprises are not governmental in character and may be undertaken by private enterprise though having some measure of governmental purpose, and, so, are works of internal improvement in a constitutional sense.

The result was that the court held that an appropriation of money for the purpose of constructing and strengthening the levee system so as to prevent the waters of the Wisconsin river from escaping from its banks, is a "work of internal improvement" prohibited by the constitution, notwithstanding the purpose was very much of public character.

After quoting with unqualified approval the decision of the

supreme court of Minnesota, which we will repeat later, this was declared as the principle to be observed:

"In the light of the historical situation surrounding the framing of the constitution, and the construction, both practical and judicial, since given, we cannot doubt that, *prima facie,* levees or dikes to restrain the waters of a navigable river are works of internal improvement, within the meaning of the prohibitory section . . . and that, too, whether the main purpose be promotion of navigability, creation of water power, or reclamation of adjoining lands.   In any of these there is enough of pecuniary benefit to warrant belief in the possibility, at least, that they may be undertaken by private enterprise or local associations." *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 40, 91 N. W. 115.

We note how, *ex industria,* the court attempted to give the broadest meaning reasonable to the particular term, "warranting belief in the possibility, at least," that they might be the subject of enterprise other than that of a state character at state expense.   Note also the emphasis put before upon the practical construction which had been given in this state to the constitution for half a century, in that nothing in the nature of "works of internal improvement," in the broad meaning of the term, had, up to that time, been undertaken at state expense.

*Judicial construction elsewhere which this court, as above stated, approved.*

As stated in the *Jones Case,* Minnesota, Michigan, and some other states followed the policy adopted here and under the same conditions.   That particular fact gives significance to the position of this court, since the meaning of the particular term, whether broad or narrow, is governed very much by the characterizing circumstances of its use at the start in the particular locality under consideration, as we have heretofore said, approving of the contention of counsel for plaintiff on that subject.

The particular states mentioned, as a result of a contest the same as here, even discountenanced state interference at state expense in matters of internal improvements to the extent of pledging all lands and money appropriated to the state by the United States for internal improvements, to school purposes, so far as Congress would consent, and so dedicated all other granted lands where free to be so appropriated. That was intended to reach the swamp lands, as we shall see later in treating another branch of the case. It is only referred to now to show the scrupulous care exercised by the framers of the constitution to leave no avenue of escape from the sweeping prohibition.

After the change in Michigan from a policy of state engagement in "works of internal improvement" which occurred in 1850, by substituting in lieu of the constitutional provision for state appropriation for such purposes a prohibition the same as ours, the new policy was vitalized, very greatly, by the court's construing it strictly in favor of the prohibition, instead of as before construing the grant broadly in favor of the power. That will be seen by an examination of the following: *Ryerson v. Utley,* 16 Mich. 270; *People ex rel. Hubbard v. Township Board,* 25 Mich. 153; *Sparrow v. Commissioner,* 56 Mich. 567, 23 N. W. 315; *Wilcox v. Paddock,* 65 Mich. 23, 31 N. W. 609.

CAMPBELL, J., in *Sparrow v. Commissioner,* speaking of the prohibition said: "The change is as broad as language can make it. It can make no difference for what direct purpose of public utility an improvement is made so long as it comes within such a definition." In *People ex rel. Hubbard v. Township Board, supra,* it was said: that if a work is "directed, planned and executed by state agency" although not at state expense it is within the prohibition.

The clause of the Minnesota constitution as adopted from here is as follows: "The state shall never contract any debts for works of internal improvement or be a party to carrying on such works."

In *Rippe v. Becker,* 56 Minn. 100, 117, 57 N. W. 331, the precise question we now have under consideration was carefully considered. As we have heretofore said the result there was fully approved here. The opinion of the court, written by MITCHELL, J., is well abridged, as to the principle declared, in the syllabus:

" 'Works of internal improvement,' as used in the constitution, means, not merely the construction or improvement of channels of trade and commerce, but any kind of public works, except those used by and for the state in performance of its governmental functions, such as a state capitol, state university, penitentiaries, reformatories, asylums, quarantine buildings, and the like, for the purposes of education, the prevention of crime, charity, the preservation of public health, furnishing accommodations for the transaction of public business by state officers, and other like recognized functions of state government."

The Minnesota court, and this court also in *State ex rel. Jones v. Froehlich, supra,* said, the term "works of internal improvement" in the constitutional sense, is far reaching,—extending far beyond construction or improvement of roads of various sorts, of canals, improvement of rivers and other facilities for trade and commerce. Said MITCHELL, J.:

"It excludes only such public works as are used by the state in carrying on the affairs of civil government. . . . The far-reaching consequences of restricting this constitutional inhibition to highways for travel and commerce . . . would leave the state . . . at liberty . . . to embark in any and every other sort of enterprise, outside of its legitimate governmental functions, which might be deemed of public benefit. It would admit of . . . engaging in schemes of drainage, irrigation, developing water powers, building public gristmills, public creameries and cheese factories, establishing stock yards and packing houses, and other like enterprises. . . . The time was when the policy was to confine the functions of government to the limits strictly necessary to secure enjoyment of life, liberty, and property. The old Jeffersonian maxim was

that the country is governed the best that is governed the least."

And further, in effect: If the people desire to make a radical change in the present constitutional theory of government they have the sovereign authority to do it; but only by amending their fundamental law. The present constitution was not framed on any such lines.

A more restricted construction has obtained in some of the Eastern states. *Bonsal v. Yellott,* 100 Md. 481, 60 Atl. 593. But in the states of the Middle West where the necessity for the sweeping restriction was appreciated, as here, the judicial construction has been uniformly with *Rippe v. Becker, supra,* with which *State ex rel. Jones v. Froehlich, supra,* since it was decided, has been commonly associated. We may well add: *Benedict v. New Orleans,* 115 La. 646, 39 South. 792; *Leavenworth Co. v. Miller,* 7 Kan. 479, 493; *State ex rel. Coleman v. Kelly,* 71 Kan. 811, 81 Pac. 450, 6 Am. & Eng. Ann. Cas. 298 and note.

The Minnesota court quoted with unqualified approval this view of the Kansas court in respect to the term under discussion:

"The state is absolutely prohibited from engaging in any kind of works of internal improvement. We will concede that this prohibition does not extend to the building of a state house, penitentiary, state university and such public improvements as are used, exclusively, by and for the state as a sovereign corporation; but it does extend to every other kind of public improvements."

*Meaning of the term "internal improvements" as indicated by the Journal of the Constitutional Convention.*

We might fill pages in the further discussion of this subject and use only the material found in the Journal of the Constitutional Convention. No subject received more earnest attention or was more emphatically settled in the manner

indicated in the fundamental law as we find it.   It is thought best not to close this discussion without looking at the matter more particularly from the convention viewpoint.

The term "works of internal improvement" is open to construction as evidenced by the large amount of judicial labor which has been put upon it.   That is conceded all the way along.   Commonly, the debates in constitutional conventions have been referred to for the purpose of discovering the full meaning intended to be embodied therein.   That was done, most significantly, in *State ex rel. Coleman v. Kelly, supra,* where the court deemed it proper to incorporate into the opinion substantially the entire convention discussion, covering many pages.   Courts, we reiterate, must in determining the meaning of an ambiguous provision of law look to the conditions with which the lawmakers sought to deal and the mischiefs they sought to prevent.   As said in the Kansas case, in effect, the rule is specially adaptable to the task of determining the meaning of the term under consideration as the framers of the constitution understood it.   We must look to the history of the subject as they had it before them and all the circumstances characterizing their action, particularly as appears upon the journal of the convention.   In short, we must strive by all means within our jurisdiction to put ourselves in the place the constitution makers occupied,—look at the situation they had in view through the same vista they observed it, and then read out of the term the meaning they sought to embody in it.   It is in that way that this court in *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 91 N. W. 115, and other courts have reached the conclusion before stated.

As indicated by the cases before quoted from, particularly our own, it was the principle at stake,—whether the new government should be confined to the ordinary civil affairs or be extended, at general expense, to those things of a public nature which were not really governmental in character, which was the subject of the convention labor.   The calamities which

had come upon the other states were, from first to last, held up as object lessons and every effort made to let down the bars at any point, defeated.    True, particular improvements were now and then spoken of, but, in general, they were used to point argument as to the principle.

It is notable that one of the most strenuous efforts made to break in upon the majority idea was in the movement to modify the plan of the committee on Education to, with the consent of Congress, devote to school purposes the 500,000 acres of land and five per cent. on land sales granted to the state by the United States for the purpose of internal improvements, so that part or all thereof might, in any event, be used for the latter purpose.    It was at this point that the opposition to the internal improvement idea was so great that, by the fundamental law, Congress was requested to change the direction of that grant.

Here, we may well say in passing, the expression was made by Mr. Estabrook, who was chairman of the committee on Education, mentioned in *State ex rel. Jones v. Froehlich, supra,*— referring to the plan for a large common school fund, more than to the prohibition of the state's engagement in works of internal improvement.    On the one side there was the effort to preserve the federal grant for purposes of internal improvement.    On the other there was the determination, with the consent of Congress, to cover the granted land, not impressed with any obligatory trust, into the school fund.    Mr. Estabrook, referring to the strength of public sentiment in favor of the latter and against the former, said: "In the old constitution, the article in reference to schools was the precious jewel in the head of a toad."    Journal of the Convention, 238.

Later on we will have occasion to again refer to the strenuous contest between the advocates of state internal improvement activity and the common-school leaders.    Further on the subject now; one member of the convention said: "Every gentleman desires that the public lands shall be applied either to

purposes of education or internal improvements." "I hope the subjects will be taken up together." Convention Journal, 255. In the same connection a member remarked: "The proposition is to apply the fund to the purpose of internal improvement and it is very proper to inquire into the subject. If there is any article in the old constitution which was acceptable to the people, it was *par excellence* that which appropriated this fund to purposes of education." Convention Journal, 238.

Later it was suggested that the best system of internal improvements was one of general education and, further, that one of the causes which defeated the first proposed constitution was that which left open the opportunity to exploit the large general grant to the state for internal improvements. It was thought this time to prevent that peril by diverting such fund to common-school purposes, if Congress would permit.

It is needless to say that the school-fund advocates prevailed. In the contest is found the most emphatic condemnation of the idea of state burden for internal improvements. As before indicated, we shall have more to say on this subject under another head.

Outside the particular feature of the contest above mentioned, the debates in the constitutional convention are very instructive. Mr. Gale "hoped no one would attempt to force into the constitution any provision which would allow our state to plunge into the gulf of internal improvements which had swallowed up the credit and prosperity of so many states. The state is not the proper party to carry on that system. The provision in the constitution prohibiting these works in the last constitution has given universal satisfaction. In fact one of the strongest arguments against the formation of a state government" was the danger of the state engaging in work of internal improvement. Journal, 347.

Opposing a proposition to modify the absolute prohibition

so that the state might engage in a particular work of internal improvement upon approval of a legislative enactment on referendum to the people, Mr. Kilbourn pointed out the uselessness of such a modification because any sort of such improvement at state expense, would be condemned by the people if given opportunity to vote direct upon. it.    Journal, 350.

Mr. Larrabee considered the whole matter "one of principle;" whether the state should, under any circumstances, engage in works of internal improvement; whether that was the best way to secure such improvements, and not a question as to how and under what restrictions the state should engage in them.    It was clear to his mind that our own safety consisted in prohibiting the state, absolutely, from engaging in any works of the kind, except so far as the agencies of the state might be necessary in carrying out the objects of special grants or donations for such purposes.

So we conclude, as in *State ex rel. Jones v. Froehlich,* that it was the principle, in a broad sense, of whether there should be state competency to incur state burdens for internal improvements, other than such as might be required by the state for state purposes, not whether there should be such competency as to any particular species of such improvements of a public character, which was dealt with and decided in favor of the restriction.    The really governmental features, except such as belong in the field of police power, were specially treated under the titles: "Declaration of Rights," "Boundaries," "Suffrage," "Legislative," "Executive," "Administrative," "Judiciary," "Eminent Domain," "Education," "Corporations," "Amendments," and "Finance."    Under the latter head provision—except as to the very restrictive power as to purpose and amount, to borrow money or incur public debt—was made for an annual accumulation of money sufficient to defray the cost, denominated "expenses of the state," of all legitimate state activities.

### VIIa.

The following is an abridgment of the forest reserve law to which the conclusion reached respecting the constitutional scope of "works of internal improvement" relates:

Sec. 1494—41 provides for a board of forestry consisting of the president of the university, director of the state geological survey, dean of the state agricultural department, attorney general, and an appointee of the governor, they to choose a president and secretary without compensation in excess of expenses.

Sec. 1494—42 provides for a state forester to be certified as to competency by the secretary of the United States department of agriculture, salary to be $3,600 per year and expenses, to have power to employ a clerk at not to exceed $1,500 per year, be furnished office quarters and supplies, and to act as secretary of the forestry board. Under supervision of the forestry board he is clothed with broad jurisdiction over all forestry matters within the state. · He is to collect statistics as to forest fire loss, aid in preventing such and other losses of forest property, promote forestry in this state, co-operate with the University of Wisconsin in drilling forest rangers, and make biennial reports of the forest work with suggestions as to forest conservation, improvement, and taxation.

Sec. 1494—43 withdraws all state lands north of town 33 and possible reversion lands, from sale and provides that they shall constitute a forest reserve, such, however, as may be found by the forester to be less suitable for forests than for other purposes to be sold by the commissioners of public lands upon the forester's recommendation and approval of the board of forestry, such board to be competent to exchange lands. It empowers the forester, under supervision of the board, to manage the forest reserve, to employ necessary assistants, to institute on the reserve "conservative lumbering, make and maintain forest nurseries, plantations, and fire lines, and ex-

ecute other silvicultural and protective measures necessary to the highest permanent usefulness of the reserve;" in such lumbering under the supervision of the board to remove and sell, in his discretion, forest products from the reserve. It also provides for his appointment as special fiscal agent of the state treasury department, and, upon his giving security, for money to be placed to his credit out of the forest reserve fund not to exceed $500 at a time, for his use for temporary laborers on the reserve.

· Sec. 1494—43a provides for ascertainment of the available water powers upon the reserve and report of the same.

Sec. 1494—44 provides for acceptance of donations of lands for forest reserve purposes.

Sec. 1494—45 provides for co-operation by the forester with the federal authorities and those of other states and municipalities and other corporations and individuals.

Sec. 1494—46 provides for appointment by the forester of an assistant with approval of the board at a salary of $2,000 per year.

Secs. 1494—47 and 1494—47a provide for fire wardens to serve under the forester.

Secs. 1494—48 to 1494—60, inclusive, relate to minor administrative details.

Sec. 1494—61 provides that all proceeds from products of reserve·lands, as far as the constitution permits, shall belong to the forest reserve fund and be used for purchase of lands to be added to the forest reserve, and forest reserve expenses.

Sec. 1494—62 provides for an annual levy of $35,000 per year for payment of salaries under the forest reserve law.

The following which do not appear in their logical order in the statutes should be considered in connection with the foregoing:

Sub. 1, sec. 257, provides, as to swamp lands, a special privilege to towns south of town 34, in that it affords to any

such town the benefit for its drainage fund of the use of all such lands for cutting grass and picking berries. It also affords these special privileges: The proceeds, as regards cutting grass and berry-picking privileges, on the lands in the forest reserve counties north of town 33 go to the forest reserve fund, but the like proceeds in all other counties north of such line go to the town where the lands are situated for the benefit of the town drainage fund.

Secs. 1494—121 to 1494—124 appropriate the proceeds of all state lands in Indian reservations to the forest reserve fund.

Sec. 1072—1 provides $50,000 per year for five years for use, principal and interest, for purchase of lands for the forest reserve and for traveling expenses of a legislative forestry committee, the forester with the approval of the board to possess power to contract for the purchase of such lands and pay therefor as funds become available, the board to use the power of eminent domain for acquirement of land where necessary.

Sec. 1494—131 empowers the commissioners of public lands to acquire lands in the forest reserve territory by purchase at tax sales and of counties of tax-title lands and, upon request of the forestry board, of other lands all at the cost of appropriation for use of such commissioners.

Sec. 1494—132 gives the commissioners of public lands one year option to take any lands in forest reserve territory acquired by any county upon tax title.

Sec. 1494—133 requires county clerks, upon lands being selected under the foregoing, to deed such lands to the state for the agreed price, not exceeding the cost to the county, payment to be made from the general fund appropriation.

Sec. 1494—134 preserves to former owners the same rights as to lands acquired as aforesaid as regards remedies against private persons, except no costs of litigation to be taxed against the state.

These features pervade the whole of the foregoing:

1st. Withdrawal of the lands from sale, except such as the forester may decide to be more suitable for some other than forestry purposes.

2d. Devotion of the lands to the growing of forest products, such to be removed for sale only so far as required to utilize dead and dying timber, and to be leased, in the discretion of the board, upon a cropping basis.

3d. Control of the lands by the forest reserve board for forest reserve purposes, the commissioners of public lands being subordinate at all points where left with any authority at all.

4th. General gainful business of silviculture and arboriculture.

5th. Business of gainful lumbering operations as deemed advisable to realize on forest crops.

6th. Ultimate gainful use, by lease or by improvement of water-power opportunities in the reserve territory and on other state lands.

7th. Progressive increase of forest reserve territory by use of all revenues derived from forest reserve lands and appropriation from general state revenues, except as required for expenses of forest administration in excess of special appropriation therefor, and except as to small amounts to towns.

8th. Care of the state lands for the prevention and extinguishment of fires, and prevention and remedying of trespassing.

9th. Optional appropriation of the value, in excess of cost, of all tax-title lands owned or acquired by counties in forest reserve territory.

10th. Special privileges conferred on municipalities in certain territory, not regarding any rule of equality, or the constitutional authority of the commissioners of public lands or claims of the school fund.

11th. In addition to the special appropriation of $250,000

from the ordinary revenues of the state, devotes other sums annually to establish, augment, and promote the forestry business.

Thus it will be seen that the all-pervading idea of the whole forestry scheme is substantial exclusion of the commissioners of public lands from control over such lands, acquirement of a large forest area at the expense of the trust fund lands and general resources of the .state, handling of such lands, including all the former swamp lands and other granted lands in a proprietary way, gainful use by business operations suitable to such an enterprise of forest reserve lands, with incidental gainful use of water-power opportunities in such area, devotion of such area to the acquired use, and annual extension of the business, so far as practicable, by use to that end of all the results of such business and an additional annual appropriation out of the general revenues of the state. No return to the general revenues of the state or to any of its specified funds is contemplated, or public benefit *in præsenti* unless it be in the nature of beneficial influence upon climatic conditions; conservation of the waters of rivers whose sources are in the reserve area, regulation of the flow of such waters, preservation and cultivation of the animal life of forests and streams, and conservation of general facilities for hunting, fishing, and otherwise enjoying life on wild unsettled lands.

That some features, at least, of the scheme as pictured spell "carrying on works of internal improvement" under the constitutional meaning of the term, there can be no manner of doubt; such as pledge of the revenues of the forestry business to augmentation of the forest area, especially, so far as relates to conservation of natural waters and regulation of the flow thereof for climatic, drainage, or water-power purposes or creating a game-preserve territory and the carrying on of lumber operations, and permanent removal of a vast property acquired at public expense from the field of opportunity for any return to the taxpayers of the present or even of the

future, as the scheme now stands, if that is what the law means, which may not be the fact. But, in any event, the legislature has the field as regards disposing of the land so far as not restricted by the constitution. One legislature cannot bind another. If the legislature of today buys land to keep, permanently, or decides to devote state trust lands, permanently, to forestry purposes, the next legislature, or any other, may decide otherwise, in its discretion. If one legislature decides to devote trust lands to forestry or any other purpose which is destructive of the constitutional purpose of the same being conserved with a view of producing money for the trust fund purpose, that decision would not stand the test of the constitution, as we shall see.

The mere reservation of the sale of state lands, until further advised, and augmentation of the amount thereof by use of the revenues therefrom for the purchase of adjacent lands, so far as not affected by the result of the next question to be treated, and the care of lands to prevent and extinguish fires and prevent and remedy trespassing, and control of the lands by a forestry board, and possibly the use of the general fund appropriations to purchase other lands adjacent, or the acquirement of such lands with a view of increasing the value of lands presently owned and of, within a reasonable time, reselling the newly acquired lands and return of the cost to the general fund and, perhaps activity to a still greater extent,—may not be within the constitutional inhibition. We incline to that view and that the forestry scheme is legitimate in its general features, as we shall more particularly see later, except in so far as it provides for lumbering operations and any diversion of the proceeds of the trust fund land to forestry purposes and unconstitutional disturbance of the commissioners of public lands as to control over the educational lands not having the cast of "school lands, proper," because of having been so dedicated by the terms of the grant,—in harmony with our conclusion upon the next point to be con-

sidered, particularly, the protection of the lands from fire, the selling of dead, down, dying, and mature timber and deriving revenue from the annual, natural forest products; all with the primary purpose of conserving the property so as to obtain the greatest practicable amount, in the judgment of those in authority, of proceeds therefrom for the constitutional purpose and without fettering the lands so but that they may be offered for acquirement by private owners if the legislature shall see fit.

The point to be considered is of such vital importance and so affects this one that the latter cannot be determined, finally, by itself. So we will rest from our labor on this subject and go to the next, treating it under another head, only concluding for now that the present subject must be answered, in part, in favor of the plaintiff.

## VIII.

Is it legitimate to set aside the trust lands or proceeds thereof for a forest reserve, according to the legislative plan indicated in the foregoing, in view of art. X of the constitution?

"Section 2. The proceeds of all lands that have been or hereafter may be granted by the United States to this state for educational purposes (except the lands heretofore granted for the purposes of a university), and all moneys and the clear proceeds of all property that may accrue to the state by forfeiture or escheat, and all moneys which may be paid as an equivalent for exemption from military duty; and the clear proceeds of all fines collected in the several counties for any breach of the penal laws, and all moneys arising from any grant to the state where the purposes of such grant are not specified, and the five hundred thousand acres of land to which the state is entitled by the provisions of an act of Congress, entitled 'An act to appropriate the proceeds of the sales of the public lands and to grant pre-emption rights,' approved the fourth day of September, one thousand eight hundred and forty-one; and also the five per centum of the net proceeds of the public lands to which the state shall become entitled on

her admission into the Union (if Congress shall consent to such appropriation of the two grants last mentioned), shall be set apart as a separate fund to be called 'the school fund,' the interest of which and all other revenues derived from the school lands shall be exclusively applied to the following objects, to wit:

"1. To the support and maintenance of common schools in each school district, and the purchase of suitable libraries and apparatus therefor.

"2. The residue shall be appropriated to the support and maintenance of academies and normal schools, and suitable libraries and apparatus therefor."

Sec. 5 provides for distribution of the income of the school fund.

Sec. 6 provides for a state university and pledge therefor of the proceeds of all lands "that have been or may hereafter be granted by the United States to the state, for" such purpose, the same to constitute a permanent fund, the interest only to be used for the support of such university.

Sec. 7 makes the secretary of state, state treasurer, and attorney general a board of commissioners for the sale of the school and university lands, with exclusive power to administer the fund arising therefrom.

Sec. 8 requires provision to be made for the sale of all school and university lands after appraisal thereof, fixes the rate of interest on deferred payments for land, empowers the commissioners to convey lands and discharge mortgages as necessary, to withhold lands from sale "when they shall deem it expedient" and to invest the proceeds of the lands "in such manner as the legislature shall provide."

The particular features of that article which are important are the pledge of "all moneys arising from any grant to the state where the purposes of such grant are not specified" to the school fund, the jurisdiction of the constitutional commissioners to invest the fund arising from the trust lands, the requirement of a provision for the sale of the lands, and the

jurisdiction of the commissioners in making sales, with power to withdraw lands from sale in their discretion.

Thus it will be seen, there is a difference in the phraseology as regards the two classes of lands,—those granted to the state for educational purposes, and those dedicated to that purpose when given to the state unfettered by any interfering trust. The "proceeds of all" the former and "all moneys arising from the latter" were "set aside as a separate fund to be called 'the school fund,' the interest of which and all other revenues derived from the school lands" to be devoted, exclusively, to specified purposes. If room were left for legislative discretion as regards handling the second class none was left as to the first class, except subject to the power vested in the commissioners of public lands, and no room was left as to either class for any diversion of the proceeds of the first or the moneys arising from the second from the particularly specified purposes. Legislative jurisdiction was made very narrow as to the first class, at least, as plainly indicated by the debates in the constitutional convention, in order to guard against motives, prejudicial to conservation of the trust fund lands and money for the best interest of the schools of the state, partially or wholly, dominating the situation so as to, practically or wholly, defeat realization of the great anticipated benefits to the school system, so carefully provided for. That such idea evidences clear conception of popular control of things unless strongly fenced about by fundamental law, subsequent events, especially as disclosed in this case, bear witness. It is conceded, as we understand it, that, so far as the legislature interfered with control conferred upon the commissioners of lands which were granted by the United States to this state for educational purposes, of which there was only a small amount, when the forestry scheme was constructed, and set aside such lands and the proceeds thereof for a permanent forest reserve, it exceeded its power. It must be kept in mind that, by the forestry scheme, control of all the land was prac-

tically taken away from the constitutional officers,—school lands under specific grant, university lands, agricultural college lands and specifically granted normal school lands, aggregating some 27,160 acres (see statement for details of this), as well as 240,000 or more acres derived from the swamp land grant. There can be no question but what the control and administration of the first four classes of lands are vested in the commissioners of public lands with some power of regulation as to disposal, not including withdrawal of the lands from sale, permanently, or at all; but how about the lands which came to the state under the swamp land grant?

We should say, in passing, that the amount of land involved as shown by the return, which was taken as the basis for what is contained on the subject in the statement at the head of this opinion, was made up for the assessment of 1913, and does not disclose the facts as they existed at the origin of the forestry scheme. The public records, statements from which have been made a part of the pleadings since the case was submitted, indicate that some $422,000 was derived from lands in the forest reserve territory from the date of the act of 1905 to the date of the assessment return. About $328,000 of that sum came from sales of land. Doubtless the total amount of the trust lands at the origin of the forestry scheme in 1903, and which was affected thereby and the later act, north of town 33, is not less than 240,000 acres, derived by the state under the swamp land grant.

The question is raised as to whether those lands which have been carried on the state records since 1865, as will be hereafter shown, as half drainage and half school lands, under the name of "normal school lands," and the half of all other lands which the state derived from the swamp land grants are not as far removed from legislative interference as university land, or the class of school lands which were granted to the state expressly for educational purposes.

At this point we have, perhaps, reached a very vital feature

of this case. It has led to a study of the constitutional plan
for a school fund and the administration thereof, as regards
trust lands, for the past sixty-five years. The dignity which
was given to the plan in the constitutional convention, and
the execution of it for half a century after the constitution
was adopted, will throw light on the fundamental meaning of
the language of sec. 2, art. X, aforesaid—"all moneys derived
from any grant to the state where the purposes of such grant
are not specified."

As we have seen, substantially the same language as that
quoted was used with reference to "lands . . . granted . . .
to the state for educational purposes." It was the money de-
rived from the lands, regardless of class, which was dealt
with in sec. 2. All were set aside as a separate fund to be
called the "school fund." Therefore, if the swamp grant
lands, in part, became, in due course of time, "school lands,"
the fundamental protection of art. X of the constitution, au-
tomatically, was impressed thereon so as to prevent legislative
interference therewith, at least as regards diverting the money
arising therefrom to any other than school purposes, the same as
in respect to what may be called "school lands proper." As to
such, the legislature cannot withhold the same from sale,
since jurisdiction in that respect, as plainly seen, is given to
the commissioners of public lands. It cannot devote the same
to parks or forests or any purpose inconsistent with the consti-
tutional mandate. *State ex rel. Sweet v. Cunningham,* 88
Wis. 81, 57 N. W. 1119, 59 N. W. 503.

Here is a case where the characterizing circumstances of
the adoption of a term are especially helpful in reading out
of it the fundamental purpose. Education, and that of a na-
ture which reaches the boys and girls in every quarter of the
state,—common school education and training for the profes-
sion of common school teacher, was one of the most cherished
thoughts of the dominating figures in the constitutional con-
vention. While the overshadowing need for that, and the

universal verbal advocacy of it was acknowledged, a general apathy at the source of vitalizing the wish, the taxpayers, was freely confessed, and to meet that it was proposed to create the largest possible school fund which could be gathered from sources other than public taxation.     That, it was thought, distributable only upon condition of local outlay sufficient with it for common school maintenance, would afford sufficient stimulation in the matter.

One member of the committee on Education said:

"If dependence is placed entirely or chiefly upon direct taxation for the support of common schools . . . it will be a long time before the state will have an efficient and beneficial system of public education.     I believe that we want a liberal school fund,—and am prepared to show our necessities will require the largest fund that can be realized from all the resources of which we can avail ourselves for that object."

Other members of the committee spoke with like urgency of the necessity of bringing into the common school fund all that could be reached.     Before the committee reported its plan, which, in time, was adopted, it was anticipated, and the contest commenced to save the grant to the state for internal improvements, or some part of it, from augmenting the school fund.     It was at that point in the debates that Mr. Estabrook, chairman of the committee on Education, in the course of his enthusiastic advocacy of the contemplated committee plan, to be adopted from the proposed constitution of 1846, earnestly requested the opponents thereof to restrain themselves from prematurely pressing their points, and referred to the fact that the probable proposition the committee would present, met with general satisfaction before and, as compared with the whole of which it formed a part, it was like "the precious jewel in the head of a toad,"—the one, if no other idea, which survived the wreck of the first structure, emerging from the gloom with increasing brightness, to again appeal to the convention for approval without a stain upon it.     An eminent

member of the convention, Mr. Kilbourn, not a member of
the ·committee, likewise expressed himself, saying:

"If there was an article in the old constitution which was
acceptable to the people it was, *par excellence,* that which ap-
propriated this fund [referring to the internal improvement
grant] to purposes of education. It was said by many that
if the old constitution contained no other good provision it
ought to be adopted for that alone. I .am in favor of retain-
ing in substance the system there presented. It ought not to
admit of a difference of opinion that such a fund so appropri-
ated would be a public benefit. A general system of educa-
tion is the only system we can depend upon for the preserva-
tion of our liberties. I do not believe that the whole fund
will be any too much for a general system of education which
should provide not only for common schools, but for those of
a higher order. At any rate, it will require a very large sum
to educate not only the children now here but those to come
hereafter."

That was the sentiment which strongly swayed the conven-
tion. It grew in intensity after the committee brought in its
report, as consideration of it progressed. Contrasting the
idea of internal improvements with the opportunity for all the
children of the state to acquire a common school education, it
was pictured as the best system of internal improvements that
the ingenuity of man could design or his resources execute.
Every effort to weaken the committee plan signally failed.
Here is the very significant circumstance, which cannot well be
referred to too often, that after laying hold of, for the school
fund, as strongly as possible the large donation from the
United States for works of internal improvement and all other
known sources of augmenting such fund, the idea of the Ryan
committee, incorporated into the article on internal improve-
ments, phrased so as to sweep in all possibilities, present and
future, was made a part of the educational plan to the end
that nothing should escape. The language was changed,
somewhat, for brevity, at the expense of emphasis. The·

thought of the convention can most clearly be seen by refer-
ring back to the language of the Ryan committee, which, it is
clear, was intended to be adopted in effect:

"All lands which shall come to the state . . . by grant
where the grant does not specifically dedicate the same to any
other purpose, shall be held by the state as a part of the state
school fund, under the same trusts, reservations and restric-
tions as are provided in this constitution in regard to school
lands proper."

That seems very plain. Higher education was only inci-
dentally spoken of in the convention. The secondary idea of
the educational system was library facilities, and normal
schools to provide professional common school teachers, as in-
dicated by sub. 1 and 2, sec. 2, art. X, of the constitution.

The words "all moneys arising from any grant" must be
read in connection with the previous words relating to grants
expressly impressed with an educational purpose, "all lands
that may have been or hereafter may be granted," etc. There
was no existing grant not so impressed, but, evidently, such
were expected. There had been agitation to that effect, as
history shows. Both expressions referred to form parts of
one harmonious system to effectuate a single purpose, to lay
hold of, as was said, time and again, in terms or effect, all
possible sources that would aid in realizing, in fact, the large
common school fund which existed in conception. That the
particular language was a dragnet instrumentality to cover
any possibility *in præsenti,* and probability or possibility of
the future, is supported by sound reason.

We have thus devoted considerable space in bringing into
light the vista through which we should look to the point of
formulation of the term, "all moneys arising from any grant
to the state where the purposes of such grant are not speci-
fied." We repeat that it was a dragnet proviso, thrown out
to cover present and future. and gathered in all coming within
its scope.

No apology seems necessary, under the circumstances, for

going into this subject with the greatest possible thorough-
ness.    The stake, as to the children, present and future, is of
very great magnitude.    If the claims on the part of defend-
ant are sound, notwithstanding the great wisdom of the fram-
ers of the constitution to efficiently provide for common school
education, the great object in view, so far as relates to the
school fund, has been practically lost sight of or ignored.
With a high sense of duty to administer, to the best of their
ability, the obligations of a great public trust, and to aid in
remedying, so far as practicable, the mistakes of the past, if
any there be, the present commissioners of the public lands,
under advice of the attorney general, have exercised the most
distinguished industry in trying to bring into the record in
this case all the evidence in their offices, or within their reach,
which might aid the court in vindicating the real right as to
the numerous questions presented—particularly, evidence of
the past handling of the public lands and the disposition of
the proceeds thereof.    We may justly say here that, while the
attorney general permitted the use of his official position to
enable the state to move, adversary in form, to compel the ad-
ministration of the forestry laws as they appear upon the
statute books, and has, with fidelity, officially represented that
side of the litigation, he has shown the most commendable
appreciation that, as an aid of the court in the administra-
tion of justice mere personal success from a partisan stand-
point is nothing as compared to vindication of the right, and,
so, has endeavored to bring all to the attention of the court,
regardless of which side it might favor.    The result is that
many matters with reference to handling of the public lands
and funds, which did not originally appear in the complaint
and answer, have been added thereto, voluntarily, enabling us
to refer to the same without depending upon whether we
might properly do so because of their being matters of public
record, though not formally brought to our attention in this
case.

It is found that the first step which culminated in what we

have seen, was taken in 1897, ch. 367 of that year. Thereby it was provided that money derived from the sale of public land should be covered into the general fund, except when otherwise disposed of by constitutional provision. That took effect May 6, 1897, and was repealed September 1, 1898, when the Statutes of 1898 went into effect. Such is the situation because the law, as it had existed from 1865, devoting half of the swamp and overflowed lands to school fund purposes, was carried into the new revision and all acts or parts of acts inconsistent therewith were repealed.

Notwithstanding such repeal, that appears to have been overlooked, and from the enactment in 1897 to the perfection of the forestry legislation in 1905, somewhere around $500,000 was carried into the general fund from proceeds of the trust lands, and, since then over $400,000 more, derived from such lands in the forest reserve territory, have been carried into the forestry fund. It is safe to say that a large, if not the greater, part of this was school money, as the constitution was understood for about half a century. .If that be true, it, with the probable value of the land remaining, according to the purchase value of similar lands as shown by the records and report of the state forester, and interest on the diverted fund, must aggregate well toward $2,000,000 which should be credited to the school fund. Looking into the future with all its possibilities, it might be twice or three times that sum. It is upon this picture,—held up to us in connection with the one that the granted land which was converted into money during the first twenty years of our history was diverted from its proper course,—that it is insisted, with much reason, that, practically, even the hope of a large common school fund has vanished, except so far as it is within the competency of the court to afford relief. That is the attitude of those who represent the plaintiff and who really stand for the sovereignty of the people as the only ray of hope.

Such is the great interest which is now in the balance, de-

pending upon the right or wrong of defendant's contentions. Thus the situation which confronts us, justifies and demands the most careful study, that justice may not fail for want of industry or understanding, and that the reasons for our conclusion be spread upon the record with the greatest possible demonstrable plainness.

It was early understood, as it came to be decided, as we shall hereafter see, that the swamp land grant conferred upon the states entitled to the benefit thereof the title to all lands within its scope, unincumbered by any "enforceable trust" as some courts put it, guided somewhat, it seems, by the practice in handling such lands, though, as hereafter noted, the expression indicating that the donor did not retain any right of interference whatever may be a little too strong. However, the lands were, from the first, regarded as substantially free to be disposed of by the states as undedicated lands; lands, using the words of our constitution, "where the purposes of such grant are not specified" except in quite an uncertain sense. So such lands were customarily disposed of by state authority without any particular regard to any definite purpose. The particular treatment in this state will be referred to later in a history of the subject and on the subject of practical construction.

This state, for itself, quite early dealt with the swamp land grants holding that they did not carry any obligatory trust except that the state would act in good faith in deciding upon a matter of fact. It was held that the grants were absolute in fact as well as in form; but with a condition that the "proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied, exclusively, as far as necessary, to the purpose of reclaiming said *lands* by means of the levees and drains aforesaid;" giving a very broad meaning to those words from the federal acts. 9 U. S. Stats. at Large, 519, ch. 84.

Thus it will be seen that the state was practically given an

exceedingly broad field of discretion in deciding the question of fact, which related solely to the necessity or advisability of draining the particular lands covered by the grant. Full power was given to devote the residue to such other public purpose as might be thought best. As to such residue "the purposes of such grant are not specified," using the words of constitutional appropriation of that species of land. As to such lands there was no trust, as between the state and the United States, which would follow into the hands of a private owner under conveyance from the state, though the idea that the lands were left entirely free from any interference by the United States, is wrong, and our constitutional appropriation, in recent years, has been quite overlooked. *La Pointe v. Ashland,* 47 Wis. 251, 2 N. W. 306, in respect to freedom of the lands from any trust to the United States has evidently been misunderstood and misapplied, and our constitution overlooked leading many to assert, with confidence, that the state may handle such lands as a proprietor. It is almost marvelous how that false notion has taken hold of the minds of, even members of the legal profession, in that part of the state where swamp lands have been dealt in with much freedom, and furnished a ready object for exploitation. The confident assertion of such has gone far to pervert the public mind on the question. That it reached the legislature and gave cast to the legislation, when there was so much private interest in having the lands handled, as free from any special public trust as possible, is not very strange.

The title to all lands of the character described in the grant passed by force of it to the state, whether known *in praesenti* or not, surveyed or unsurveyed. All that was required was to identify the lands impressed with the act, to perfect the title of record as of the date of the donation. There was no condition of reversion and no obligatory trust, except to act in good faith, and none which attached to and traveled with the title. In case of an abuse of the trust, doubtless it was com-

petent for the United States to interfere, but the discretion of the grantee was given so wide a leeway that we are unable to find where it has been challenged by the United States, the only party competent to do so. The status of the particular land has been so long and so firmly settled that citation of authority in addition to our own cases seems unnecessary, but we will refer to a few cases, among those cited by counsel for plaintiff. *La Pointe v. Ashland,* 47 Wis. 251, 2 N. W. 306; *American E. Co. v. Adams Co.* 100 U. S. 61; *Mills Co. v. Railroad Cos.* 107 U. S. 557, 2 Sup. Ct. 654; *Simpson v. Stoddard,* 173 Mo. 455, 73 S. W. 700.

The foregoing is a most illuminating background for the legislative dealing with the subject when the ideas of the convention were yet fresh in the public mind, and the actors in the constitutional drama were in being to give direction to affairs.

The early legislature must have known that the large swamp land grant was presented to the state to deal with in its discretion. Furthermore, that states, in general, had acted upon the theory which early obtained judicial sanction, viz. that acting in good faith the swamp lands were available for any public use so far as not deemed by the legislature necessary for the primary purpose mentioned in the grant and not fundamentally appropriated. Free from the conditional use there stood the rest enveloped in the toils of that language which must be given its broad meaning, in the light of the lofty fundamental conception "where the purposes of such grant are not specified."

### History.

Some of the matters mentioned in this history have been incidentally referred to before. They may be in further branches of the case; but it is thought best to bring them all together at this point, arranged in their logical order. They will be seen to tell a very interesting and persuasive story as to the ideas of the people of this state when the sentiments

which ruled the constitutional convention in formulating the
fundamental law and guided the electors in approving of it,
were still uppermost in thought.    It may well be presumed
that the same sentiments led to the results which followed, re-
membering that a large school fund was the ambition of the
hour; that the constitutional methods of acquiring it were
fresh in mind; that the original actors were the most influen-
tial factors in public life, doubtless bent on seeing their con-
ception grow as speedily as possible into a reality, and that
some of them were members of the legislature when the vital-
izing acts commenced.

By ch. 125, Laws of 1856, provision was made for disposi-
tion of the lands in question in harmony with what has been
said.    They were recognized as being logically within the ad-
ministration of the commissioners of public lands.    The ex-
isting regulations for sale of school and university lands were
applied.    Direction to sell was given, a minimum price of $5
per acre being fixed.    Note that private desire to acquire the
land was not yet active, or if so, not influential.    To increase
the revenues as much as possible, it was declared that all lands
acquired by the state in lieu of swamp lands should belong to
that class for the purposes of the act.    It was provided that af-
ter payment of the expenses of the sale "seventy-five per cent. of
the residue, and all of the purchase money for the selected
lands" (in lieu of swamp lands) "shall form and be a consti-
tuted part of the school fund of this state, and shall be subject to
the same uses, designs, regulations and laws."    Note the pe-
culiar form of the expression "be a constituted part," etc.    The
remaining twenty-five per cent. was directed to be paid to the
county treasurers of the counties within which the lands were
located, subject to be drawn by the towns therein where such
lands were located, on application and representation as to such
lands being susceptible to drainage and that the proportionate
share was required for that purpose.    It was further provided,
that all money not so applied for within two years "shall be paid

into the state treasury" and that the same shall form "a constituent part of the school fund, and shall be managed" accordingly.

Except as stated the lands were placed in the school and university class and all acts inconsistent therewith were repealed. The latter clause was evidently added by force of custom and as evidence, on the face, that the enactment was intended to cover the subject entirely, for there were no acts, so far as we can discover, to which the repealing clause could apply.

The enactment of 1856 was carried into the Revised Statutes of 1858 as sec. 24, ch. 29. Though the revision took effect January 1, 1859, it did not affect the act next to be mentioned because of a saving clause as to all acts of the legislature of 1858.

At the session last mentioned, the legislature conceived the idea that ambition for a large common school fund might have been carried to such an extent as to lay the state open to a charge of not having dealt with the swamp land grant in good faith, in making so small a provision for the primary purpose of the grant. That resulted in passage of ch. 67, Laws of 1858. In the opening lines are the words, "For the purpose of carrying out the intention of the act of Congress," etc. To that end the proportion of the moneys arising from sales of the lands to be devoted to the primary purpose of the grant was raised to fifty per cent., and particular provision, as theretofore, was made to secure faithful expenditure thereof.

In 1859 influences became efficient to induce legislative departure from the original idea. By ch. 164, laws of that year, the drainage fund money, apportioned to counties, was directed to be expended in such counties for road building. This invaded the primary purpose of the grant without affecting the constitutional appropriation under consideration, as the disturbance only related to the fifty per cent. set aside by the act of 1858 for drainage purposes.

In 1864 there was substantial forgetfulness of the primary purpose of the swamp land grant and of any constitutional claim as well.

By ch. 431, laws of that year, land in Clark and Marathon counties was devoted to road building and incidentally to drainage.

By ch. 432, ten sections of land in Oconto county were set aside to aid in the building of an interstate bridge.

By ch. 436, lands in Crawford, Vernon, and La Crosse counties were appropriated for building a particular road, nothing being said about drainage.

By ch. 437, some lands in Juneau and Wood counties were appropriated for road construction, nothing being said about drainage.

By ch. 439, the state attempted entirely to abdicate its trust as to lands in Calumet and Manitowoc counties by a legislative appropriation of the same to such counties to hold in fee simple, but in trust, partly for drainage purposes, partly to aid in bridge building, and partly for building district school houses and maintenance of schools.

Thus a combination of eleven counties participated in the successful assault upon the original plan for use of the swamp lands. It is interesting to note that all the enactments took the same course and were approved on the same day.

At the next session of the legislature the acts of the previous session which we have detailed, and all other acts relating to the swamp lands, were repealed. The legislature seems to have been conscious of a bad record having been made and much confusion created. To rectify that, by ch. 537, Laws of 1865, the slate was made clean. All lands were recalled for redisposition, subject to existing contracts, "except so far as the title to such granted lands may have been actually diverted under such acts."

For the purpose of preventing any further confusion of lands to be devoted to drainage purposes with those to be re-

garded as school fund lands, the plan of division of 1858 was substantially re-enacted. The new enactment practically related back to the time of the disturbance of the act of 1858, and it was provided that all the proceeds of lands and undisposed of lands should be divided into two equal parts, "one part to be denominated 'the normal school fund,' and the other to be denominated 'the drainage fund.'" Note that the normal school fund idea was first in thought, and that it was one of the constitutional purposes of the school fund. The most careful provision was made for partition of money, contracts, and lands; those belonging to each class to be specifically designated and thereafter administered separately so far as necessary to prevent future confusion of the two resources and purposes. It was made the duty of the commissioners of public lands to make the partition and duly file their decision, to take effect the 1st day of June, 1865, to publish such decision, and furnish every town clerk of a town and county clerk of a county, wherein any of the lands were situated, with a copy. The act was made as comprehensive as possible so as to cover, not only all lands then carried on the books as coming from the swamp land grant, but all that might thereafter be identified as belonging to the state as swamp land, or selected, under act of Congress on the subject, in lieu of swamp lands.

Pursuant to the foregoing, in due course, the commissioners of public lands, Lucius Fairchild, secretary of state, Samuel D. Hastings, state treasurer, and Winfield Smith, attorney general, made their decision, in great detail, and filed it in their office as such commissioners.

The contents of the report and decision bear striking evidence of the thoroughness with which the commissioners did their work. A basis of $1 per acre was taken as a guide to go by. A careful compilation of all lands on that basis and all dues for lands sold showed the amount to be dealt with to be 2,218,854.13 acres and dollars. There were, tentatively, set aside for the fund denominated normal school fund

504,596.35 acres of land, which, with dues on outstanding contracts, loans, and some forfeited lands made up 1,128,246.55 acres and dollars, and for the so-called drainage fund 1,034,103.65 acres which, with dues on certificates and other claims, made up 1,109,427.06 acres and dollars. The two parts were brought to an equality by charging the normal school fund, in form, and crediting the drainage fund with $18,819.40, to be paid out of the first sales of lands belonging to the former fund.

It will be noted that the normal school fund, as regards present use, was regarded as first in importance. . Some over $400,000 income-paying assets were awarded to that fund, while only around $75,000 of such assets were awarded to the drainage fund, the two funds being evened up by awarding to the latter some twice as many acres of land as to the former.

The decision contained a designation of the lands by descriptions set apart for the respective funds. The report was recorded in the state land office and the land appropriately marked on the books of such office, so that in future sales, the proceeds would go to the proper fund.

As part of this history, it should be noted that, in the report of the state superintendent of schools, made by Hon. John G. McMynn, to the legislature of 1865, particular attention was called to the provision of the constitution under consideration. It was copied into such report. The swamp lands were mentioned as one of the four sources for the school fund and necessity for' legislation for conservation of the funds was pointed out.

At the sessions of the legislature of 1866, 1867, and 1868, some small invasions of the work aforesaid were made though none materially, if at all, affecting the integrity of the school fund feature. However, the interfering acts were such that, at the next session, by ch. 151 of that year, they were expressly repealed and the act of 1865, in its entirety, re-enacted and the partition thereunder was, so far as the records

show, never disturbed or confused for some thirty years thereafter.

From 1869 to the new revision of 1878, there were several interfering enactments, but none affecting the integrity of the normal school fund. In such revision the acts of 1865 and 1869 were written as secs. 250 and 251, with this note by the learned revisers and approved by the legislature: "Based upon ch. 537, 1865, as re-enacted in ch. 151, 1869, and declares the result of the decision made in pursuance of the law of 1865, the records of which were made at the time and are preserved in the land office."

A particular feature of the acts of 1865 and 1869 was made sec. 251 in the new revision with an explanatory note to the effect that, in case of other lands or money in lieu of the swamp lands coming to the state under the swamp land grants "they ought to be divided on the same basis already established, and upon which the former division was made."

Note the language "the same basis already established." Is that not of special significance in view of the fact that it is the expression of five of the most eminent lawyers of the state, two of whom were justices of this court when their work received legislative approval? Note that they spoke of the result of the partition proceedings as a decision. They doubtless used that term advisedly. They were men who would not be likely to use such a term loosely. They regarded the award as a final decision, evidently, up to its date as between the primary purposes of the grant and the constitutional dedication of all the lands not needed for such to school purposes. They probably thought it as final as any decision could be, not pronounced by a court of last resort. That explains the care exercised to add sec. 251 so that such decision would attach to any other lands which might come to the state of the same class. That they had in mind the two purposes to which the lands were required to be devoted as regards the proceeds thereof, there can be little if any doubt.

For further confirmation of the foregoing, there is the deliberate decision of the legislature of 1889. By ch. 340 of that year,—in an enactment prefaced by a preamble of five carefully phrased paragraphs, reciting the history of the swamp land grant and its administration in this state, particularly the decision of 1865, awarding one half of the proceeds of the lands to the primary purpose of the grant and the other half to the normal school fund, and the rights of certain counties where the lands were situated to have the use of the drainage half for its appropriate purpose—to vindicate the integrity of the partition aforesaid it was enacted that "the proceeds of sale of the lands . . . shall be paid one-half into the drainage fund of each county entitled thereto, . . . and the balance . . . into the normal school fund," and the secretary of state was directed to issue warrants from time to time accordingly.

In the twenty-seven sessions of the legislature after the act of 1865, bringing the history down to 1903, there was no legislative interference to speak of with the normal school lands except the brief period before mentioned between the act of 1897 and its repeal by the revision of 1898. The two sections, 250 and 251, stood without change until 1903. They disappeared from the statute books by the forestry act of that year (ch. 450) which was substantially confirmed and enlarged by the act of 1905 (ch. 264), though, as we have seen, the officers of the state having to do with the matter lost sight of the facts some five years earlier.

From the date the revision of 1898 took effect up to the time of the act of 1903, there was not the semblance of authority for not putting the moneys arising from the swamp lands which had been set aside for school purposes as aforesaid into the normal school fund. After such act the administrative officers had to take the law to be as it read, or force an issue in respect to the matter, as was finally done.

Why the integrity of the school fund was not efficiently

looked after by those charged with the duty of specially guarding the school interests of the state, it is not our duty to inquire or to even speak in criticism, though we may well suggest the matter for future guidance.

## *Practical construction.*

Whether the constitution as to the proceeds of all lands granted to the state so far as free from any interference by the terms of the grant, should be held to include such swamp lands as were not needed for the primary purposes of the grant, is strongly evidenced in the affirmative by the rule of practical construction, as the foregoing very clearly shows. No rule is more helpful than that, where there is good room for its operation. None, in such circumstances, is more conclusive of legislative intent. The effect of it is to give to the language of the law, otherwise obscure, a cast in harmony with long established administration, as plainly observable as if incorporated therein in its letter. This court has spoken very decisively on that subject and nowhere more than in *Harrington v. Smith,* 28 Wis. 43, 68: "Long and uninterrupted practice under a statute, especially by the officers whose duty it was to execute it, is good evidence of its construction, and such practical constrution will be adhered to, even though, were it *res integra,* it might be difficult to maintain it."

The language of DIXON, C. J., speaking for the court in *Dean v. Borchsenius,* 30 Wis. 236, 246, seems to fit this case: "The uninterrupted practice of a government prevailing through a long series of years, and the acquiescence of all its departments, legislative, executive, and judicial, sometimes become imperative even on constitutional questions. If ever there were such a case, this would seem to be one."

The foregoing is strongly reinforced here by that other rule of construction: Where the intent is plain and there is opportunity to choose between a restrictive and a liberal construction and the latter accords with such intent, it should be ac-

112    SUPREME COURT OF WISCONSIN.    [Feb.

State ex rel. Owen v. Donald, 160 Wis. 21.

cepted as pointing the way to the right of the matter and should be extended so far as the rules of language will permit and is necessary to effectuate such intent.

No narrow construction will do here, in view of the history of the constitutional convention. To say that the swamp land grant is not within the constitutional meaning of "the proceeds of all lands where the purposes of such grant are not specified" because there is a specified purpose coupled with a limitation, in view of the long and earnest work in the convention to make the school fund as large as possible, laying hold of every resource, present and prospective or even possible, for that purpose, is to try to evade it, not to apply and administer it.

Force is added to the foregoing by this: The particular section of our constitution has been incorporated into several state constitutions without any, or material, change. Sec. 3, art. VI, Const. Kansas; sec. 2, art. IX, Const. Washington; sec. 5, art. IX, Const. Missouri, 1865; sec. 2, art. VIII, Const. Minnesota, added November, 1881. It should be noted that swamp lands are specially mentioned with a direction as in our act of 1865, "the principal to be preserved inviolate and undiminished; one half of the proceeds of said principal shall be appropriated to the common school fund of the state."

The Minnesota court in *Scofield v. Schaeffer,* 104 Minn. 123, 116 N. W. 210, held that, though the lands came to the state substantially unfettered by any trust, under the state constitution they were placed on the same footing as lands, in terms, granted for school purposes,—or, as expressed in the Ryan committee article, as before indicated, placed "under the same trusts, reservations and restrictions as are provided . . . in regard to school lands proper."

The conclusions under this head of the case are these:

The term "all moneys arising from any grant to this state, where the purposes of such grant are not specified," used in sec. 2, art. X, of the constitution, with its context, automat-

ically carried any property donated to the state, whether under a grant existent when the constitution was made or a subsequent grant, to the extent that it was free from any obligatory trust for some other purpose, to the educational fund class of lands, to the extent at least of requiring the same to be conserved with a view of producing money therefor.

Upon the swamp land act taking effect, the title to all the lands, within its scope, situated within this state, as between the donor and donee, became impressed with an obligation on the part of the latter to decide and set apart, in good faith, the share of the granted lands needed for the primary purpose, leaving the balance free from incumbrance and subject to the constitutional burden under the section aforesaid, and that rule applies to all lands which came to the state under the national swamp land legislation.

The swamp land acquired from the United States, as stated, as regards moneys arising therefrom, can take, legitimately, but one of two directions; primarily, drainage purposes, secondarily, school purposes. Diversion of the same to any other than these two purposes is a violation of the fundamental law. Therefore so far as the decision of 1865 might be modified, it would result in changing land from the drainage to the school land class.

The fundamental burden impressed itself upon the granted property, simultaneously with the creation of the federal burden, both being afloat, but the former subservient to the latter, waiting upon a definite absolute determination of the necessary extent of the burden. No question could properly be raised in respect to that, as regards the dedication of the "moneys arising therefrom" to the school fund. None, otherwise, as to the disposition of the land, except between the donor and the donee. *State ex rel. Douglas v. Hastings,* 11 Wis. 448. Nothing could properly interfere with the extent of the secondary burden but the action of the state in deciding upon the necessities of the primary purposes of the grant.

Lands not decided to be needed for such primary purposes were automatically held fast by the secondary trust.'

Decisions elsewhere in the absence of such a self-executing appropriation of free granted lands as exists here, declaring, broadly, that the state, subject to challenge by the United States for bad faith, may dispose of the lands derived from the United States under the swamp land act as it sees fit within a wide range of judgment, and decisions, if there be any, where there is such fundamental element as we have, but it has not been appreciated, are beside the case.

The deliberately made partition of lands derived by the state under the swamp land act, which was made under the state law of 1865 and confirmed by the act of 1869, illustrated by acquiescence therein for more than thirty years by all who had to do therewith, is a binding exercise of the state's option to take such part of the lands in question for drainage as it deemed necessary. The school fund share thereby passed wholly within the constitutional jurisdiction over lands held in trust for educational purposes, possessed by the commissioners of public lands under the ruling in *State ex rel. Sweet v. Cunningham,* 88 Wis. 81, 57 N. W. 1119, 59 N. W. 503, or by the legislature, according as we must decide there is a difference between the two classes of lands.

The forestry act of 1903 and that of 1905 and all other acts and parts of acts making up the legislative scheme for a forest reserve, so far as they violate the trust impressed on the swamp lands for school purposes to the extent which the same cannot be restrained, so as to avoid such interferences; are not the law of this state and so furnish no warrant for the claim of the plaintiff.

The foregoing means that the forestry acts to be legitimate must be restrained to harmonize with secs. 250 and 251, Statutes of 1898. Such sections are a part of the written law of this state, unaffected by any act, or part thereof, so far as interfering with the proceeds of the lands partitioned off to the

school fund class under the law of 1865 or lands which should be, under the rule there, going as in such act provided.

This result does not cast the slightest discredit upon forestry enterprise. We may well concede for it, as a theory, all that its most enthusiastic advocates claim, and concede the advisability of reserving, for a time at least, the trust lands from sale and that the trust fund has been a great loser by the injudicious manner in which sales have been made; but neither one nor all such can furnish any justification for overturning the constitution.

In entering upon a new field of activity as a state, regardless of how beneficial advancement may appear to be, we should stop to earnestly and efficiently inquire whether there are constitutional restraints in our pathway. The people, as a whole, upon reflection, will always be found to desire to have those safeguards maintained in all their integrity. Often enthusiastic, well-meaning experimenters and intending promoters of the common good, chafe under such restraints, or blindly go on, unmindful of the sleeping danger which needs but the judicial touch to effectually bar the way.

Much confusion in public affairs would be prevented by more study of the fundamental law and a better appreciation of what it means and of importance of fidelity thereto. It is as necessary now, if not more so, to the general welfare, both in respect to the people of the present and those who will come after us, as it ever was. Those who decry it may secure, efficiently, for a time, the public ear, at least have efficient influence with the people's representatives; but the principle so assaulted, notwithstanding the "black menaces" which sometimes seemingly surround it, is as secure as "a star in the maw of the clouds." Some time the winds raised by object lessons and reflection, "will come along and sweep them all away;" vindicating the sentiment that no enduring, worthwhile fame can be won by unfaithfulness to the constitution.

Nothing in the foregoing should be taken as purposed to

cast discredit on the investigator, experimenter, and promoter in the economic field. Progress would move slow without such. A monument could not be erected so high as to exaggerate the debt of mankind to them. To examine, to analyze, to think deliberately, practically, and conservatively, and to restrain reasonably and fundamentally, utilizes the good and rejects the useless and harmful. It is at this point that extremes meet and then settle to an equilibrium. Less antagonism and more charity between those of the mountain top, of the valley, and of the plain, would promote the ideal of the greatest good to the greatest number and make the world happier.

It is not overlooked that sec. 1494—61 of the forestry act recognizes possibility of some of the proceeds of land set aside for forest purposes belonging to some constitutional trust. That is seen in the provision, in effect, that all such proceeds shall constitute a part of the forestry fund "except when otherwise disposed of by constitutional provision." But, evidently, such language relates only to land granted by the United States to this state for particular purposes and so designated by the constitution. But here the withdrawal from sale, as we have heretofore shown, contains no reservation. All were withdrawn regardless of trust character, and placed under control of the state board of forestry, not only as regards the "moneys arising therefrom" but the disposition of the land contrary, in any view of the matter, to sec. 8, art. X, of the constitution as regards such moneys constituting a part of the school fund together with the proceeds of school lands proper. We may say, in passing, that we use the term "school lands proper" to distinguish, briefly, between lands which were granted to the state for educational purposes and such as partook of the nature of school lands by the secondary trust in respect to the swamp lands. That term was so used in the proceedings of the constitutional convention of 1846. As to the so-called "school lands proper" this court early de-

cided that the constitution clothes the commissioners of public lands with "power to withhold from sale any portion of such lands when they shall deem it expedient."

It might possibly be held that the general language "The sale of all lands belonging to the state . . . shall constitute a forest reserve," etc., evidences legislative intention as to state lands strictly so called; that is, land held by the state with full proprietary capacity to deal with the same for public purposes as a private owner might. But the whole shows that no such thought was in the legislative mind, though it may well be there was doubt as to power to do what was attempted. The act has been administered substantially as we have heretofore seen, as if the words "state lands" covered all lands the title to which is vested in the state and in harmony with a prevailing forgetfulness that the trust lands cannot be dealt with as state property, that they are impressed with a special constitutional trust, and the control of them, in the main, as to "school lands proper" at least, was placed, absolutely, with the three constitutional officers, the secretary of state, state treasurer, and the attorney general as a board of commissioners, as a sort of corporate body.

## VIII*a*.

In the foregoing, at many points, the question will be seen to have been reserved, expressly or impliedly, of whether the constitutional jurisdiction of the commissioners of public lands is common as to both classes,—educational lands, proper, and those which partake of that nature as regards the "moneys arising therefrom," at least. The court is of the opinion that there is some reasonable basis for holding that, as to the disposition or use of the latter class for the purpose of so deriving "moneys" authority was retained by the people to be exercised in legislative discretion; keeping primarily in mind the constitutional intent to make the same as fruitful a source as practicable of moneys for the school fund.

The ground for a distinction, as before indicated, lies in difference of phraseology in sec. 2 of art. X of the constitution heretofore mentioned, and the use of the term "school and university lands" in the section creating the board of commissioners and also in the section defining its power, thus referring, in the latter, to the particular lands which came to the state impressed with a specific trust for educational purposes. True, the administration of the second class for a great many years proceeded, in common with that of the first class; but, commencing with ch. 125, Laws of 1856, and running through ch. 537, Laws of 1865, ch. 151, Laws of 1869, and other acts, the legislature, quite freely, directed the sale of lands of such second class and administration thereof somewhat inconsistent with the commissioners of school and university lands possessing that measure of jurisdiction over the same which they possessed over "school lands proper."

The court does not lose sight of the fact that administration of the swamp land class of school lands, under legislative direction, was left for some forty years with the commissioners of school and university lands; nevertheless, the history of the subject quite significantly shows that, in respect thereto such commissioners looked to the lawmaking power for authority rather than to the constitution. It is true that, in most respects, the acts of the legislature incorporated into legislative language the idea of the fundamental law as regards "school lands proper;" but, here and there, it may well be said, there is some want of harmony and, it is a fact, that the legislature, in the beginning, and consistently thereafter, gave specific directions as to the second class lands, which were unnecessary if the constitution covers the subject. That challenges attention to many points, practically connecting up from the beginning in 1856.

Therefore, under the rule that all reasonable doubts must be resolved in favor of the exercise of legislative authority, and that of practical construction as well, we incline to the

view and so decide that the term "school and university lands" in secs. 7 and 8, art. X, of the constitution relating to the creation and power of the commissioners of public lands, does not include lands in the nature of school lands which were derived from the swamp land grants; that, as to such lands, such commissioners have only such power as the legislature may see fit to delegate to them. Whether the better policy is not to have a divided administration in respect to the lands of the two classes, or those and the drainage lands, is a matter for legislative discretion. Conditions may at one time favor the latter policy and at another the policy which now exists. It is entirely within the province of the legislature to decide that matter.

The foregoing does not militate at all against the integrity of the provision of sec. 2, art. X, of the constitution that the "moneys arising from" the second class lands must be set apart with other moneys referred to in such section "as a separate fund to be called 'the school fund' " and that, in obedience to the spirit of the fundamental law, in legislative administration of such lands, the primary purpose should, and fundamentally must be, to produce money—using the legislative language in the act of 1856, to "be a constituted part of said school fund." That obviously renders nugatory any legislation purporting to authorize a diversion of the moneys arising from such lands to any other than the constitutional purpose, and likewise condemns any disposition or use of the land which does not have for a primary purpose the production of such money, though, doubtless, that leaves a wide field for legislative discretion in respect to withholding the lands from sale and improving the same by reforestation or afforestation which will be referred to again hereafter.

## IX.

If the conclusions already arrived at were different we would have to face the further question next to be settled.

Though the final outcome of the litigation, looking to the situation as it now appears, might render it unnecessary to even consider such question, since it is within the field covered by issues formed in response to the court's suggestion, and it appears now, as it did when such suggestion was made, to be of far-reaching public importance, and counsel for the litigants have submitted it for decision with helpful discussions and citations of authority, it does not seem best to pass it without at least pointing out its dangers and general limitations, even if a definite principle be not announced which will include the particular matter.    This is the question, though stated somewhat more broadly than in the basis for the formation of issues:

Is it competent for the legislature to burden the people with taxation to raise money to purchase land for a large forest reserve, the anticipated benefits of which will, necessarily, be postponed to some indefinite time in the distant future, and to likewise burden the people with the expense of cultivating such lands for public benefit?

The question relates, particularly, to the appropriation of $50,000 per year for a period of five years under the act of 1911 (sec. 1072—1, Stats.), the appropriation of $30,000 per year out of the general fund for the purpose of paying the salaries of the state forester and his assistants in carrying out the forest reserve plan, and the appropriation of $10,000 out of the general fund under sec. 172—37, Stats., to purchase tax-title lands for the forest reserve under secs. 1494—131, 1494—133.    Probably there are other statutes but these are the main ones and, though the system is yet in its infancy, they cover $90,000 per year.

It is contended that such appropriations and similar ones are not legitimate expenses of state government and so are not within the constitutional power to tax, and that the limitation upon the power to burden the people of the state by taxation for state expenses is the limit of the power to appropriate

money out of the state treasury, since the only legitimate source for replenishing the public fund is by some form of taxation upon the rule of uniformity and equality, subject to the power of classification within the rules on that subject.

It is strenuously urged that there is a tendency to drift away from the old position, keenly appreciated when the people met to originate a form of government and that we should desist if not retreat. True, the country was then new and the people were poor. There were vast fertile prairies interspersed with wooded hills and valleys, with its empire in the background, extending over more than half the state, covered with forests, the growth of centuries, with its innumerable springs and lakes from which came a multitude of rivulets, augmenting to great rivers in their courses to meet the main artery of the West. Internal improvements, one well recognized great necessity for future growth, in their wisdom, looking to the experience of the past, in the most comprehensive and exclusive sense, they left to local units and to private enterprise under sovereign regulation and encouragement. Civil government in the simplest American form was all they thought to establish.

So they entrenched, as the substructure of their creation, inherent human right, with an accompanying declaration of essentials of administration and an admonishment to recur thereto frequently for guidance, lest that hoped for blessings of their efforts to endure permanently might fail of realization. On that they builded as the first course, elective machinery and a legislature to make written law within a closely fenced about field; but including power to form municipal corporations for exclusive local affairs and other corporations of a semi-public and also private nature, necessary or convenient to the development of the state and the employment of its people; then an executive department with administrative assistants to carry out the will of the people under the restraints of self-imposed disabilities; then a judicial depart-

ment to test situations as they should arise by legal standards to determine what is law in fact and what is mere law in form, and to apply the former; that was overcrowned with a provision for a broad system of general education with every possible facility for its maintenance encouraged by the maximum of resources with the minimum of private burden.   Details were added of the ordinary kind, such as power of eminent domain, power to make additions to and repairs of the structure as needed, and adoption of existing unwritten law, subject to legislative change within fundamental restraints. They then vitalized the entirety by a plan for creating and circulating the necessary life blood for the particular state purposes in view, all on a basis of uniformity and equality and with well defined restrictions as to anticipating future resources, except in case of extraordinary occasions, to a small amount.   Estimated expense, year by year, to carry on the government according to the constitutional plan was the ruling thought.   It was provided:

*"The legislature shall provide an annual tax sufficient to defray the estimated expenses of the state for each year; and whenever the expenses of any year shall exceed the income the legislature shall provide for levying a tax for the ensuing year, sufficient, with other sources of income, to pay the deficiency as well as the estimated expenses of such ensuing year."*

Thus the constitution plainly contemplates legislative action to determine the sufficiency of income each year to cover the regular expenses until the next opportunity for such action, and for a legislative levy of a tax therefor and to make up any deficiency for the preceding year.   Nothing in that field was left to administrative officers, but merely to administer.   That is plain.

The supreme court of New York in *People ex rel. Hopkins v. Kings Co.* 52 N. Y. 556, treated a similar subject, at length, and with much emphasis.   As there indicated, the scheme of the constitution is to keep the subject of state appropriations

for expenses and state indebtedness, as close to the people and within the disabilities created by the people as possible. The dangers thus sought to be avoided and the necessity of adhering strictly to the constitutional plan in order to make it an efficient safeguard against such dangers, were pointed out. The idea of blanket appropriations to cover indefinite necessities, leaving it for administrative officers to determine the amount of the tax levy, was condemned as wholly foreign to the fundamental idea.

So much for the general features of our system. As said in another part of this opinion, we must look at it from the viewpoint of the framers of the constitution. It means what they intended to have it mean not what, as an original proposition, we would like to have it mean. That may be different because of the environment of its creators than the same system might mean under a wholly different environment. "A thing which is within the intention of the makers" of a law "is as much within" the law "as if it were within the letter." *U. S. v. Freeman,* 3 How. 556, 565; *State ex rel. McGrael v. Phelps,* 144 Wis. 1, 128 N. W. 1041.

Principles are expansible, but not subject to be added to or taken from by judicial administration or declaration to cope with particular exigencies. The work of so coping in the field of fundamental law is reserved to the people themselves, as said in *Rippe v. Becker,* 56 Minn. 100, 57 N. W. 331.

If the constitution contemplated public outlay other than in the governmental field covered by the various blocks so carefully carved out and fitted together in the fundamental structure, why the command for an *annual tax* sufficient to defray the *expenses of each year,* supplemented by an annual levy, if necessary to make up for the excess of expenses over income *for the preceding year?* Why was there no room left in the constitution for imposition of any tax for anything other than as indicated, expressly or inferentially, coupled with the most drastic provisions to prevent the creation of

state debts for any but emergency matters of an extraordinary nature?

Placing ourselves where the framers of the constitution were placed and the people who ratified it, was it intended to prohibit such extraordinary matters as the expenditure of a very large amount of money to create and cultivate a vast forest reserve, costing millions of dollars, for use of the people of the far distant future? That, in view of modern conceptions, ambitions, and paternalism, is a great subject. But it must be looked at, not from the high-up point supposed to have been now reached, but from the level of the plane where the people stood when they created this government. I am not entirely satisfied to say, and certainly the court is not, that the power reasonably exercised and free from the internal improvement feature, if that be possible, does not exist at all. It is sufficient for now to point out the gravity of the subject. I am permitted to do that. It may lead to the precise question never having to be decidedly answered with detail limitations, without a change in the fundamental law. An aroused sense of legislative responsibility to vindicate it, doubtless, will result in reasonable doubts being resolved in that field in its favor.

### Public purpose.

It is a maxim of the law that the power to appropriate is coextensive with the power to tax and so has fundamental and inherent limitations.

The first of such limitations is implied from the very nature of organized society. That exists for public purposes of a governmental character. The scope of such purposes, it must be conceded, except as expressly or by necessary implication fundamentally limited, is quite broad.

It follows that we need not, necessarily, depend on any fundamental limitations of the power to tax. There would be such if we had no constitution. Then, a tax could not

properly be levied to take property from one person and give it to another.

Public purpose and the character of the tax otherwise, would determine its legitimacy. A state-wide tax could only be levied for state-wide purposes and so on down to the smallest taxing district. In either case, the purpose would need to be public, in the sense of a matter of common or general interest to those upon whom the burden is laid. This court discussed that at much length in *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 88 N. W. 596, 90 N. W. 1067. We adopt, now, the logic of that case without extending this opinion for much rediscussion or quoting from opinions.

Other courts and text-writers in general lay down the rule as above indicated. 2 Dillon, Mun. Corp. (4th ed.) §§ 736, 737; Cooley, Const. Lim. (6th ed.) 608; *People ex rel. Detroit & H. R. Co. v. Salem,* 20 Mich. 452; *Loan Asso. v. Topeka,* 87 U. S. (20 Wall.) 655; *Northern Liberties v. St. John's Church,* 13 Pa. St. 104. In these citations, and many more which might be referred to, the principle will be found declared which has been incorporated into most elementary works. Where there is no public purpose, in the sense of carrying on some part of the machinery of government, there is no power to tax. As put by the federal supreme court in *Loan Asso. v. Topeka, supra,* an object which is not within the purposes for which governments are established, falls outside the limitation upon the right to take the property of the citizen, by way of taxation, for public use.

Another limitation on the power of taxation, from the very organic purpose of government, is this: At the point where reciprocal benefits end, the power of taxation also ends. The basic idea of exercise of the taxing power and justification for it, is that, it involves an exchange of equivalents. The taxing district obtains the contribution to the public treasury and the contributor, in return, receives a legal consideration of a pecuniary or protective nature to his person or his prop-

erty or both.    It is often difficult to appreciate just where the consideration comes in, but without it, in fact, the taking of one's property, though under the form of taxation, and, so, in form, by due process of law, would be confiscation,—an appropriation of private property for a nonpublic use, even though, in the particular case, the public might be interested in the enterprise promoted and be largely, incidentally, benefited.    *Warden v. Fond du Lac Co.* 14 Wis. 618; *Dalrymple v. Milwaukee,* 53 Wis. 178, 10 N. W. 141; *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 655, 108 N. W. 557; 1 Cooley, Taxation (3d ed.) 22–24.

We need not stop to bring the stated principles home to the particular situation.    Their application is obvious, but not so the conclusion.    But how to square them with the imposition of large public burdens upon the people of the present without any hope of return to them, in addition to the benefits they enjoy as their equivalent for ordinary taxation,—burdens imposed with the avowed purpose of accumulating benefits for generations yet unborn, is somewhat puzzling.

The mind naturally reaches out to grasp some sort of present equivalent moving to the taxpayer for the property taken from him, and, seemingly, closes upon a shadow.    There must be some present benefit.    It is not sufficient that the forced contribution will be a boon to some future generation.    The state has no right to take the property of individuals presently and afford them no possible return, merely because the storehouse, being filled, will be opened some time, depending upon Providence and the majority as to when, for the enrichment or comfort of the people then in being in which the taxpayer has no special interest which reasonably demands any such sacrifice.

There may lurk in the field of present protection to person or property or both, or, in what seems quite idealistic, a high moral duty to mankind, in general, without regard to place or time, the essential element of consideration, yet it must be

remembered that even the demands of charity, springing from dire distress in some foreign jurisdiction, or any outside of the particular taxing unit, are not a legitimate basis for taxation of property in the particular jurisdiction, because of the absence of reciprocal obligations and benefits, in a governmental sense. *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 575, 88 N. W. 596, 90 N. W. 1067. "There can be no legitimate taxation unless for the uses of the government" levying it. 2 Dillon, Mun. Corp. (4th ed.) § 736.

If it were true that there are no inherent rights, only privileges possessed by individual members of society, one might see the equivalent for which the sovereign could exact whatever toll might be thought best for the enjoyment of such privileges. But from the standpoint of our American system of government which is based on individual possession of rights high above any power to take away or destroy,—which rights include as one of the most important,—really the one upon which all others are dependable,—the right to possess, to dispose of, or to enjoy whatever one acquires legitimately, according to his own pleasure, subject to such lawful demands as may be made upon him as his share of the expenses of government as the equivalent for present protection of his person and his property,—there is a difficulty, though perhaps not an insurmountable one.

## The practice elsewhere.

We have been referred to statutes and practice in other states as having some bearing on the question of the legitimacy of using public revenue for forestry purposes, and will give some attention to that branch of the case.

We must say, at the start, that very little light can be shed on the question at issue by mere reference to foreign practices. At most, it can only throw light on whether there is such reasonable necessity for the particular activity to justify it, no fundamental limitation being in the way, under a

head in this opinion yet to be treated. But, if others have made mistakes of a basic nature it furnishes no excuse for us to follow in their footsteps. Judicial discussions of the matter under conditions similar to ours would doubtless be helpful; but there are none cited to our attention, or which we have been able to discover. The subject involves important principles of government, some written and some unwritten. That we have seen, and will perhaps more clearly see, by the subject yet to be treated.

The great difficulty seems to be that opinions of those who have fostered the forestry movement have not always been guided by the truth that, while, in a sense "the right to tax," except as fundamentally restrained, "is the right to destroy," that contemplates the right to tax for vitalizing the functions of government. Within that field, in a limited sense, the saying of Chief Justice JOHN MARSHALL is correct; but the right to destroy for governmental purposes does not mean the right to confiscate. What would be destruction for governmental purposes under ancient systems would be mere confiscation under ours. The right to tax under the former is absolute while under ours it is not, even in the absence of a written constitution.

There is much evidence that the principles suggested have not been clearly appreciated where this subject of forestry has been dealt with. That failure has resulted, I think, from too much inclination to look beyond the boundaries of our country for models. That has been in evidence from long before the time of any of us here. There has, seemingly, been want of appreciation of the limitations of the rule early established that the common law prevails here except so far as modified by statute or unadaptable to our system and conditions. That element of unadaptability under our conception of inherent rights in place of privileges by grace was hardly understood when the idea took root which obtained quite generally for a century after our American system was established, that there

is no natural right to inherit and none to participate in making a choice of agencies to vitalize civil government; both of which this court has seen fit to reject as heresies, viewed from the standpoint of our conception of such rights. *Black v. State,* 113 Wis. 205, 233, 89 N. W. 522; *Nunnemacher v. State,* 129 Wis. 190, 108 N. W. 627; *State ex rel. McGrael v. Phelps,* 144 Wis. 1, 13, 128 N. W. 1041.

It must be remembered that the foreign idea of government, as regards basic principles, is far different from ours. Theirs dignifies the sovereign as a personal personification of all power. In that personality is everything; the individual, nothing, except by grace, and so the logic of subordination of the individual to the supreme personality,—the "I," regarding the individual possessions as held by a privilege for any use the "I," through his ministers and agencies, may determine to be for the sovereign good.

In the formation of the first model of a constitution on our shores, all the logic of foreign systems was cast aside and a system took its place moulded by original creative power out of well known but unvitalized principles. The very opposite of the ancient idea was aptly thus expressed by the historian:

"As a sea is made up of drops, American society is composed of separate, free and constantly moving atoms, ever in reciprocal action, advancing, receding, crossing, struggling against each other and with each other; so that the institutions and laws of the country rise out of the masses of individual thoughts, which like the waters of the ocean, are rolling evermore."

The rule of individuality from the standpoint of the common level was in contrast with that of all dependable upon one only of significance. So the central idea was that the individual should not be disturbed in his person or his property and should not be the subject of public care except within very narrow lines essential to civil government.

Again, no very helpful light can be thrown on the subject

under discussion by referring to holdings in this country where there is no restriction by written constitution or under constitutions similar in letter to ours, but construed from a different standpoint and embodying the thought of the hour as to present and future.    It is our constitution, not that of any other state, we have to deal with.

"That is the great charter of our rights, to which the humblest may at all times appeal, and to which the highest *must* at all times submit. . . . Our conclusions must be guided . . . by the plain, simple, but authoritative and mandatory provisions of our own constitution.    We made it ourselves. . . . We must construe it and support it . . . according to its plain letter and meaning. . . . The people of other states made for themselves respectively, constitutions which are construed by their own appropriate functionaries.    Let them construe theirs—let us construe, and stand by ours."

Those words, by SMITH, J., in *Att'y Gen. ex rel. Bashford v. Barstow,* 4 Wis. 567, 757, are apt in any case where the spirit of our fundamental law is looked for in decisions elsewhere under other constitutions.

Of the numerous laws called to our attention to illustrate, it is thought that no one fully fits this case, so far as legislative judgment is concerned independently of constitutional restrictions.    The nearest approaches thereto are in Michigan and Minnesota, but there is no attempt in either state to create a large forest reserve, the income from it to be invested and reinvested for the continued enlargement and improvement of a vast forest area, ignoring the claim of trust funds, and the interests of the people in the immediate future in a return for their investment.    Outside of the two instances, there is no semblance, in the Middle West, at least, to a scheme such as we have here.

The restrained nature is strikingly illustrated by the statute of New Hampshire which we are cited to, under which the purchase of land is restricted to such as can be procured with money privately contributed.    Ch. 44, Laws of 1893.

The law in Maine, another to which we are referred, is based on a specific provision of the Maine constitution, held to expressly authorize 'the appropriation. *Opinions of the Justices,* 103 Me. 506, 69 Atl. 627. Moreover, it did not provide for any appropriation to buy land. There is no interference in Minnesota with land acquired from the United States or by donations other than for forest purposes. No lands are dealt with for such purposes except such as the state owns in its proprietary capacity or were donated for the particular use. The land-purchase feature is quite restrictive and does not appear to be a burden on the general fund, except perhaps a small amount for park purposes. The scheme, in the main, is conservative instead of constructive. In case of improvement of swamp lands the 'area is restricted to a few tracts at a time with duty, after a moderate period for the improvement, to sell the property and cover the proceeds into the fund to which the land belongs. The scheme does not appear to have had judicial approval; even in its moderate form; moreover the constitutional financial restrictions are not, as here, though it was formerly otherwise.

The situation in Pennsylvania is very much as in Minnesota with the added feature of there being no such prohibition as here against the state engaging in "works of internal improvement."

In New York there is a plain constitutional recognition of state forestry as a legitimate subject of state activity and expense.

. In Michigan the situation is about as in New York with this added significant circumstance that there is a prohibition against state work of internal improvement which in its original form was supposed to include reforestation activity. To render that legitimate the provision on that subject now excepts "reforestation and protection of lands owned by the state and expenditure of grants to the state of lands or other property." The forestry legislation is in harmony therewith.

There is no appropriation of lands to forestry purposes which were set aside by the fundamental law for other uses.

We might continue this review of public treatment of the matter elsewhere at great length. Suffice it to say, we are unable to find that any court has yet held that the legislature has power to do the thing under consideration,—burden the people with taxation to purchase and improve a vast domain for a permanent forest reserve, which does not contemplate any return on the investment to the state as a proprietor at any time, or to the people other than in the distant future. To acquire a vast domain by public taxation, to be held for permanent investment and reinvestment, and with the trust lands of the state, which were pledged by the constitution and by contract with the United States to other purposes,—is without precedent and without judicial sanction. According to the official reports, the domain contemplated here is a million acres, the reforestation of which, at the rate suggested, would cost around four million dollars and the entire investment five or six million dollars, more or less.

Another class of citations to which we are referred do not seem to fit the case. The nature thereof is well illustrated by the citation of the text, 26 Am. & Eng. Ency. of Law (2d ed.) 219, to the effect that, subject to constitutional restrictions and those inhering in a grant of lands, the legislature may exercise such power over them as it sees fit. No one can doubt that. The interferences here are just of that kind.

Numerous cases cited, mostly federal, to the effect that the government, as proprietor, may exercise its judgment as to what to do with its lands, have nothing to do with the point to be decided. True, the government of any state which has a proprietary interest in lands may, for a public purpose, expend money on them or sell them or not, at its pleasure; and so a city may appropriate money to buy land for a public park. All these matters are called to our attention to support the contention that the state may constitutionally do

what is called in question here.   It is not perceived that any of the premises we have mentioned or all of them together are conclusive or very persuasive that the state appropriations mentioned are legitimate, because they do not declare or illustrate a principle which clearly fits into our constitutional system, with its group of governmental functions and restrictive method of defraying the cost of executing the same.   Such a broad far-reaching scheme as reforestation and afforestation at public expense, should be plainly grounded on some one or more of such functions.

Mere declarations, found here and there, which do not discriminate between what may be done and what the authors of such declarations think ought to be done, affirming as to the latter, as if anything which from the viewpoint of the authors is a good thing in a· public sense, may be done at public expense, count for little.   If there be a legitimate basis for a forestry scheme within the scope of our constitution, it is our duty to use our best endeavors to discover it and to entrench it so as to locate it within the fundamental field of taxation to the end that there may not be any future doubt in respect thereto.   That being done, the legislature will, doubtless, exercise due care to conform thereto.

### Meaning of "expenses of the state."

We must keep in mind that the state tax burdens must rest on a public state-wide constitutional purpose (*State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 88 N. W. 596, 90 N. W. 1067; *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 91 N. W. 115; *State ex rel. Garrett v. Froehlich,* 118 Wis. 129, 94 N. W. 50), and that it must fall within the constitutional scope of the term "expenses of the state" as used in sec. 5, art. VIII, Const.

The power to raise money by state taxation was evidently intended by the framers of the constitution to be very closely fenced about.   We must apply to their language the usual

rule in such cases.  Any other would weaken the fundamental law to the point of breaking.  The power to tax is not retained by the people to be exercised by the legislature for all purposes not mentioned.  Not by any means.  Where the constitution deals with the matter, it deals exclusively.  That is the rule.  The language, in form, conferring the power to tax for a class of things "expenses of the state for each year," though in form in words of grant, is in fact a limitation. *Expressio unius exclusio alterius.*  That rule of construction is peculiarly adaptable to the clear reading of a state constitution, the provisions of which, properly framed, are mere declarations of principles of a general nature and usually in the mandatory or declaratory form.

If it were not for the light of the well known rule, many of such provisions, as has been said in the books, would be as meaningless as waste paper.  It must be presumed that our constitution was formulated with reference to that rule which had long been established and which the many able men who were members of the convention well understood.  One of the dominant purposes of the people in adopting their charter was to limit the power of the legislature to impose burdens in the form of taxation upon the inhabitants.  Excesses in that regard had brought many of the older states to the brink of financial ruin.  It was the great menace in that regard, which was the chief deterrent from starting out as a separate governmental organization.  The mischiefs created by unbridled taxation power were comparatively nil in the territories.  It was fear of an unfavorable change which led to the defeat of the first constitution more than all others.

Hence the great care in framing the chapter on finance.  It was intended thereby to tie the hands of the legislature as firmly as Prometheus was bound to the rock.  The chain was admirably conceived, link by link, the parts united together, and the whole anchored in place.  (a) Uniform rule of taxation; (b) Nonpayment of money from the public funds ex-

cept pursuant to a specific appropriation by the legislature for the particular purpose; (c) Disability to loan state credit or create any indebtedness or borrow any money except to a small amount, and that for emergency purposes; (d) No law to be passed by either house which imposes, extends, or renews· a tax or creates a debt or charge or makes any appropriation of public or trust moneys, or in any wise disposes of a state demand, except by yea and nay recorded vote with three quarters of all the members present in each house at the time of such house acting in the matter; (e) No evidence of debt to be issued except for the small amount of emergency borrowing; (f) No state connection with internal improvements. Could a more closely fenced in field be thought of, leaving nothing therein but ordinary and necessary matters of civil government? Then, to give life to the structure, in effect, there is the provision for taxation year by year in advance sufficient to defray *estimated expenses of the state and any deficiency for the preceding year.* If this ideal plan were always carried out in performance, there would be less complaint of the burdens of taxation, but experience shows that in this field as in others

> "The best laid schemes o' mice an' men
> Gang aft a-gley
> An' lea'e us naught but grief an' pain
> For promis'd joy."

The foregoing brings the subject of state appropriations for the particular purpose down to such a narrow, yet such a vital point that it may well be treated under a head by itself.

## X.

Does the term "state expenses" include such as the appropriations to create a permanent forest reserve, the proceeds thereof to be invested and reinvested in perpetuity? The entire scheme of the act in question is thus embodied, though perhaps the perpetuity feature might be omitted without difference in result.

We cannot point to anything in the constitution which makes the particular matter expressly "state expense." We cannot point to anything there which in spirit makes it such, unless it is the inherent police power.

The police power is the broadest in scope of any field of governmental authority. It is inherent in the very nature of organic society. We do not look into the fundamental law to find it or to define it, but only for limitation upon it. It is as limitless as man's aspirations and conception of human welfare and its exercise is likewise limitless, where not fundamentally restrained. It has many such restraints, both express and implied. Internal improvement activity falls within the general field, but lies dormant in the shade of the constitutional prohibition. *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 91 N. W. 115; *Rippe v. Becker,* 56 Minn. 100, 57 N. W. 331. The actual and supposed beneficial influence upon individual and community life which might be derived from vitalizing the conceptions of sociological thinkers and would-be experimentalists, is no excuse for an assault upon, or overturning at any point, the fundamental law.

If what was last said were better appreciated, much less mischief would be attempted and much less succeed, at least temporarily. Exercise of the police power is impliedly limited by the very spirit and purpose of the constitution to conservation of "life, liberty and the pursuit of happiness" and of all other inherent rights, "to secure which governments are instituted among men, deriving their just powers from the consent of the governed." Therefore, excessive exercise which impairs' instead of promotes those rights, is deemed unreasonable, abusive of legislative discretion; and, so, unconstitutional. *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 90 N. W. 1098; *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 521, 107 N. W. 500; *State v. Redmon,* 134 Wis. 89, 114 N. W. 137; *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885. Perhaps no heresy which obtained

lodgment to some extent in the jurisdictions of this country was more pernicious than that which once was proclaimed by some text-writers and courts, that the police power is free from constitutional restraints. Such a doctrine if adopted would render the constitution largely like the poet's characterization of life, a thing "full of sound and fury, signifying nothing." On the other hand, no heresy which was once advocated and received distinguished approval, has been more emphatically repudiated than the one that the police power is a free authority, and by no court has it been rejected with greater emphasis than by our own. The phrasing of the matter in *State ex rel. Milwaukee Med. Coll. v. Chittenden, supra,* has come to be regarded as somewhat standard here and elsewhere by text-writers:

"Legislation referring to police authority for legitimacy, like any other exercise of the lawmaking power, must bear the test of constitutional limitations, which will be found upon all sides. On the one side it may meet the barrier of an express prohibition; on another the implied prohibition of any law not in harmony with the all-prevailing purposes of the constitution; on another the implied inhibition involved in the declaration that 'the blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles' (sec. 22, art. I, Const.), and at last the limitation of reasonableness springing from the whole constitutional scheme."

So it by no means answers the proposition now under discussion, favorably to plaintiff to concede that the particular appropriations are within the field of police power. The most serious question would then arise of whether they are within the constitutional exercise of such power. The great scope of it is such that no one would appreciatingly venture to say what it does not include, in the general sense, of the countless things which have to do with human welfare. The words of Judge COOLEY in the course of his very learned treatment

of "Public Purpose," *People ex rel. Detroit & H. R. Co. v. Salem,* 20 Mich. 452—one of the classics on the subject,—are none too strong:

"It reaches to every person, to every kind of business, to every species of property within the commonwealth. The conduct of every individual and the use of all property and of all rights is regulated by it, to any extent found necessary for the preservation of the public order, and also for the protection of the private rights of one individual against encroachments by others."

He might well have rounded out the picture by saying, and the conservation of any other of the rights of man in his individual and communal state.

Manifestly from what has been said the police power, while the most powerful instrumentality for good when properly exercised, is the most powerful for oppression when not so exercised. History is illumined with its accomplishments and is distressingly clouded by its activities as well. That was appreciated by the wise men who designed the general outlines of our American system of constitutions and their greatest study was how to secure the maximum of its benefits with a minimum of its dangers. Exercise of it, unbridled by the safe barrier of reasonableness, all things considered, and attempted conservation of human rights might run mad at the peril of such oppressive taxation demands upon the people as would vindicate the maxim that "the power to tax is the power to destroy," and might subvert the very purpose of civil government, leaving those sacred rights we cherish so much no longer existent in fact; only surviving in theory and memory. In its possibilities, whether the form of government be based on theory of individual rights or of mere privileges—lurks the menace of socialistic, autocratic, bureaucratic, and paternalistic despotism. Though in its nature paternalistic and beneficent and, when exercised within the field of reason, capable of inestimably promoting the general good, the suggested dan-

gers of excessive exercise were so well appreciated when our
system was created that the people set up for themselves defi-
nite standards of disability and a judiciary on the watch
tower clothed with the power and the duty to save the good by
the constitutional test and condemn the bad, always resolving
all reasonable doubts in favor of legislative wisdom.

The court approaches its most onerous and delicate task in
the field suggested when called upon to decide whether a
fundamental restraint has been overstepped because of abuse
of discretion. Not abuse in the sense of any intended viola-
tion; nothing of the kind is harbored in thought; but abuse
in the legal sense. Between the to some extent reasonable
and necessary and so conservative of rights, and the unreason-
able beyond any fair doubt, and so tending to impair or de-
stroy rights, there is a very wide field of definiteness, bordered
by a very large margin of more or less uncertain ground, the
within being supremely under control of legislative judgment
until the reasonably uncertain border land shall have been
passed. Then the court cannot escape the conclusion that the
paramount law condemns. *State v. Redmon,* 134 Wis. 89,
114 N. W. 137; *Marbury v. Madison,* 1 Cranch, 137.

Now we have arrived at the very vitals of the question un-
der discussion. Where reasonably necessary the conservation
of forests and conservative reproduction of them has been,
time out of mind, one of the well recognized ways of promot-
ing the public welfare. History is replete with examples of
it, literature affords much that is interesting and instructive
in reference to it, and the beneficence of it is evident where
there is need for it to the commonest understanding. So ac-
tivity in that regard is manifestly within the field of police
power. Whether a particular enterprise, ostensibly or in fact,
to promote public welfare is a legitimate subject for exercise
of such power, unless barred by constitutional limitations, is
wholly a judicial question. The idea that everything is with-
in the police power which promotes public welfare or which

the legislature may say is within it was born of the idea that such power is without fundamental limitations and passed out of sight with the death of that heresy. The court must say the word as to subject, whenever properly interrogated in respect thereto. As early as *Marbury v. Madison,* 1 Cranch, 137, that was declared by Chief Justice MARSHALL, speaking for the federal supreme court. It has been most emphatically since, there and here and elsewhere, affirmed. If a statute, although ostensibly passed to promote the common good or in good faith, but through mistake, enacted for that purpose "is a palpable invasion of rights secured by the fundamental law, it is the duty of the court to so adjudge and thereby give effect to the constitution." *Mugler v. Kansas,* 123 U. S. 661, 8 Sup. Ct. 273.

It must be understood that, whether a particular subject concerns the public welfare is not the sole test of whether it is a proper one to be dealt with under the police power. That question being answered favorably to the exercise, then the inquiry is presented, Do the interests of the public generally or reasonably call for the interference? That being also answered favorably and the field of legitimacy of purpose will have been passed and that of appropriateness and reasonableness of means will have been reached. The legislature furnishes such means. What is appropriate and what is not, what is unduly oppressive and what is not, is within its discretion to determine within a wide range; but the means must be reasonably adapted to the particular end and must not be so burdensome as regards private rights as to outweigh any reasonably probable benefit from the interference. *Lawton v. Steele,* 152 U. S. 133, 14 Sup. Ct. 499; *State v. Redmon,* 134 Wis. 89, 114 N. W. 137; *Ex parte Jentzsch,* 112 Cal. 468, 472, 44 Pac. 803; *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885.

The court in the federal case put special emphasis on the idea that not everything is within the police power which pro-

motes public welfare, and spoke words of caution as to the dangerous tendency of giving legislation the cast of legitimacy by the character of the label and of approving because of the mere fact that in some degree the enactment might be said to promote public welfare. Such a course tends to a multitude of interferences practically destructive of private rights.

The rule as stated by the text-writers has been approved here and elsewhere. So the subject must be legitimate, within the limitations stated. That being for the court to determine, then the means must be reasonably adaptable to deal with the subject and not prohibited. Those all satisfied for this case we are then at the threshold of the subject of the means to render the activity practicable within the constitutional meaning of the term "expenses of the state."

Now what would be reasonable in any particular field would depend upon circumstances. What would not be such in the early days of the commonwealth when everything was in a primitive state, burdens of taxation to care for the real necessities of civil government were all that could be borne, the state was wealthy in its forests, lakes, and rivers beyond comprehensible danger of diminution,—any danger in that regard so remote as not to be appreciated or seen at all and the paramount thought of all being agriculture, manufacturing, and development in a way which meant destruction upon the one hand for conservation upon the other, might not be such now, if conducted with some degree of moderation, but that, of course, would exclude the doing of anything expressly prohibited by the fundamental law.

From the foregoing it will be appreciated that reforestation activity, in an old and thickly settled country where necessity, in the near future, for increase of fuel supply and for storing and equalizing the flow of natural waters is apparent, would be quite reasonable, the degree of activity and weight of public burden being in some rational degree proportionate

to the exigencies of the case. In a country, more than half its territory unseated lands, in the whole sparsely settled and with no congestion probable for a long term of years, wood fuel in abundance within reasonable reach in that portion of the country which could be thus served more economically than with other fuel; little or no economy in prospect in the use of local timber supply for building purposes, and the natural conditions as to natural surface water supply quite ideal,—to conserve and increase forest products at public expense solely for the benefit of the people of the future, and under such conditions that the benefits would in the remote time be as likely to go to those outside the taxing jurisdiction as to those within it, would seem to be, at best, a great stretch of the police power.

The foregoing, without discussion, or application, definitely, to the particular situation, suggests that, while reforestation and afforestation is within the scope of police power and, to that extent as well as for the conservation of trust lands, such work is a legitimate subject of state expense, within the meaning of the constitution,—there are limitations which should be observed in a country like ours. There are the inherent restraints upon the exercise of the police power and the express limitations of the constitution besides. It does not seem difficult to conclude that there might be such excessive use of public money as to transcend the broadest reasonable scope of the police power, both as to legitimateness of purpose and appropriateness of means, and there might be activity of such nature as to invade the field of works of internal improvement.

The precise legitimate scope of forestry industry, it is not our province to here suggest. It would be impossible to do that so as to mark any definite unmovable line. The scope may contract or expand with material changes of conditions. The best that can be done is to state general principles and apply them, by process of inclusion and exclusion, to the par-

ticular situation we have to deal with and leave the rest to legislative wisdom, with assurance of there being no danger of the result being judicially disturbed so long as it does not, convincingly, appear to exceed, beyond a reasonable doubt, the field of legislative discretion. Such general principles, perhaps, have been sufficiently stated. They have been in some respects applied to such situation, but to clear up any uncertainties which might arise in the mind of any one having occasion to study the discussion here, it may be well to restate and add to, with particular reference to our statutory scheme.

Of course, the fundamental limitations of legislative authority as regards diverting lands impressed with an exclusive educational trust, or the moneys, arising from lands fundamentally dedicated to such a trust, to independent forestry or to any other purpose, or diverting lands of the swamp grant class so that moneys arising therefrom, not used for the primary purpose of such grant, will not inure to the secondary trust under the state constitution or invade the constitutional authority of the commissioners of public lands over "school lands proper" cannot lawfully be overstepped. Any activity beyond those barriers is outside of legislative discretion.

Whatever is reasonably required to care for the trust land of any character, as regards fire hazard or trespassing or realizing on annual forest crops, naturally produced thereon and to utilize the dead, down, dying, and mature timber for the benefit of the fund for which the lands are held, may doubtless be done and at general public expense, if the legislature so wills, and referable either to the police power or the governmental function for which the lands are held. Neither police nor any other power would justify use of public money and, so, the taxing power, in the purchase of land for forest or any other purpose and administration thereof so as to prejudice the proper handling of the trust lands, either by lessening the proceeds which might otherwise be derived there-

from, or income thereon, or confusing the proceeds, or the income thereof, belonging to one fund with those belonging to another.

Probably conservation of the trust lands under the police power for the particular purposes of the trusts, might include judicious purchasing of adjacent lands to protect the former and increase the proceeds therefrom in the end; the investment to remain a part of the trust where the ultimate benefit is to be state wide, as in case of lands held for educational purposes, or returned to the general fund in case of a sale, as the legislature might determine, and in case of the lands being subject to a trust for a local use, as for example drainage, the investment returned to the general fund in the event of a sale. Under the particular power, doubtless, there is a wide field of legitimate activity as to policing to prevent and protect against fire loss in the wooded portions of the state, or loss from fires originating on unoccupied lands, or liable to spread with dangerous consequences to other lands.

Probably, too, under the police power, expense may be incurred to properly care for the quite large amount of lands granted to the state for forestry purposes, and they may be added to at state expense for the primary purpose of utilizing the particular lands and making them valuable in an educational way and for the public purposes of the grants. The primary purpose would not be to create a forest reserve either as a temporary or a permanent feature of the state and, so, violate the inhibition against engaging in "works of internal improvement;" but would be for the public purpose of realizing upon the granted property for the purposes of the grant. That would seem to be well within the field of public welfare and not contrary to any fundamental limitation. The cost then would be legitimate "state expense" within the meaning of the constitution. The legitimacy of that would not be militated against because of the incidental effect being to create a permanent forest reserve, if such were the result, and if

caution were taken to keep the primary purpose of the public investment within reasonable bounds and conservative of the donated property for the educational and other purposes of the grant.

The primary purpose in making purchases to block up with lands presently held should be conservation of the particular class of lands and the administration should be on that plan, in order not to run any risk of violating express or implied fundamental limitations and bring the expense within the meaning of "state expense" in case of there being no provision for returning the outlay, reasonably, to the general fund.

Thus it is logically considered that, restrained as before indicated, the forestry work, in general, mentioned in secs. 1494—41 to 1494—62, inclusive, with incidental appropriations out of the state treasury to pay for the same as state expenses, if the legislature so wills, is legitimate. There must be excepted, lumbering operations, sales of timber or other products of the trust lands other than for enhancement of the school or other appropriate fund according to the class of land yielding the same, expenditures for the purpose of making the lands, as such, of permanent use to the state in the general sense. While the trust lands may be leased or used otherwise than offered for sale they cannot be tied up permanently for the benefit of forestry or at all except for the primary purpose of producing the results contemplated by the constitution. For that they may be withheld from sale, in legislative discretion. That discretion may favor one way of handling the land at one time and a different way at another. The language of the law in terms that they may be handled with reference to a permanent benefit, in the general sense, as if held in a proprietary capacity goes too far but does not hurt because not binding. The proceeds of or moneys arising from the land cannot be used otherwise than as the constitution provides nor the lands used otherwise than with a view of acquiring such proceeds or moneys.

The prime difficulty discovered in this case is the disregard of the constitutional dedication of "the proceeds of" and "moneys arising from" the trust lands which has been in progress since the law of 1897, causing almost inextricable confusion of "school lands proper" with second class school lands, drainage lands, lands purchased from the proceeds of, or moneys derived from, such land, and other classes of lands and further confusion of such proceeds and moneys and moneys arising from the purchased lands. That confusion must have been intensified by the practice of swapping land and other activities, all the operations involving, with the receipts from lands since the forest diversion took place, a million dollars, more or less, to say nothing about interest.

The confusion spoken of will require a most careful accounting to determine the legal and equitable status of the claims of the trust funds upon the general fund, and the relations between the school fund and the drainage fund, and of both with the forestry fund, and a judicial confirmation as a closing administrative matter in executing the judgment in this case.

Now whether, in the light of the foregoing, there is any reasonable call for the large appropriations characterizing the particular scheme,—a significant part being the $50,000 per year depended upon to pay out the land-contract claims,—in view of the present development of the state, need not be decided, because the supposed condition under which the legislature created the plan and which the forester, as we see, has advised carrying out to an extent which would absorb several millions of dollars, would doubtless not have been thought of, had it not been supposed that the domain belonging to the trust fund purposes could be laid hold of as a foundation for the permanent forestry investment. It is easily seen that it would require a very large investment to purchase all the lands required to realize the ambitious plan. The estimated amount of lands, in the whole, according to the report of the forester,

would be around a million acres.   All was designed to be treated in a proprietary way by making improvements of various kinds and carrying on business with the improvement of water powers in prospect.   The entire investment contemplated, including withdrawal of all the trust lands so as to make them a permanent feature of the state for its general purposes as suggested in sub. 2, sec. 1494—43, and withhold them from private ownership and from present use for the ordinary public functions of the state government,—would be $3,000,000, more or less, a large part of which must belong to the educational funds of the state; but permanently diverted therefrom contrary to the most emphatic dedication thereof by the people in the beginning.

As clearly seen, the sacred trust lands were the basis upon which the whole structure we have considered was builded. After the practice for several years without question, under the supposed law of 1897, which in fact did not exist, except for a brief period, of treating the lands which had been for more than thirty years in charge of the constitutional commissioners under the fundamental law, as free lands which the legislature could do with as they saw fit, that it came to pass, by 1903 and 1905, that the true character thereof was lost sight of or ignored, is not to be wondered at.   There were several changes of officers during the period mentioned, both as to commissioners of public lands and officers who were supposed to give special attention to the school fund for the benefit of which the state held the trust lands; but just how it came about that none of these guardians came to its rescue until the present commissioner raised the protest which resulted in this litigation, it is not our business to inquire, though in the public interest which is now so within our judicial authority to conserve, we may properly mention the seeming omission as one of the things which gave rise to the false conception in the light of which the legislature created the scheme for a permanent forest reserve with the trust land as

the substructure and the constitutional guardians of the "school lands proper" and who had theretofore been intrusted with the care of the other state lands relegated to a very inconsequential position. In the new light as to the trust lands, and the situation which must necessarily considerably restrict the forestry activity and scheme, the legislature will doubtless recast the plan in respect to the matter and carefully eliminate from the statutes all illegalities and such excesses as there may be in the light of this decision.

## XI.

It is perhaps rightly thought that sec. 1092$m$, Stats. (ch. 740, Laws of 1913), is so involved in the forestry scheme of which the primary matter of this litigation is a part, that it should be considered with the other details of the entirety.

We will do that, because it seems that, necessarily, such litigation, as broadened, takes in all the details of the forestry scheme to the end that a single decree may settle the entirety.

Is the statute referred to constitutional? It provides for:

1. Filing by the state forester each year with the tax commission of a list of all forest reserve lands in certain counties and portions thereof.

2. Assessment of such lands for taxation by the tax commission.

3. Placing of such lands on the local tax rolls for local taxation; the tax burden to be limited to one and one-quarter of one per cent. upon the assessed valuation.

4. Payment of the tax out of the general fund of the state.

5. Reassessment under sec. 1087—45, Stats. Also appeal from the equalization by the county board under secs. 1077$a$ to 1077$l$, Stats.; the assessor of incomes of any county where any of the forest reserve lands are situated to possess the right to institute proceedings for reassessment by the tax commis-

sion of all taxable property in any town where any forest reserve lands are situated and institute proceedings for a review of the relative value of the taxable property of the taxing districts where said lands are situated.

That certainly is quite a novel piece of legislation. It seems to be fatally infirm in treating the lands as proprietary property. It will be observed that the state consents to the taxation on that theory. Had it been appreciated that the state's title was of a trust character, the legislature would probably not have so provided. It is not perceived by what right the state can deplete the general fund for the purpose of paying local taxes on its trust lands. State revenue can only be used for state purposes of a governmental nature, as we have before seen.

Again, if the trust lands may be made subject to local taxation, why does not the act violate the constitutional provision that the rule of taxation shall be uniform? Sec. 1, art. VIII. Under this act, the trust lands in certain counties and portions of counties are made subject to local taxation, while the same kinds of lands elsewhere are not.

Again, why does not the act violate the constitutional plan of local self-government, in that the original assessment of the property for taxation is required to be made by the state tax commission instead of by the local assessors, and the whole scheme ignores the right of local control and the law requiring uniformity of rule of taxation? That applies, so that, while the doctrine of classification is recognized the rule of taxation within each class must be uniform. If the trust lands are to be taxed at all, all the lands of that character must be taxed. All church property may be exempted from taxation; but to subject such property to taxation as to some church organizations or in some counties and exempt like property otherwise would be clearly unconstitutional. That would be not unlike taxing some of the trust lands because they are in the for-

est reserve and leaving the others not so burdened, thus affording towns in which lands of the first class may be situated a special advantage.

Again, it is not perceived why this taxing statute does not violate sec. 31, art. IV, of the constitution prohibiting special legislation for the assessment or collection of taxes. The act is special in every respect. It applies to but part of a class of land. It provides for assessing such part in a special way and for a particular class of tax burdens. It provides for taxation within a specified limitation as to amount. In the whole, it is difficult to conceive of anything which could be added to the enactment to emphasize its character as a piece of legislation of special nature for the assessment and collection of taxes. The constitutional provision reaches the whole subject of taxation and every part of it. *Kimball v. Rosendale,* 42 Wis. 407; *Chicago & N. W. R. Co. v. Forest Co.* 95 Wis. 80, 70 N. W. 77; *State ex rel. Merrimac v. Hazelwood,* 158 Wis. 405, 149 N. W. 141.

The various infractions of the fundamental law are so clear that it seems unnecessary to cite authority in respect thereto. The enactment seems to have been framed to meet an emergency supposed to be very pressing. The supposed exigency seems to have overshadowed entirely the fundamental law, preventing devotion to the proposition of the real official discretion and judgment which should be applied to such matters. The remedy suggested was accepted. An act in relation to a subject so closely fenced about by fundamental law as that of taxation should be scrutinized by legislators with the greatest possible care, and reasonable doubts as to its validity should be resolved in favor of the constitution. To enact proposed legislation without such care and in case of doubt as to constitutionality pass it regardless thereof, with the thought that it may never be judicially questioned and, if it shall be, the point of view will be reversed and the act sustained, unless found to be manifestly unconstitutional, is to greatly minimize and in some features abrogate fundamental law.

## XII.

Are secs. 1494—132, 1494—133, and 1494—134 constitutional? They are part of the whole which is involved in this litigation. They provide:

(a) No county which is wholly or partly north of town 33 shall take a tax deed except upon condition of filing with the commissioners of public lands a list of the deeded lands, the date of the deed, record thereof, and amount of the county investment in such lands.

(b) A county which shall have taken a tax deed 'in such territory shall not sell the land for one year, except to the state, unless duly notified that it does not desire to acquire the same.

(c) The commissioners of public lands may take such of said lands for the state as they may desire to so take within the year period and, at not to exceed the cost to the county, the purchase price to be paid out of the general fund.

(d) As to lands so taken a former owner is accorded the benefit of the statutes as to regaining the property by judicial remedies except as to recovering costs in case of being the prevailing party.

The special nature of such provisions is plain. Under the general system of county government, the taking of tax deeds by counties on matured tax-sale certificates owned by it, is obligatory. The deeded land, in any such case, becomes county property as absolutely as in case of a tax deed to a private person. Until the county chooses to sell the land, not exceeding two years, it remains subject to taxation, in which case the county must pay the local and state taxes and take the certificate on the sale as an additional claim against the land. It cannot be sold except by order of the county board and at such price as it may determine. It may be more or less than the county investment. The county may demand the full value thereof the same as a private owner might. In that way it has competency to make up on excess sales what it loses on others. Secs. 1193 and 1194. The whole is an important part of the system for the collection of taxes by counties for their benefit

and that of local taxing districts and the state as well. The enactment seems to pretty clearly violate the fundamental requirement for uniformity of town and county government. There can be "but one system of town and county government, which shall be as nearly uniform as practicable." Sec. 23, art. IV, Const.

In general, as indicated, counties may handle their tax lands in their discretion, subject to the limitation as to taxing. To take away that right in the particular counties—remove the lands, practically, at once, upon a tax deed being taken by the county, from its taxing resources and those of the towns as well and appropriate the same at the cost to the county of the particular lands, regardless of the real value, and the actual cost as well, in the general sense, specializes to a high degree to the prejudice of such counties and taxing districts. The scheme violates the prohibition of special legislation for the assessment and collection of taxes.

Land once acquired by a county, is, as to the state, private property. The latter has no interest in it whatever. Therefore, for the state to appropriate it in the adversary way designed, violates the prohibition against taking private property for public use without rendering just compensation therefor. That applies in case of the state taking property which a county owns in its proprietary capacity, the same as in case of its taking property from any other person.

The feature affording a former owner less advantages as to regaining his property than owners, in general, violates the fundamental rules of equality.

We have now covered all questions suggested in the case. We need not add a recapitulation of conclusions. They appear sufficiently in the opinion to render a résumé, other than what will be embodied in the order and judgment, unnecessary. That will be subject to an accounting to be had and the approved result embodied therein in due time. The judgment must respond to the situation that the whole case, as to

pleaded facts on the part of the defendant, is admitted, rendering opportunity to plead over not needed.    Because of the broad character of the issues, framed under suggestions of the court, the submission and desire for all involved to be set at rest, the closing must be correspondingly broad, taking much the cast of a decree in equity, as in *Will of Rice,* 150 Wis. 401, 136 N. W. 956, 137 N. W. 778; *State ex rel. Att'y Gen. v. N. P. R. Co.* 157 Wis. 73, 147 N. W. 219.

On account of the unwarranted confusion of different classes of trust fund lands with lands purchased by proceeds of trust fund lands and other moneys, including money drawn from the general fund, and income from trust funds, and other confusions, all must be regarded as having the cast of trust fund lands and money so far as necessary to the full restoration of such trust fund lands and property, and identification of the amount belonging to each fund as of the date of ch. 367, Laws of 1897, and further back if found practicable.

*By the Court.*—It is considered, ordered, decreed, and adjudged that:

*First.* The demurrer to defendant's pleading be and is overruled.

*Second.* The land contract mentioned in the petition is void for reasons indicated in the opinion, particularly because:

a. It created a state debt and created such when state indebtedness exceeded the constitutional limit.

b. It is an evidence of indebtedness within the state constitutional prohibition.

c. The contract was not authorized by statute.

d. By sec. 10, art. VIII, Const., at the date of the contract, it is fatally within the "works of internal improvement" feature of the forestry statutes (though they are in important features, as indicated in the opinion, not so tainted) and the addition, in form, to such section in November, 1910, failed for reasons stated in the opinion.

e. It is an inseparable part of the forestry legislation and particularly of the invalid features thereof stated in the opinion.

*Third.* The forestry legislation, including sec. 1072—1, Stats., ch. 367, Laws of 1897, ch. 450, Laws of 1903, and ch. 264, Laws of 1905, and such other acts as there may be, did not repeal or affect secs. 250 and 251, Stats. 1898, for reasons cited in the opinion. Such sections are part of the written law of the state and govern the matters therein referred to.

*Fourth.* All lands derived by the state from the United States under the swamp land grants, the lands in lieu of swamp lands, set aside for educational purposes under ch. 537, Laws of 1865, and confirmed by ch. 151, Laws of 1869, and subsequent practice, and all other lands so derived or in lieu of swamp lands and required to be set apart under the terms of said secs. 250 and 251, by sec. 2, art. X, of the constitution and the legislative action referred to became, and so far as not disposed of are, school fund lands as regards the manner of handling the same, subject to the constitutional duty to conserve the same for the purpose of producing money for the school fund, as indicated in the opinion; but under the control of the legislature in respect to the manner of dealing therewith for such purpose.

*Fifth.* The sections of the statutes composing ch. 740, Laws of 1913, and those composing ch. 491, Laws of 1907, are unconstitutional for the reasons stated in the opinion.

*Sixth.* The provisions of the forestry legislation, other than the features mentioned, are valid within limitations stated in the opinion.

*Seventh.* The state has an equitable lien on the lands included in the illegal contract for the money paid thereon, and such money, equitably, is declared to have been trust money, whereby such lien inures to the benefit of the trust fund property.

*Eighth.* For the benefit of the trust funds, the balance due on the contract shall be paid out of trust fund money when practicable and to provide therefor all moneys to the credit of the forestry fund derived from sales of land, or from appropriations to buy lands, or in the tax-title fund referable to secs. 1494—131 to 1494—135 inclusive, Stats. 1913, are declared to equitably belong to the drainage and constitutional trust funds. Because of the diversion of such funds to forestry purposes and to the general fund, and the resulting confusion, the whole is declared to have the character of the more important funds which have wrongfully lost their identity, and such equitable status shall subsist so far as necessary to fully remedy the diversion and confusion.

*Ninth.* The newly acquired lands under the forestry law, except those donated to the state for forestry purposes, have the cast of the constitutional trust fund lands and will be administered accordingly until, upon a full accounting, it shall be found what part, if any, will remain after fully restoring the integrity of the trust fund lands and trust funds.

*Tenth.* The facts being admitted, the alternative writ of *mandamus* is dismissed, but the cause retained for the purpose of final disposition upon the coming in of the report of the referees hereafter appointed.

*Eleventh.* There shall be an accounting which is hereby ordered of all dealings with the trust fund lands of the date of ch. 367, Laws of 1897, and so long prior thereto as practicable, not earlier than the decision under ch. 537, Laws of 1865,—and of lands acquired under the forestry legislation since 1897, except those donated to the state for forestry purposes or acquired by proceeds of the latter, and an accounting of all proceeds of such trust lands and income thereof and income which such proceeds would have earned had the same been devoted to the trust to which they belonged, such accounting to include all moneys paid into the forestry fund or

general fund, derived from trust fund lands or lands purchased therewith and income from such proceeds, and a partition shall be made of the entire property so found equitably and legally to belong to the constitutional trusts, including any indebtedness from the general fund; giving due credit for all proper disbursements chargeable to such trust funds,—so that each of the constitutional trusts will have its equitable and legal portion of the trust fund property with identity established as to lands and other assets, as near as may be, after the manner of the decision under ch. 537, Laws of 1865. Such accounting shall include all matters not specifically mentioned so far as necessary to cover the field discussed in the opinion and carry out the intent thereof guided by such opinion, and the referees shall report the result of the accounting to the court with all convenient speed.

For the purposes of the accounting the cause is referred to the Commissioners of Public Lands and Judge Samuel D. Hastings as special referee.

The holders of land contracts like the particular one shall be bound by the decision herein subject to the right of any vendor or assignee of such vendor to show cause why to the contrary within twenty days after service of a copy of this order on such vendor or assignee and notice to show such cause within such time or be so bound, and such notice in writing shall be given, so far as practicable, within twenty days after the entry hereof and proof be filed as part of the records of this case.

Administrative orders will be accorded, if necessary, for further guidance in the course of the accounting, to the end that this determination may be fully carried out according to the intent thereof.

Upon the coming in and confirmation of the report of the referees judgment shall be rendered in respect to the matters covered thereby in accordance with such confirmation.

The following opinion was filed February 24, 1915:

Winslow, C. J. (*concurring*). I concur in the judgment pronounced in this case, but not in some of the propositions of the opinion. At the outset I may properly say that the justices who participated in the decision of this case realized from the beginning its great importance to the state and to the people at large, as well as the great desirability that a result be reached which should speak with the authority of unanimity. The efforts to reach that result have been earnest and continuous on the part of all since the day of final submission. Necessarily there have been concessions made by all. I am not withdrawing any of them now. I had hoped that the opinion of the court would be so phrased that I should be able to let the case pass without further writing, but, as it stands, I feel compelled in justice to myself to state certain respects in which I differ radically from the lines of reasoning in the opinion, while not disagreeing with the judgment itself.

I agree without discussion to the propositions (1) that the constitutional amendment was not passed because not agreed to by the Assembly at the second session; (2) that the contract in question is void because the debt limit of the state had already been exceeded by borrowing from the trust funds of the state; (3) that the school funds of the state should be made good so far as possible by an accounting and the enforcement of a lien in favor of such trust funds on the lands included in the contract in question and the other contracts similar thereto; (4) that the division of the swamp lands made under the act of 1865, by which certain of them were set apart for normal school purposes and the balance for drainage purposes, fixed upon the lands set apart for school purposes a trust to the extent that "all moneys arising" from them must become part of the school funds under sec. 2 of art. X of the constitution; (5) that such lands, however, did not become "school"

158     SUPREME COURT OF WISCONSIN.     [Feb.

State ex rel. Owen v. Donald, 160 Wis. 21.

or "university" lands within the meaning of sec. 7 of said art. X, and hence were not placed by the constitution under the exclusive control of the commissioners of school and university lands; (6) that said lands remain within the control of the legislature, which may sell them or withdraw them from sale as seems at any time best for the purposes of the trust, always provided that the moneys arising from them, whether resulting from sale of the land or sale of the timber thereon, go into the school funds of the state; (7) that these trust lands may be reforested after approved methods and conserved from fire and additional lands necessary to make reasonably complete forest areas purchased with trust funds, which lands will then become part of the trust fund lands, and that timber may be sold therefrom subject only to the proviso that the "moneys arising" be turned into the school fund. With considerable doubt I also yield assent to the holding that ch. 491 of the Laws of 1907 and ch. 740 of the Laws of 1913, referring to the acquisition by the state of tax titles held by counties, and the taxation of forest reserve lands, are invalid. My mind is not clear enough on this subject to justify me in disagreeing with the unanimous convictions of my brethren.

My difficulty with the opinion, stated in a general way, is this: it so limits and circumscribes the powers of the state with regard to afforestation and reforestation that it leaves little more than a shell behind. At least this is the way the opinion impresses me and the way I think it will be generally understood.

There are three general propositions which I think should be stated in this case clearly and fully, without hedging them about with limitations, qualifications, and provisos which render them practically useless, and those propositions are as follows:

*First,* the acquisition, preservation, and scientific care of forests and forest areas by the state, as well as the sale of timber therefrom for gain in accordance with the well understood can-

ons of forest culture, is pre-eminently a public purpose. It would be a mere affectation of learning to dwell upon the value to a state of great forest areas. That has been established long since and is not open to question. The lamentable results which have followed the cutting of forests over large areas, the serious effects of such cutting upon climate, rainfall, preservation of the soil from erosion, regularity of river flow, and other highly important things which go to make up the welfare of the state, are matters of history. They need not be descanted upon.

*Second,* being a public purpose of the first rank in importance, there can be no question of the power of the state to levy taxes for the accomplishment of the purpose. The power of taxation exists for every public purpose unless some constitutional prohibition, either federal or state, has taken it away. I find no such prohibition. I confess my inability to understand the reasoning which finds it in that clause of the constitution which commands the legislature to levy an annual tax to defray the estimated expenses of the state. The power of taxation is one of the necessary attributes of sovereignty. To say that because the constitution makers thought best to make a specific provision that taxes should be levied for certain purposes they intended thereby to interdict taxation for all other public purposes is to my mind unthinkable. Besides, if afforestation and reforestation be public purposes, then the moneys spent in carrying them on are necessarily and properly expenses of the state and come within the constitutional command. The expenses of a state include the moneys which it spends in carrying out the public purposes which the legislative judgment directs to be carried out.

*Third,* afforestation and reforestation of large areas are not "works of internal improvement" within the meaning of the constitution. In stating the proposition I accept the definition given in the case of *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 91 N. W. 115. It was there said that the term in-

cludes "those things which ordinarily might in human experience be expected to be undertaken for profit or benefit to the property interests of private promoters, as distinguished from those other things which primarily and preponderantly merely facilitate the essential functions of government." In the same opinion it was said, in substance, that this classification does not exclude the possibility that some of the dominant characteristics of one class may be present but, of course, not dominantly in illustrations of the other class.

Now I affirm that it is not to be expected in the light of human experience in this land at least, that the establishment and conservation of great forest areas for the public good should be undertaken by private enterprise, and I also affirm my belief, as previously stated, that such work is pre-eminently a public work, and hence one of the essential functions of government. It has not been recognized as such until recently perhaps, but that is merely because the conditions which make it such have only recently arisen and become acute. So in my judgment every act which is necessary to be done in successfully carrying on afforestation and reforestation, including the purchasing of the necessary lands, may properly be done by the state. My original opinion was that this might properly include the erection of sawmills and the manufacture of lumber out of the timber which under the rules of scientific forestry ought to be cut, but I yielded my opinion on this point, and I stand by the concession. I do think, however, that it covers every necessary and proper act up to and including the sale to third persons of standing timber which ought to be cut.

I have not desired to argue out these propositions, but only to state them.